FILED

VIRGINIA:
IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

2013 SEP 18  P 3: 07

⎯ ⎯ ⎯ DISTRICT COURT
⎯ ⎯ CHMOND, VIRGINIA

PALAXAR GROUP, LLC;                          )
   a Virginia Limited Liability Company      )
PALAXAR HOLDINGS, LLC;                       )
   a Virginia Limited Liability Company      )
                                             )
             Plaintiffs,              )
-v.-                                         )
                                             )
SHANE WILLIAMS                               )
Please Serve:  SHANE WILLIAMS                )
1562 Hanks Avenue                            )
Orlando, FL 32814-6704                       )
                                             )
JAY STOLLENWERK                              )
Please Serve:  JAY STOLLENWERK               )
5009 Pelleport Avenue                        )
Belle Isle, FL 32812-1124                    )
                                             )
JODI DONALDSON JAIMAN                        )
Please Serve:  JODI DONALDSON JAIMAN         )
533 Tuten Trail                              )
Orlando, FL 32828-8364                       )
                                             )
HARRISON T. SLAUGHTER, JR.                   )
Please Serve:  HARRISON T. SLAUGHTER, JR.    )
126 E Jefferson Street                       )
Orlando, Florida 328011830                   )
                                             )
MICHAEL C. MAHER                             )
Please Serve:  MICHAEL C. MAHER              )
631 W Morse Boulevard, #200                  )
Winter Park, Florida 32789-3730              )
                                             )
SCOTT M. GOLDBERG                            )
Please Serve: SCOTT M. GOLDBERG              )
7773 Sugar Bend Drive                        )
Orlando, FL 32819-7278                       )
                                             )
MATTHEW SCOTT MOKWA,                         )
Please Serve:  MATTHEW SCOTT MOKWA           )
631 W Morse Boulevard, #200                  )
Winter Park, Florida 32789-3730              )
                                             )
AARON CARTER BATES                           )
Please Serve:  AARON CARTER BATES            )
6159 Metrowest Boulevard, #103               )

Civil Action No: _3:13CV641_
**TRIAL BY JURY IS DEMANDED**

Orlando, FL 32835                                          )
                                                           )
ALLEN McLEAN ESTES                                         )
Please Serve:  ALLEN McLEAN ESTES                          )
1901 Sixth Avenue North #1500                              )
Birmingham, AL 35203-4642                                  )
                                                           )
JOHN RUSSELL CAMPBELL                                      )
Please Serve:  JOHN RUSSELL CAMPBELL                       )
1901 Sixth Avenue North, #1500                             )
Birmingham, AL 35203-4642                                  )
                                                           )
ERIC LANGLEY                                               )
Please Serve:  ERIC LANGLEY                                )
1901 Sixth Avenue North #1500                              )
Birmingham, AL 35203-4642                                  )
                                                           )
LINDSAY REESE                                              )
Please Serve:  LINDSAY REESE                               )
100 Adris Place                                            )
Dothan, AL 36303                                           )
                                                           )
SCOTT SHUKER                                               )
Please Serve:  SCOTT SHUKER                                )
111 N Magnolia Avenue, #1400                               )
Orlando, Florida 32801-2367                                )
                                                           )
ELIZABETH GREEN                                            )
Please Serve:  ELIZABETH GREEN                             )
200 South Orange Avenue #2300                              )
Orlando, FL 32801-3432                                     )
                                                           )
ROY KOBERT                                                 )
Please Serve:  ROY KOBERT                                  )
390 N Orange Avenue, #1400                                 )
Orlando, Florida 32801-1640                                )
                                                           )
TODD NORMAN                                                )
Please Serve:  TODD NORMAN                                 )
390 N Orange Avenue, #1400                                 )
Orlando, Florida 32801-1640                                )
                                                           )
NICOLETTE VILMOS                                           )
Please Serve:  NICOLETTE VILMOS                            )
390 N Orange Avenue, #1400                                 )
Orlando, Florida 32801-1640                                )
                                                           )
ROBERT O'MALLEY                                            )
Please Serve:  ROBERT O'MALLEY                             )
819 Glen Arden Way                                         )
Altamonte Springs, Florida 32701                           )

|  |  |
|---|---|
| ROBERT W. CUTHILL, Jr.<br>Please Serve:  ROBERT W. CUTHILL, Jr.<br>1820 Taylor Avenue<br>Winter Park, FL 32789-2767 | ) ) ) ) ) ) ) |
| BALCH & BINGHAM, LLP.<br>Please Serve:  Alan T. Rogers, Managing Partner<br>1901 6th Avenue North,  #1500<br>Birmingham, AL 35203 | ) ) ) ) ) |
| BROAD AND CASSEL, P.A.<br>Please Serve:  C. David Brown, II<br>390 N Orange Avenue, #1400<br>Orlando, Florida 32801-1640 | ) ) ) ) ) |
| LATHAM, SHUKER, EDEN & BEAUDINE,<br>LLP<br>Please Serve:  Peter G. Latham<br>111 N Magnolia Avenue, #1400<br>Orlando, Florida 32801-2367 | ) ) ) ) ) ) |
| THE MAHER LAW FIRM, PA<br>Please Serve:  Michael C. Maher<br>631 W Morse Boulevard, #200<br>Winter Park, Florida 32789-3730 | ) ) ) ) ) |
| NEXIA STRATEGY CORPORATION<br>Please Serve: Scott Park,<br>Assistant United States Attorney<br>400 W. Washington Street Suite 3100<br>Orlando, Fl. 32801 | ) ) ) ) ) ) |
| AQMI STRATEGY CORPORATION<br>Please Serve: Scott Park,<br>Assistant United States Attorney<br>400 W. Washington Street Suite 3100<br>Orlando, Fl. 32801 | ) ) ) ) ) ) |
|                          Defendants. | ) ) |

## COMPLAINT

COME NOW the Plaintiffs,   Palaxar Group, LLC., and Palaxar Holdings, LLC, (hereinafter

collectively "PALAXAR") by counsel, and hereby file this Complaint against Defendants Nexia Strategy

Corporation, (hereinafter "NEXIA"), AQMI Strategy Corporation (hereinafter "AQMI") Harrison

Slaughter (hereinafter "SLAUGHTER"), Michael Maher (hereinafter "MAHER"), Allen McLean Estes

(hereinafter "ESTES"), John Russell Campbell (hereinafter "CAMPBELL"), Lindsey Reese (hereinafter "REESE"), Eric Langley (hereinafter "LANGLEY"), Todd Norman (hereinafter "NORMAN"), Nicolette Vilmos (hereinafter "VILMOS"), Roy Kobert (hereinafter "KOBERT"), Aaron Carter Bates (hereinafter "BATES"), Matthew Scott Mokwa (hereinafter "MOKWA"), Scott Marshall Goldberg (hereinafter "GOLDBERG"), Elizabeth Green (hereinafter "GREEN"), Scott Shuker (hereinafter "SHUKER"), (hereinafter SLAUGHTER, MAHER, CAMPBELL, REESE, LANGLEY, NORMAN, VILMOS, KOBERT, BATES, MOKWA, and GOLDBERG hereinafter collectively "COUNSEL"), Jodi Donaldson Jaiman (hereinafter "JAIMAN"), Jay Stollenwerk (hereinafter "STOLLENWERK"), Shane Williams (hereinafter "WILLIAMS"), Robert W. Cuthill, Jr. (hereinafter "CUTHILL"), (JAIMAN, STOLLENWERK, WILLIAMS, and CUTHILL hereinafter collectively "PARTICIPANTS") (Robert O'Malley (hereinafter "O'MALLEY" or "PUBLICIST"), Balch & Bingham, LLP, (hereinafter "BALCH") Latham, Shuker, Eden & Beaudine, LLP, (hereinafter "LATHAM SHUKER") The Maher Law Firm, PA., (hereinafter "MAHER FIRM") and Broad and Cassel, PA., (hereinafter "BROAD") (BALCH, LATHAM SHUKER, MAHER FIRM And BROAD hereinafter collectively "LAW FIRMS") (AQMI, NEXIA, COUNSEL, LAW FIRMS, PARTICIPANTS and PUBLICIST together hereinafter collectively the "CONSPIRATORS") for the relief as set forth below, and in support thereof state:

## PARTIES

1.       Plaintiffs PALAXAR are limited liability companies organized in 2006 as an anti-fraud investigation and consulting organization in the Commonwealth of Virginia (hereinafter "Virginia") with a principal place of business in Henrico County, Virginia.  PALAXAR owns the exclusive rights to the now patented anti-fraud methodology (all times relevant to this matter, it was patent-pending), primarily used to detect insider threats such as corporate fraud and government espionage (hereinafter "PALAXAR PROCESSES").  Beginning in 2006, PALAXAR, operating from its place of business in Virginia, was researching, refining and improving upon the PALAXAR PROCESSES, negotiating contracts with various entities for the marketing, use, and/or sale of the PALAXAR PROCESSES including but not limited to the United States Government, Intelligence Community, Department of Homeland Security,

Virginia, Internal Revenue Service (hereinafter "IRS") and was pursuing via confidential teaming agreements (hereinafter "TEAMING AGREEMENTS") global efforts with large data aggregators including Acxiom, Experian and ChoicePoint. PALAXAR demonstrated that had the PALAXAR PROCESSES been available during the time notorious US spies such as Robert Hanssen and Aldridge Ames were active, Hanssen and Ames would have been detected within months as opposed to decades. On October 12, 2007, without any prior contact, negotiation or inquiry of PALAXAR, certain of the CONSPIRATORS, as defined herein below,  maliciously filed a knowingly false and baseless, both in fact and law, complaint against PALAXAR, seeking injunctive relief and publicly accusing PALAXAR and its members of Conversion, Misappropriation, Self-Dealing, Breach of Fiduciary Duties, Breach of Employment Contracts, Conspiracy to Convert Assets, Breach of Contract, and Unjust Enrichment (hereinafter "PALAXAR LITIGATION").  Prior to and concurrent with the PALAXAR LITIGATION, certain of the CONSPIRATORS launched a successful and well-organized, knowingly false and defamatory media smear campaign, funded by millions in stolen and laundered money as set forth herein. The direct and proximate cause of the damages to PALAXAR was due to the planned, organized and concerted actions of the CONSPIRATORS, rendering PALAXAR's rightful title and use of the PALAXAR PROCESSES completely unmarketable during the pendency of the PALAXAR LITIGATION, with ongoing damages.  As a further direct and proximate cause of the concerted actions of the Defendants, PALAXAR lost the ability to participate in, including, without limitation, the United States' security clearance process reform efforts, resulting in millions of dollars of damages to PALAXAR.   The PALAXAR LITIGATION was not based on fact or law, and was maliciously maintained for 34 months; and despite two amended complaints, was unable to succeed under any circumstances as set forth herein.  The PALAXAR LITIGATION was part of a much larger conspiracy plan Exhibit 1 (hereinafter the "PLAN" as defined herein); the Honorable Judge Gregory A. Presnell, United States District Court, Middle District of Florida in related PLAN litigation, Exhibit 2 declared :

"I think this is a stick-up."

2.      Defendant SLAUGHTER is a member of the Florida Bar, and was criminal counsel and

concurrently civil co-counsel Exhibit 3 with Defendant MAHER for Frank Amodeo (hereinafter "Amodeo"). A disbarred, convicted felon, declared mentally incompetent until he was properly medicated with anti-psychotic and mood stabilizing agents in August 2008, Amodeo faced indictment, due to his actions taken individually and through several of the companies he used to orchestrate his fraud (hereinafter "CONTROLLED COMPANIES") for what was to become at that time, the largest payroll tax fraud in US history. At all times relevant herein, SLAUGHTER occupied a central strategic, access, planning, and litigation role with the CONSPIRATORS. SLAUGHTER, concurrent with his criminal representation of Amodeo, planned, coordinated, communicated, and participated in this PLAN to earn and did earn fees from the PALAXAR LITIGATION and/or other activities of the PLAN.

3.      Defendant MAHER is a member of the Florida Bar and beginning no later than April 2007 was concurrently civil co-counsel with Defendant SLAUGHTER, for Amodeo individually, several CONTROLLED COMPANIES, including, without limitation, Mirabilis Ventures, Inc. (hereinafter "MVI"), and AQMI. At all times relevant herein, MAHER occupied a critical planning, insurance strategy and litigation role with the CONSPIRATORS. MAHER joined and participated in this PLAN to earn and did earn fees from the PALAXAR LITIGATION and/or other activities of the PLAN.

4.      Defendant MAHER FIRM is a law firm registered to do business in Florida with offices in Winter Park, Florida. MAHER FIRM through its staff and/or employees, including Defendants MAHER, BATES, and MOKWA; represented Amodeo personally, and several of the CONTROLLED COMPANIES since no later than 2007. MAHER FIRM transacts business and supplies services in Virginia including the active and regular solicitation of business in Virginia through their website, and; representation of clients whose residences, offices and/or corporate headquarters are located in Virginia. At all times material hereto, MAHER was a partner and BATES and MOKWA were employees and/or staff of MAHER FIRM and their acts, representations, and omissions alleged herein were made within the course and scope of that employment. As a result, MAHER FIRM is liable for all acts, representations, and omissions made by MAHER, BATES and MOKWA in connections with the representation of AQMI, MVI, its related companies and its subsidiaries, including NEXIA, during the term of MAHER,

BATES and MOKWA'S association, partnership, and/or employment with MAHER. At all times relevant herein, MAHER FIRM occupied a critical planning, insurance strategy and litigation role with the CONSPIRATORS. MAHER FIRM joined and participated in this PLAN to earn and did earn fees from the PALAXAR LITIGATION and/or other activities of the PLAN

5.      Defendant NEXIA, a wholly owned subsidiary of MVI, was defunct at the filing of the PALAXAR LITIGATION. NEXIA was subsequently forfeited to the United States as part of Amodeo's guilty plea.   AQMI and NEXIA, by and through COUNSEL, LAW FIRMS, PARTICIPANTS and PUBLICIST, planned, instigated, published and prosecuted improperly without a good faith basis in fact or law, the PALAXAR LITIGATION causing injuries and damages to PALAXAR as more fully set forth below. Through 2006, NEXIA was transacting business in Virginia, including employing personnel, leasing office space in Virginia, and soliciting and receiving economic incentives of over $4,200,000 Exhibit 4 from Virginia to allow NEXIA to expand its Virginia business.

6.      Defendant AQMI, the secured creditor of MVI and NEXIA, seized control of all MVI and NEXIA assets in May 2007, and was subsequently forfeited to the United States as part of Amodeo's plea agreement. Exhibit 5 AQMI and NEXIA by and through COUNSEL, LAW FIRMS, PARTICIPANTS and PUBLICIST, planned, instigated, published, prosecuted improperly, and prolonged without a good faith basis in fact or law, the PALAXAR LITIGATION causing injuries and damages to PALAXAR as more fully set forth below.

7.      Defendant JAIMAN, an individual was concurrently an executive officer, board member, signatory on bank accounts, and/or staff for including, without limitation, NEXIA, MVI, AQMI and several of the CONTROLLED COMPANIES.     JAIMAN retained counsel, Williams Mullen, P.C., on behalf of certain CONTROLLED COMPANIES and engaged in litigation in the County of Henrico, Virginia, Exhibit 6 making appearances and submitting documents therein. At all times relevant herein, JAIMAN occupied a central role with the CONTROLLED COMPANIES, filing false and misleading affidavits, and paying monies to the CONSPIRATORS herein from the CONTROLLED COMPANIES which were subsequently, in whole or part, seized by the Government as laundered funds.   JAIMAN

joined and participated in this PLAN to earn and did earn fees from the PALAXAR LITIGATION and/or other activities of the PLAN

8.      Defendant WILLIAMS, an individual was concurrently an officer, board member, and/or staff for including, without limitation, NEXIA, MVI, AQMI and several of the CONTROLLED COMPANIES. At all times relevant herein, WILLIAMS occupied a central role with the CONTROLLED COMPANIES and directed actions and communications concerning the PALAXAR LITIGATION and related matters in furtherance of the PLAN as more fully set forth herein. WILLIAMS joined and participated in this PLAN to earn and did earn fees from PALAXAR LITIGATION and/or other activities of the PLAN.

9.      Defendant STOLLENWERK an individual was concurrently an employee, officer, board member, signatory on bank accounts, and/or staff for several of the CONTROLLED COMPANIES. STOLLENWERK was responsible for the QuickBooks Accounting system for MVI, NEXIA and AQMI, and other CONTROLLED COMPANIES. At all times relevant herein, STOLLENWERK occupied a central role with the CONTROLLED COMPANIES and paid monies to the CONSPIRATORS herein from the CONTROLLED COMPANIES which was subsequently, in whole or part, seized by the Government as laundered funds. STOLLENWORK joined and participated in this PLAN to earn and did earn fees from the PALAXAR LITIGATION and/or other activities of the PLAN.

10.     Defendant BATES is a member of the Florida Bar, was in-house counsel for certain CONTROLLED COMPANIES including AQMI, MVI and NEXIA, then on or about June 2007 began representing multiple CONTROLLED COMPANIES Exhibit 3 as outside counsel, including, without limitation, MVI, AQMI and NEXIA while also concurrently representing Amodeo individually. BATES, together with SLAUGHTER and MAHER, originated and coordinated the PLAN. BATES began to work as an employee and/or staff of, and is currently employed by, the MAHER FIRM; he appeared as an attorney in Virginia Courts as a part of and to further the PLAN. BATES appeared *pro hac vice* in the Circuit Court for the County of Henrico, Virginia wherein he represented certain CONTROLLED COMPANIES including but not limited to the communication with and direction of local counsel as well as making appearances in Court, all in furtherance of the PLAN. At all times relevant herein, BATES

occupied a critical role assisting the CONTROLLED COMPANIES, hosting, planning, coordinating, communicating and acting in furtherance of the PLAN.   BATES joined and participated in this PLAN to earn and did earn fees from the PALAXAR LITIGATION and/or other activities of the PLAN.

11.     Defendant MOKWA is a member of the Texas and Florida Bar; was in-house counsel for certain CONTROLLED COMPANIES, including, without limitation, MVI, Common Paymaster Corporation and AEM, then on or about June 2007 began representing multiple CONTROLLED COMPANIES as outside counsel, Exhibit 3 including, without limitation, MVI, AQMI and NEXIA while concurrently representing Amodeo individually.   MOKWA began to work as employee and/or staff of, and is currently employed by, the MAHER FIRM.   At all times relevant herein, MOKWA occupied a critical role assisting the CONTROLLED COMPANIES, hosting, planning, coordinating, communicating and acting in furtherance of the PLAN.   MOKWA joined and participated in this PLAN to earn and did earn fees from the PALAXAR LITIGATION and/or other activities of the PLAN.

12.     Defendant GOLDBERG is a member of the Florida Bar; was in-house counsel for certain of CONTROLLED COMPANIES including, without limitation, MVI, AQMI, NEXIA, and then on or about June 2007 began representing multiple CONTROLLED COMPANIES Exhibit 3 as outside counsel, including, without limitation, MVI, AQMI and NEXIA while concurrently representing Amodeo individually.   As in-house counsel, concurrently for MVI, NEXIA and AQMI, GOLDBERG drafted the Assignment Agreements by and between MVI, NEXIA and all four (4) MVI/NEXIA employee inventors of the PALAXAR PROCESSES.   At all times relevant herein, GOLDBERG occupied a critical role assisting the CONTROLLED COMPANIES, planning, coordinating, communicating and acting in furtherance of the PLAN.   GOLDBERG joined and participated in this PLAN to earn and did earn fees from the PALAXAR LITIGATION and/or other activities of the PLAN.

13.     Defendant BALCH is a law firm registered to do business in Alabama with offices in Alabama, Georgia, Mississippi, Florida, and Washington, D.C.   Since no later than 2006, Exhibit 3 BALCH represented, through its staff and employees, including but not limited to Defendants ESTES, CAMPBELL, LANGLEY, REESE, various CONTROLLED COMPANIES, including, without

limitation, NEXIA, MVI, AQMI, and Amodeo individually. BALCH transacts business in Virginia including representation of clients in Virginia Courts and representation of clients whose residences, offices and/or corporate headquarters are located in Virginia. BALCH supplies services, including legal, lobbying and related services, in Virginia. At all times relevant herein, BALCH occupied a critical role assisting the CONTROLLED COMPANIES, planning, coordinating, communicating and acting in furtherance of the PLAN. BALCH joined and participated in this PLAN to earn and did earn fees from the PALAXAR LITIGATION and/or other activities of the PLAN.

14.     Defendant ESTES, a member of the Alabama Bar concurrently represented several of the CONTROLLED COMPANIES, Exhibit 3 including, without limitation, MVI – both pre- and post-bankruptcy petition, AQMI, NEXIA, and Amodeo individually. ESTES also represented debtor MVI as litigation counsel. At all times material hereto, ESTES was an employee of BALCH and his acts, representations, and omissions alleged herein were made within the course and scope of that employment. As a result, BALCH is liable for all acts, representations, and omissions made by ESTES in connections with its representation of representation of the CONTROLLED COMPANIES, AQMI, MVI, its related companies and its subsidiaries, including NEXIA, during the term of ESTES' partnership and/or employment with BALCH. At all times relevant herein, ESTES occupied a critical role assisting the CONTROLLED COMPANIES, planning, coordinating, communicating and acting in furtherance of the PLAN. ESTES joined and participated in this PLAN to earn and did earn fees from the PALAXAR LITIGATION and/or other activities of the PLAN.

15.     Defendant CAMPBELL, a member of the Alabama and Florida Bar concurrently represented several of the Exhibit 3 CONTROLLED COMPANIES, including, without limitation, MVI – both pre and post-bankruptcy petition, AQMI, NEXIA, and Amodeo individually. At all times material hereto, CAMPBELL was an employee and staff of BALCH and his acts, representations, and omissions alleged herein were made within the course and scope of that employment. As a result, BALCH is liable for all acts, representations, and omissions made by CAMPBELL in connections with its representation of representation of the CONTROLLED COMPANIES, AQMI, MVI, its related companies and its

subsidiaries, including NEXIA, during the term of CAMPBELL'S partnership and/or employment with BALCH. At all times relevant herein, CAMPBELL occupied a critical role assisting the CONTROLLED COMPANIES, planning, coordinating, communicating and acting in furtherance of the PLAN. CAMPBELL joined and participated in this PLAN to earn and did earn fees from the PALAXAR LITIGATION and/or other activities of the PLAN.

16.    Defendant LANGLEY, a member of the Alabama Bar concurrently represented several of the CONTROLLED COMPANIES, Exhibit 3 including, without limitation, MVI − both pre and post-bankruptcy petition, and NEXIA, and Amodeo individually.  At all times material hereto, LANGLEY was an employee and staff of BALCH and his acts, representations, and omissions alleged herein were made within the course and scope of that employment.  As a result, BALCH is liable for all acts, representations, and omissions made by LANGLEY in connection with its representation of the CONTROLLED COMPANIES, AQMI, MVI, its related companies and its subsidiaries, including NEXIA, during the term of LANGLEY's partnership, and/or employment with BALCH. At all times relevant herein, LANGLEY occupied a critical role assisting the CONTROLLED COMPANIES, planning, coordinating, communicating and acting in furtherance of the PLAN.  LANGLEY joined and participated in this PLAN to earn and did earn fees from the PALAXAR LITIGATION and/or other activities of the PLAN.

17.    Defendant REESE is a member of the Alabama Bar and concurrently represented several of the CONTROLLED COMPANIES, Exhibit 3 including, without limitation, MVI − both pre and post-bankruptcy petition, and NEXIA, and Amodeo individually.  At all times material hereto, LANGLEY was an employee and staff of BALCH and her acts, representations, and omissions alleged herein were made within the course and scope of that employment.  As a result, BALCH is liable for all acts, representations, and omissions made by REESE in connections with its representation of the CONTROLLED COMPANIES, MVI, its related companies and its subsidiaries, including NEXIA, during the term of REESE's partnership and/or employment with BALCH. At all times relevant herein, REESE occupied a critical role assisting the CONTROLLED COMPANIES, planning, coordinating,

communicating and acting in furtherance of the PLAN.   REESE joined and participated in this PLAN to earn and did earn fees from the PALAXAR LITIGATION and/or other activities of the PLAN.

18.     Defendant LATHAM SHUKER is a law firm registered to do business in Florida with offices in Florida. Since no later than August, 2007, Exhibit 3 LATHAM SHUKER through its staff and employees including but not limited to Defendants SHUKER and GREEN, represented various CONTROLLED COMPANIES, including, without limitation,. AQMI, MVI, NEXIA, AEM, HOTH HOLDINGS, LLC., and Amodeo individually. LATHAM SHUKER through its staff and employees, SHUKER and GREEN, represented Defendant CUTHILL personally as well as his business interests since no later than 2000. LATHAM SHUKER transacts business and supplies services in Virginia including the representation of clients in Virginia Courts and representation of clients whose residences, offices and/or corporate headquarters are located in Virginia. At all times relevant herein, LATHAM SHUKER occupied a critical role assisting the CONTROLLED COMPANIES, planning, coordinating, communicating and acting in furtherance of the PLAN.   LATHAM SHUKER joined and participated in this PLAN to earn and did earn fees from the PALAXAR LITIGATION and/or other activities of the PLAN.

19.     Defendant GREEN, a member of the Florida Bar concurrently represented various CONTROLLED COMPANIES Exhibit 3 including, without limitation, AQMI, MVI – pre and post-bankruptcy petition, including MVI subsidiary, NEXIA. At all times material hereto, GREEN was an employee of LATHAM SHUKER and her acts, representations, and omissions alleged herein were made within the course and scope of that employment. As a result, LATHAM SHUKER is liable for all acts, representations, and omissions made by GREEN in connection with its representation of the CONTROLLED COMPANIES, AQMI, MVI, its related companies and its subsidiaries, including NEXIA, during the term of GREEN's partnership and/or employment with LATHAM SHUKER. At all times relevant herein, GREEN occupied a critical role assisting the CONTROLLED COMPANIES, planning, coordinating, communicating and acting in furtherance of the PLAN.   GREEN joined and participated in this PLAN to earn and did earn fees from the PALAXAR LITIGATION and/or other activities of the PLAN.

20.     Defendant SHUKER is a member of the Florida Bar and represents debtors MVI, et al., from approximately September 22, 2009 through present.  Since 2000, SHUKER has been CUTHILL's personal attorney as well as representing CUTHILL in more than 140 bankruptcy-related proceedings wherein CUTHILL was either a Trustee or Liquidating President. Exhibit 7. At all times material hereto, SHUKER was an employee and of LATHAM SHUKER and his acts, representations, and omissions alleged herein were made within the course and scope of that employment.  As a result, LATHAM SHUKER is liable for all acts, representations, and omissions made by SHUKER in connection with its representation of the CONTROLLED COMPANIES, MVI, its related companies and its subsidiaries, including NEXIA, during the term of SHUKER's partnership and/or employment with LATHAM SHUKER. At all times relevant herein, SHUKER occupied a critical role assisting the CONTROLLED COMPANIES, planning, coordinating, communicating and acting in furtherance of the PLAN. SHUKER joined and participated in this PLAN to earn and did earn fees from the PALAXAR LITIGATION and/or other activities of the PLAN.

21.     Defendant BROAD is a law firm registered to do business in Florida with offices throughout Florida. Since no later than 2007, BROAD through its staff and employees, including but not limited to Defendants KOBERT, NORMAN and VILMOS, represented several of the CONTROLLED COMPANIES including, without limitation, AQMI, MVI, its related companies and its subsidiaries, including NEXIA, and since no later than 2006, represents Defendant CUTHILL personally.  BROAD transacts business and supplies legal services in Virginia including the representation of clients in Virginia Courts and representation of clients whose residences, offices and/or corporate headquarters are located in Virginia.  At all times relevant herein, BROAD occupied a critical role assisting the CONTROLLED COMPANIES, planning, coordinating, communicating and acting in furtherance of the PLAN.   BROAD joined and participated in this PLAN to earn and did earn fees from the PALAXAR LITIGATION and/or other activities of the PLAN.

22.     Defendant NORMAN is a member of the Florida Bar and from October 6, 2009 - present represents debtor MVI, et al., and represented NEXIA in the PALAXAR LITIGATION.  At all times

material hereto, NORMAN was an employee of BROAD and his acts, representations, and omissions alleged herein were made within the course and scope of that employment. As a result BROAD is liable for all acts, representations, and omissions made by NORMAN in connections with its representation of the CONTROLLED COMPANIES, MVI, its related companies and its subsidiaries, including NEXIA, during the term of NORMAN's partnership and/or employment with BROAD. At all times relevant herein, NORMAN occupied a critical role assisting the CONTROLLED COMPANIES, planning, coordinating, communicating and acting in furtherance of the PLAN. NORMAN joined and participated in this PLAN to earn and did earn fees from the PALAXAR LITIGATION and/or other activities of the PLAN.

23.     Defendant KOBERT, a member of the Florida Bar, represented debtor MVI from October 6, 2009 through present; and represented NEXIA in the PALAXAR LITIGATION; and from no later than May 2008, represented Defendant CUTHILL individually. At all times material hereto, KOBERT was an employee of BROAD and his acts, representations, and omissions alleged herein were made within the course and scope of that employment. As a result BROAD is liable for all acts, representations, and omissions made by KOBERT in connections with its representation of the CONTROLLED COMPANIES, MVI, its related companies and its subsidiaries, including NEXIA, during the term of KOBERT's partnership and/or employment with BROAD. At all times relevant herein, KOBERT occupied a critical role assisting the CONTROLLED COMPANIES, planning, coordinating, communicating and acting in furtherance of the PLAN. KOBERT joined and participated in this PLAN to earn and did earn fees from the PALAXAR LITIGATION and/or other activities of the PLAN.

24.     Defendant VILMOS, a member of the Florida Bar and from October 6, 2009 through the present represented debtor MVI, et al., and represented NEXIA in the PALAXAR LITIGATION. At all times material hereto, VILMOS was an employee of BROAD and her acts, representations, and omissions alleged herein were made within the course and scope of that employment. As a result BROAD is liable for all acts, representations, and omissions made by VILMOS in connection with its representation of the CONTROLLED COMPANIES, MVI, its related companies and its subsidiaries, including NEXIA,

during the term of VILMOS's partnership and/or employment with BROAD. At all times relevant herein, VILMOS occupied a critical role assisting the CONTROLLED COMPANIES, planning, coordinating, communicating and acting in furtherance of the PLAN. VILMOS joined and participated in this PLAN to earn and did earn fees from the PALAXAR LITIGATION and/or other activities of the PLAN.

25.     Defendant CUTHILL, is an individual represented personally and professionally by SHUKER and LATHAM SHUKER since no later than 2000, as well as by KOBERT and BROAD since no later than May 2008. At all times relevant to this matter, CUTHILL, without proper authority began acting as liquidating president to MVI and various subsidiaries, including but not limited to NEXIA, and is not covered by the Barton Doctrine. Exhibit 8. At all times relevant herein, CUTHILL occupied a critical role assisting the CONTROLLED COMPANIES, planning, coordinating, communicating and acting in furtherance of the PLAN. CUTHILL joined and participated in this PLAN to earn and did earn fees in excess of $2,000,000 to date from the PALAXAR LITIGATION and/or other activities of the PLAN.

26.     Defendant Robert "Bob" O'MALLEY, an accredited public relations professional who from early 2007 represented several of the CONTROLLED COMPANIES including, without limitation, AQMI, MVI, its related companies and its subsidiaries, including NEXIA and AQMI. O'MALLEY coordinated knowingly false, or with reckless disregard to truth or veracity, misleading and defamatory publications about PALAXAR and as part of the CONSPIRACY. At all times relevant herein, O'MALLEY occupied a critical role assisting the CONTROLLED COMPANIES, planning, coordinating, communicating and acting in furtherance of the PLAN. O'MALLEY joined and participated in this PLAN to earn and did earn fees from the PALAXAR LITIGATION and/or other activities of the PLAN.

## VENUE

27.     Venue is proper in this district, under 28 U.S.C. § 1391(a)(2), 28 U.S.C. § 1391(a)(3) and/or 28 U.S.C. § 1391(c), in that: a substantial part of the events or omissions giving rise to the claims alleged in the original cause of action occurred in the Eastern District of Virginia, Richmond Division and/or (b) Defendants are subject to personal jurisdiction in this judicial district as set forth herein.

## JURISDICTION

Page **15** of **72**

28.    This Court has personal jurisdiction over the Defendants pursuant to 28 U.S.C. § 1391(a)(2), 28 U.S.C. § 1391(a)(3) and/or 28 U.S.C. § 1391(c) and 28 U.S.C. § 959.  In personam jurisdiction is proper in this matter for statutory and common-law matters under Code of Virginia §8.01-328.1 (1950 amended), including but not limited to Code of Virginia §8.01-499 (1950 amended) et seq.

29.    This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because the amount in controversy as to each named Defendant exceeds $75,000, exclusive of interests and costs, and the action is between citizens of different states, i.e., citizens of Alabama, Florida and  Virginia while at the same time involving transactions and events throughout the United States including, but not limited to Virginia, Arizona, Washington, D.C., Ohio and Florida.

## I.    THE FACTS

30.    In 2001, just after being released from a 24 month prison sentence for fraud, Amodeo and his business partner Yaniv Amar (hereinafter "Amar") failed to remit $203,716 of payroll trust fund taxes for their payroll processing company.  Amodeo subsequently testified: "[He] knew that payroll taxes had to be paid...with no question in his mind.  None." Exhibit 9.

31.    In 2004, Amodeo formed MVI and later NEXIA; which eventually evolved into several businesses that specialized in acquisitions and mergers in various industries and by late 2006, MVI had grown to be a conglomerate of approximately 70 companies, including NEXIA. Exhibit 5.

32.    Through much of 2005 and 2006, Amodeo diverted more than $100,000,000 in payroll taxes from other payroll processing companies he controlled, collectively Professional Benefit Solutions (hereinafter "PBS") Exhibit 2, a portion of which he, individually and through the CONTROLLED COMPANIES, used to capitalize AQMI, MVI and NEXIA.

33.    In June 2006, SLAUGHTER began representing Amodeo and various of the CONTROLLED COMPANIES.  At their first meeting, Amodeo announced, "I'm either a genius or a megalomaniac." Exhibit 10.

34.    On August 1, 2006, four inventors: Edith Curry, Frank Hailstones, Laurie Holtz and Michael Dement, all of whom were then affiliated with MVI and/or NEXIA assigned (hereinafter

"ASSIGNMENT AGREEMENTS") to MVI and NEXIA a world-wide, royalty free, non-exclusive

license to the PALAXAR PROCESSES and in exchange, MVI and NEXIA irrevocably waived all rights,

title and interest including, without limitation, all intellectual property rights in and to the PALAXAR

PROCESSES. Exhibit 11.

35.    The ASSIGNMENT AGREEMENTS, drafted by GOLDBERG as in-house counsel concurrently

for AQMI, MVI and NEXIA were valid at the time the knowingly false and malicious PALAXAR

LITIGATION was filed on October 12, 2007 and provided:

> If either Party commences any action or proceeding against the other Party to enforce this
> Agreement or any of such Party's rights hereunder, the prevailing Party will be entitled to
> its reasonable expenses related to such action or proceeding, including reasonable
> attorney's and expert fees.

36.    On August 29, 2006, SLAUGHTER attended Amodeo's deposition  at which Amodeo gave

sworn testimony admitting to diverting over $180,000,000 in federal trust fund tax monies from 2004 –

2006 and upon his review of the deposition transcript, SLAUGHTER told Amodeo that his actions were

"a major, major crime." Exhibit 10,

37.    On October 16, 2006, PALAXAR's member Curry, and MVI, for itself and on behalf of NEXIA,

entered into Confidential Separation Agreement (hereinafter "SEPARATION AGREEMENT"), Exhibit

11, as drafted and negotiated by MVI's General Counsel together with several MVI Board Members, and

reviewed by MOKWA, which reaffirmed:

> All rights, title and interest in [PALAXAR PROCESSES] will be assigned to
> [PALAXAR's member Curry]. [Curry] shall be indemnified by MVI, from and against
> any claims that may be brought against [Curry] as a result of [her] serving as an officer
> and director of Mirabilis and/or its affiliates...

38.    The SEPARATION AGREEMENT did not exclude claims brought by MVI or NEXIA.

Exhibit 11.

39.    In addition to the SEPARATION AGREEMENT, ASSIGNMENT AGREEMENTS, MVI's By-

Laws at Article VIII, NEXIA's By-laws at Article VIII, Exhibit 12, MVI's Articles of Incorporation and

NEXIA's Employment Agreement  with PALAXAR member Curry, each contained indemnification

provisions in favor of PALAXAR's member Curry, and ignoring all the above, the CONSPIRATORS

initiated, planned, executed, maintained and published the malicious, false and baseless PALAXAR LITIGATION.

40.     PALAXAR was and is sole owner to the rights of the PALAXAR PROCESSES.

41.     PALAXAR had a joint agreement with NEXIA whereby NEXIA and PALAXAR were jointly marketing their services and as a result thereof entered into contractual negotiations with Wachovia Securities to license the use of PALAXAR PROCESSES and were on the eve of concluding the deal as of February 2007. Exhibit 90.

42.     In early December 2006 the CONTROLLED COMPANIES began receiving target letters Exhibit 13, and notices that Assistant United States Attorney I. Randall Gold (hereinafter "GOLD") was conducting a Federal Grand Jury Investigation (hereinafter "INVESTIGATION") relating to the unpaid payroll taxes at PBS.

43.     With the illegal source of funds being investigated by GOLD, the CONTROLLED COMPANIES including MVI and NEXIA were forced to shut down and begin liquidating on or about on December 31, 2006, terminating all employees in full "liquidation mode" by March 2007  Exhibit 14, except JAIMAN, STOLLENWERK, WILLIAMS, BATES, MOKWA, and GOLDBERG and a few administrative staff.

44.     In early 2007, SLAUGHTER discovered the CONTROLLED COMPANIES, including MVI and NEXIA had "a pretty good bit of insurance money out there," Exhibit 15, and brought in MAHER, the MAHER FIRM and together with BATES, MOKWA, GOLDBERG, ESTES, LANGLEY, REESE, BALCH, and O'MALLEY met, conspired, conceived, designed, agreed to, began to implement pursuant to PLAN as set forth herein.

45.     The PLAN would accomplish two goals: (i) seek to recover $420,000,000, of which $180,000,000 (what Amodeo admitted stealing) was to be paid to the IRS; Exhibit 16; and (ii) generate substantial fees that would be divided among the CONSPIRATORS.  The funds would come from demands made or lawsuits filed against a litigation target list of 112 companies, including PALAXAR, Exhibit 1, and/or individuals and their respective Directors and Officers (hereinafter "D & O") and/or liability insurance carriers, that ever had any dealings with the CONTROLLED COMPANIES including

MVI and NEXIA, AQMI and/or Amodeo regardless of whether there was any merit to the underlying claim or lawsuit. Exhibit 16.

46.     SLAUGHTER, as criminal counsel would retain sole possession of all CONTROLLED COMPANIES', including, without limitation, MVI and NEXIA documents, corporate records, files and electronic media, limiting access to members of the CONSPIRACY. Exhibit 1.

47.     Members of the CONSPIRACY would, in Court filings, pleadings, sworn testimony and statements in open court, deny the initial real party in interest - Amodeo - together with their personal financial interest in the outcome of the PLAN Exhibit 16.

48.     Payment of the trust fund taxes, just as Amodeo did in 2004, was believed to be necessary for SLAUGHTER to seek leniency at Amodeo's sentencing, or secure the same sentencing "deal" that was offered to Lou Pearlman – one month off his prison sentence for each $1,000,000 returned. Exhibit 15.

49.     The CONSPIRATORS would obtain, but not disclose their personal financial interest in the proceeds of the PLAN of up to 55% of all amounts recovered in addition to the cumulative hourly fees billed in excess of $6,000,000 to date. Exhibit 16.

50.     JAIMAN, STOLLENWERK, and WILLIAMS' financial interest in the PLAN resulted in their receipt of over $300,000 in fees from August 2007 – May 2008, and an additional $250,000 to WILLIAMS' company Matglowstores, Inc., Exhibit 17 and additional $30,000 to STOLLENWERK, and their personal stake in any PLAN recoveries would have secured them as much as $21,000,000.00. COUNSEL and the LAW FIRMS were to receive 55% of the $420,000,000 or $231,000,000.

51.     SLAUGHTER, in 2009, summarized for the Court, his experiences during the three (3) years of his representing Amodeo:

> ...I can assure you, Your Honor, and I mean this, **I'm as serious as I can be as an officer of the court, he is sick. I've seen it. I've seen it hundreds of times over two and a half years working with him.** Again, you don't know whether he's going to be up, you don't know whether he's going to be down. **His attention span is that of a gnat. He can't even read a one page document.** He'll sit for five seconds and gets up and walks around the room and drinks some more tea. He's almost impossible to work with...The problem is he was cooperating with the government through the twisted prism of this illness. And it is an illness. I don't think you'll ever see [the forensic psychiatrist] come up here and tell you he's found another person that's as bipolar as [Amodeo].

(Emphasis added) Exhibit 10.

52.     SLAUGHTER's co-counsel, in 2009, also summarized for the Court, his experience representing Amodeo stating: "if not controlled, either by strong medication or by external forces, such as attorneys, accountants, or even prosecutors, [Amodeo] is… likely to run amuck." Exhibit 16.

53.     On February 9, 2007, SLAUGHTER, on behalf of Amodeo began criminal plea negotiations with GOLD. Exhibit 18.

54.     In February 2007, GOLD "mandated to MVI's" one of four in-house counsel "that no payments [were to be made] to creditors particularly insiders that dealt with [the payroll companies from where Amodeo stole the funds]…or it would be construed as money laundering." Exhibit 19.

55.     PALAXAR and NEXIA were in contract negotiations reasonably expected to secure the contract with Wachovia Securities for over $2,000,000 to be negotiated to a final amount, for which PALAXAR's share was $2,000,000 with NEXIA due to get the subsequent and resulting consulting contract with Wachovia as its portion of the teaming agreement.

56.     NEXIA in furtherance of the PLAN, breached its teaming agreement with PALAXAR, terminating all but completed negotiations with Wachovia and instead filed the PALAXAR LITIGATION, which was not based in fact or law, accompanied by a knowingly false media smear campaign as described herein.

57.     On February 7, 2007, SLAUGHTER, MAHER, MAHER FIRM, BATES, MOKWA, JAIMAN, WILLIAMS, GOLDBERG, and STOLLENWERK were given actual knowledge that PALAXAR member Curry, former MVI Board Member and "innocent decision maker" Exhibit 85, was voluntarily cooperating with GOLD's INVESTIGATION Exhibit 21, of the CONTROLLED COMPANIES and their client, Amodeo. PALAXAR member Curry was labeled "GOLD's witness" by JAIMAN, NEXIA, CUTHILL, KOBERT, NORMAN, and BROAD. Exhibit 20. Curry's cooperation with AUSA GOLD'S INVESTIGATION was a threat to the success of the PLAN.

58.     On or before August 17, 2007, SLAUGHTER, MAHER, MAHER FIRM, BATES, MOKWA, GOLDBERG, BALCH, CAMPBELL, RUSSELL, ESTES, LANGLEY, JAIMAN, WILLIAMS,

STOLLENWERK asserted "[PALAXAR] negotiated a deal for the [PALAXAR PROCESSES] with Wachovia Securities for approximately $2,000,000 and immediately exited MVI and...closed the deal for the benefit of PALAXAR," which evidenced actual knowledge of PALAXAR's economic expectancy while at the same interfered with the prospective economic benefit and wrongfully painting PALAXAR, expressly and through implication, as stealing the PALAXAR PROCESSES from MVI and/or NEXIA. Exhibit 1.

59.     Prior to the CONSPIRATORS filing the PALAXAR LITIGATION, PALAXAR entered into and was performing under confidential TEAMING AGREEMENTS with PricewaterhouseCoopers, Acxiom, Fair Isaac Corporation, Protivity, to pursue the Security Clearance Process Reform efforts begun by the United States Government in 2007 and PALAXAR continued to market and foster close relationships and ties with agencies and departments of the United States Government, Intelligence Community, Department of Homeland Security, the Commonwealth of Virginia while pursuing global efforts with large data providers including Acxiom, Experian and ChoicePoint

60.     PALAXAR actively pursued these TEAMING AGREEMENTS including but not limited to meeting with its teaming partners, conducting pilots and otherwise showed the effectiveness of the PALAXAR PROCESSES, and formulated marketing plans and leads as well as met with in furtherance thereof the United State Government, the I.R.S., the Department of Defense, and Commonwealth of Virginia.

61.     As of October 1, 2007, PALAXAR along with Fair Isaac Corporation and PriceWaterhouse Coopers were in top-tier negotiations with the United States as the only qualified bidder with PROCESSES-pending processes, i.e. the team of PALAXAR, Fair Isaac, and PriceWaterhouse Coopers (hereinafter "TEAM") were the only contractors with the capabilities and patent-pending processes being considered for the Security Clearance Process Reform efforts.

62.     PALAXAR as part of the confidential TEAMING AGREMENTS, had responded to requests for information, submitted a proposal, conducted briefings, prepared a demonstration, conducted pilots, and was engaging in pricing and negotiations.

63.     PALAXAR and the TEAM reasonably expected to secure the contract with the United States for which PALAXAR's share was $47,000,000.

64.     PALAXAR and the TEAM had conducted a pilot wherein PALAXAR used its PALAXAR PROCESSES along with the data and other attributes of the TEAM to run test scenarios to show the effectiveness of PALAXAR and the TEAM's solutions for the United States.

65.     Based on these results, PALAXAR was in the final selection criteria at which time PALAXAR and the TEAM were finalizing deliverable products, and metrics to judge the effectiveness of the work to be done, and finalization of the payment by the United States for the work to be done.

66.     PALAXAR and Acxiom were engaged in joint negotiations with the Commonwealth of Virginia, personally briefing Aneesh Chopra, then Virginia's Secretary of Technology, and others for a portion of a contract for the real ID project ultimately awarded to Northrop Grumman.

67.     PALAXAR expected to secure a portion of the Real ID contract with Virginia.

68.     PALAXAR expected to enter into other contracts and/or continue in these business expectancies; and thereby secure the financial reward and/or economic benefit from these described negotiations, contracts, and otherwise.

69.     SLAUGHTER, MAHER, MAHER FIRM, BATES, NEXIA, MOKWA, GOLDBERG, JAIMAN, WILLIAMS, STOLLENWERK, O'MALLEY, ESTES, CAMPBELL, LANGLEY, REESE, and BALCH had actual knowledge of PALAXAR'S business negotiations and business expectancies as shown through MVI and NEXIA's court filings and production in the PALAXAR LITIGATION and the PLAN'S related litigation. Exhibit 1.

70.     On October 11, 2007, AQMI, BATES, MOKWA, GOLDBERG, CAMPBELL, ESTES, LANGLEY, REESE, BALCH, JAIMAN, WILLIAMS, STOLLENWERK, and/or some combination thereof caused NEXIA to be reinstated for the sole purpose to further the PLAN and then filed the PALAXAR LITIGATION without basis in law or fact seeking, including, without limitation, to improperly and unlawfully obtain monies from PALAXAR and/or its insurance companies, secure a *de facto* seizure of the PALAXAR PROCESSES, damage and interfere with PALAXAR'S business

expectancies and damage PALAXAR as more fully set forth below.

71.     On October 12, 2007, AQMI, NEXIA, BALCH, ESTES, CAMPBELL, LANGLEY, REESE, BATES, MOKWA, GOLDBERG, pursuant to the PLAN and together with SLAUGHTER, MAHER, MAHER FIRM, JAIMAN, WILLIAMS and STOLLENWERK, filed a knowingly false complaint seeking an injunction and accusing PALAXAR and PALAXAR's members of Conversion, Misappropriation, Self-Dealing, Breach of Fiduciary Duties, Breach of Employment Contracts, Conspiracy to Convert Asset, Breach of Contract, and Unjust Enrichment. Exhibit 1.

72.     On October 12, 2007, AQMI, NEXIA, SLAUGHTER, THE MAHER FIRM, MAHER, BATES, MOKWA, GOLDBERG, JAIMAN, WILLIAMS, O'MALLEY, STOLLENWERK, ESTES, REESE, CAMPBELL, LANGLEY, and BALCH showed actual knowledge that "PALAXAR is now offering or plans to offer to third parties the PROCESSES-pending fraud solution program..." which evidenced knowledge of PALAXAR's economic expectancy by marketing the PALAXAR PROCESSES while at the same interfered with the prospective economic benefit and globally painting PALAXAR, expressly and through implication, as stealing the PALAXAR PROCESSES from NEXIA and MVI.

73.     On or about October 13, 2007, AQMI, NEXIA, BATES, MOWKWA, GOLDBERG, CAMPBELL, ESTES, LANGLEY, REESE, BALCH, JAIMAN, WILLIAMS, STOLLENWERK, O'MALLEY and/or some combination thereof released a knowingly false and misleading news article and press release announcing the PALAXAR LITIGATION *before the complaint had been served*, with the front page headline of the Orlando Sentinel Newspaper: *"Mirabilis lost at least $220M."* Exhibit 23.

74.     On October 15, 2007, BATES and MOKWA flew from Orlando, Florida to Scottsdale, Arizona to confront and serve PALAXAR at "the 58th Audit Directors & Managers' Symposium, where they believed PALAXAR was directing workshops relating to [PALAXAR's PROCESSES]" and intended to interfere in that business expectancy, cause a breach or termination of any relationships, therefrom and improperly using the judicial system, and the false media smear campaign as a means to harm PALAXAR.

75.     On or about October 17, 2007, NEXIA, AQMI, BATES, MOWKWA, GOLDBERG,

CAMPBELL, ESTES, LANGLEY, REESE, BALCH, JAIMAN, WILLIAMS, STOLLENWERK, O'MALLEY and/or some combination thereof released a knowingly false press release to 305 newswires on the world-wide web damaging PALAXAR by publishing <u>Exhibit 24</u>, *"Anti-Fraud Company Sued for Absconding Assets."* "Orlando-based private equity fund Mirabilis Ventures, Inc. has filed a lawsuit and a preliminary injunction against PALAXAR...to enjoin them from utilizing property, trade secrets and confidential/proprietary information that rightfully belongs to Mirabilis" both expanding upon these previous statements, fulfilling its false media smear campaign, and interfering with PALAXAR's rightfully owned title to the PALAXAR PROCESSES.

76.     As a result of the above acts, PALAXAR was unable to enter into a contract with Wachovia Securities and Wachovia Securities canceled all further negotiations for the same, which injured and damaged PALAXAR in an amount of no less than $2,000,000 and further impaired its goodwill and reputation.

77.     Significantly, immediately upon the CONSPIRATORS filing of the knowingly false PALAXAR LITIGATION, PALAXAR was foreclosed due to the Federal Acquisition Regulation (hereinafter "FAR"), the Defense Federal Acquisition Regulations (hereinafter "DFAR") and related statutes in the Commonwealth of Virginia from continuing to market as well as license its PALAXAR PROCESSES to any department or agency of the United States Government, the Commonwealth of Virginia and its divisions, and to financial sector organizations to include but not be limited to banks and other financial institutions.

78.     AQMI, NEXIA, SLAUGHTER, MAHER FIRM, MAHER, BATES, CAMPBELL, ESTES, JAIMAN, LANGLEY, REESE, O'MALLEY, STOLLENWERK, WILLIAMS, and BALCH knew or should have known the above regulations and the catastrophic impact upon PALAXAR brought about by the filing of the PALAXAR LITIGATION as set forth herein.

79.     BALCH advertises its expertise in the provision of legal and lobbying services to clients who work with the United States Government, state governments, and the like and thus knew or should have known of the above regulations and the resulting damage to PALAXAR.

80.     As a result of the above acts, Virginia stopped negotiating with PALAXAR, and withdrew from all negotiations, which injured and damaged PALAXAR and further impaired its goodwill and reputation.

81.     As a result of the above acts, the United States stopped negotiating with PALAXAR and the TEAM, withdrew from all negotiations, which injured and damaged PALAXAR in an amount no less than $47,000,000 and further impaired its goodwill and reputation.

82.     As a further direct and proximate cause of the knowingly false and malicious PALAXAR LITIGATION being filed and the attendant false and defamatory public relations smear campaign, virtually overnight, PALAXAR lost the ability to participate in the United States' security clearance process reform, resulting damages of injuries to PALAXAR but also untold damage to the United States resulting from improper and false background clearances being granted and cleared personnel not being monitored thus allowing, including, without limitation, unauthorized disclosure of classified information.

83.     GREEN, SHUKER and LATHAM SHUKER were retained to protect, and in furtherance of, the PLAN and as a contingency should GOLD or the INVESTIGATION interfere with the PLAN, they would file MVI's bankruptcy consistent and or reminiscent of the CHURCH STREET plan they implemented for Lou Pearlman's companies. Exhibit 3.

84.     Needing money to fund the massive PLAN litigation efforts, including the lawsuit launched against PALAXAR, in December 2007, certain of the CONSPIRATORS diverted a $4,500,000 insurance refund Exhibit 25, properly due the IRS to the COUNSEL, STAFF, PUBLICIST and others.

85.     Upon discovering the December 2007 stolen and laundered funds, on April 24, 2008 GOLD issued an *in rem* civil forfeiture and seized what remained of the $4,500,000 insurance refund from the trust funds of the LAW FIRMS, and certain of the PARTICIPANTS' companies. Exhibit 26.

86.     The CONSPIRATORS, in furtherance of the PLAN and to protect their financial interest in the PLAN, filed MVI, et al.'s bankruptcy, withholding from the bankruptcy court, the AUSA's office, and the United States District Court for the Middle District of Florida the critical documents evidencing the CONSPIRATORS' bad-faith bankruptcy filing and unlawful actions and PLAN as detailed herein below.

87.     PALAXAR was injured by these acts from the filing of the PALAXAR LITIGATION well past

the entry of the Final Judgment on September 19, 2011; though the PLAN and the CONSPIRACY continued until at least March 2, 2012. PALAXAR is still suffering continued injury as a result of these acts.

88.    As set forth herein, CONSPIRATORS, acted in concert through a preconceived plan and unity of design and purpose, and initially funded with stolen and diverted money, fraudulently used the CONTROLLED COMPANIES to seize, without legal justification, PALAXAR's property, harm PALAXAR's legitimate business operations, interfere with its confidential TEAMING AGREEMENTS, interfere with its expected economic benefits, and otherwise damage PALAXAR, including but not limited to the false public relations media smear campaign, the malicious and knowingly false PALAXAR LITIGATION, the bad-faith filing of the MVI, et al., bankruptcy and withholding of the critical documents from various Federal Courts to sustain the bankruptcy and the PLAN, and associated activities of the PLAN as detailed herein.

## II. ACTIONS TAKEN IN FURTHERANCE OF PLAN

89.    SLAUGHTER assisted BATES, MOKWA and GOLDBERG in shielding Amodeo within law firms set up by BATES, MOKWA and GOLDBERG who, together with JAIMAN, STOLLENWERK and WILLIAMS, all co-located in adjoining suites at 3660 Maguire Boulevard, Orlando, Florida, suites, #301, #201 and #101 respectively all sharing BATES, MOKWA and GOLDBERG's law-firm conference room, or as the CONSPIRATORS labeled it, the "War Room," where they would join, meet, plan, and execute their part of the PLAN. Exhibit 1.

90.    JAIMAN, STOLLENWERK, WILLIAMS, assisted by BATES, MOKWA and GOLDBERG began setting up various corporations, including, without limitation, Soone Business Development, (hereinafter "SOONE") in order to launder funds, to secure payments to themselves and other CONSPIRATORS under the guise of consultant and/or other fees, and to lend other support to the PLAN. Exhibit 27.

91.    On March 8, 2007, Exhibit 28, and contrary to what they maintained in the PALAXAR LITIGATON GOLDBERG as Associate General Counsel for MVI, et al., stated:

> It is...false that MVI, or Mirabilis HR [dba AEM], owes any payroll taxes to the government. In fact, as of the date of this letter, MVI and Mirabilis HR are current on all payroll taxes. MVI and Mirabilis HR are not under a federal grand jury investigation, but instead other companies with which Mirabilis has had dealings, but to which is not affiliated, are the subject of the grand jury investigation.

92.    On March 27, 2007, and contrary to what they maintained in the PALAXAR LITIGATON, AQMI and NEXIA working by and through JAIMAN, STOLLENWERK, WILLIAMS, BATES, MOKWA and GOLDBERG, notified creditors Exhibit 28, that "it had been engaged by NEXIA to assist them in the payment of invoices... [and that] NEXIA Strategy has ceased operations..."

93.    On June 29, 2007, August 16, 2007 and August 20, 2007, BATES, discussed the PLAN and communicated with the law firm of Mateer and Harbert and MAHER, and the MAHER FIRM to discuss, plan and communicate the "D&O liability, malpractice actions and collection [litigation] matters." Subsequently, and after a lengthy legal analysis, Mateer and Harbert did not join the PLAN. Exhibit 1.

94.    On July 9, July 10, August 30, and November 15, 2007,  STOLLENWERK, WILLIAMS, BATES, MOKWA, GOLDBERG and JAIMAN, caused to be filed in state and Federal Court, , JAIMAN'S signed *Interrogatories* under penalty of perjury, contrary to their subsequent and fraudulent statements in the PALAXAR LITIGATION by attesting as follows Exhibit 29:

> In or about November of 2006, MVI was served with subpoenas as part of a Grand Jury Investigation related to outstanding taxes allegedly owed to the United States Internal Revenue Service by Mirabilis...*Moreover on or about June 30, 2007, MVI's first priority secured creditor, AQMI secured its position via the assets of MVI after MVI's default on repayment of obligations owed to AQMI*. MVI has taken the position that all amounts allegedly outstanding and owed to its priority secured creditors, namely the IRS and AQMI, must be assessed and resolved before any other alleged obligations are satisfied. [Emphasis added.]

95.    On July 26, 2007, JAIMAN and GOLDBERG, falsely claiming to be "retained by MVI" when all the assets had been seized by AQMI months earlier, Exhibit 30 instructed over $415,000 to be wired to one of the CONTROLLED COMPANIES' accounts, rather than to the US Government. Exhibit 22.

96.    On July 24, 2007, in furtherance of the PLAN, BATES, CAMPBELL, and BALCH met and communicated, dividing the PLAN into three areas: "Collections, Professional [malpractice, breach, theft, etc., litigation], and D & O [Director's & Officer's liability insurance]." Exhibit 1.

97.    No later than August 2007, GREEN, SHUKER and LATHAM SHUKER Exhibit 3 joined the PLAN and together with JAIMAN, STOLLENWERK, WILLIAMS, BATES, MOKWA, GOLDBERG, BALCH, ESTES, CAMPBELL, LANGLEY and REESE, planned to use the United States Bankruptcy Court for the United States District Court of Florida, Orlando Division, to appoint CUTHILL as MVI's president who then immediately filed what GOLD described as a bad-faith bankruptcy filing, to maintain the PLAN. Exhibit 60

98.    On August 1, 2007, GOLDBERG revised BATES, MOKWA and GOLDBERG's June 26, 2007 engagement letter to include "providing legal services to Amodeo, and the following entities: AQMI, Titanium Technologies, Inc., Wellington Capital Group, Tenshi Enterprises, Inc., and MVI, including respective subsidiaries and affiliates" and pursuant to which, GOLDBERG, BATES and MOKWA received funds from undisclosed sources to include a "non-refundable fee of $45,000 as well as a non-refundable transition fee of $90,000 deemed earned upon receipt." Exhibit 38.

99.    On August 1, 2007, JAIMAN and AQMI entered into a consulting agreement requiring JAIMAN, WILLIAMS and STOLLENWERK to be paid using funds from undisclosed sources, a $90,000 non-refundable retainer, and $45,000 per month thereafter. Exhibit 39.

100.    On August 9, 2007, GREEN and LATHAM SHUKER entered into an agreement for their representation of AQMI, MVI and NEXIA in the "current bankruptcy matters in connection with MVI…including the proposed action against the former officers and directors of MVI, et al." BATES signed the agreement on behalf of AQMI and MVI. Exhibit 3.

101.    On August 14 & 15, 2007, MAHER, and SLAUGHTER were updated on the status of the civil litigation to further the PLAN, including but not limited to the contemplated PALAXAR LITIGATION. Exhibit 1.

102.    On August 27, 2007, BATES, and CAMPBELL and BALCH met to discuss the PLAN, to include drafting knowingly false press releases to be finalized and distributed by O'MALLEY. Exhibit 1.

103.    On August 29, 2007, WILLIAMS, BATES and O'MALLEY communicated in furtherance of the PLAN wherein the "lawyers [BATES, MOKWA, GOLDBERG, BALCH, ESTES, CAMPBELL,

LINDSAY and REESE] would approve the content of the [knowingly false and defamatory] press releases, news articles and blog posts." Exhibit 40.

104.    On August 30, 2007, BATES, CAMPBELL, and BALCH communicated and devised the PLAN, to include knowingly false press releases to be drafted and distributed by O'MALLEY as well as constructing statements to be attributed to, or on behalf of, Amodeo. These other press releases were all in furtherance of the PLAN and preparing for the filing of the baseless and false PALAXAR LITIGATION. Exhibit 40.

105.    On September 25, 2007, BATES and LANGLEY received communication whereby BALCH, ESTES, CAMPBELL, LANGLEY, and REESE were notifying MVI creditors of "a grand jury subpoena directed at MVI. A copy of which [was] enclosed." Exhibit 41. This is contrary to what they attested in their sworn *Answer and Affirmative Defenses* as filed in the PALAXAR LITIGATION. Exhibit 57.

106.    On October 12, 2007, without any prior contact, negotiation or inquiry of PALAXAR, certain of the Defendants, BALCH, ESTES, CAMPBELL, LANGLEY, REESE, BATES, MOKWA, GOLDBERG together with SLAUGHTER, MAHER and MAHER FIRM, JAIMAN, WILLIAMS STOLLENWERK, and O'MALLEY, and thus the CONSPIRATORS, without any basis in law or fact, maliciously and frivolously filed a knowingly false complaint against PALAXAR with the attendant false media smear campaign press releases. Exhibit 42

107.    On September 27, 2007, SLAUGHTER, MAHER and the MAHER FIRM, MVI and AQMI, in furtherance of the PLAN, sent demand letters to various litigation targets of the PLAN in search of insurance coverage information. Exhibit 95

108.    On October 17, 2007, STOLLENWERK notified one of MVI and NEXIA'S D&O carriers of a "potential claim by a client...that MVI Officers and Directors failed to exercise reasonable care managing other investment funds provided by [the mentally-incompetent Amodeo]." Exhibit 43

109.    On December 27, 2007 ESTES, LANGLEY, REECE, CAMPBELL, and BALCH, together with SLAUGHER, MAHER, MAHER FIRM, JAIMAN, STOLLENWERK, WILLIAMS, BATES, MOKWA and GOLDBERG, in furtherance of the PLAN, made an additional $20,000,000 demand on PALAXAR

members and their insurance carrier(s) as well as thirty-three (33) former executives and officers of MVI
and NEXIA alleging Exhibit 44 as follows:

> During the events giving rise to this [threatened] lawsuit, Plaintiffs AQMI Strategy
> Corporation ... and Titanium Technologies, Inc.... [both wholly owned Amodeo
> Companies], were the primary secured creditors of Mirabilis Ventures, Inc., ...Mirabilis
> [was] created to help reorganize and preserve the Professional Employer
> Organization...assets of Presidion Solutions, Inc. [Amodeo controlled companies]...
> *Mirabilis [was] tasked with this job by AQMI*... [Emphasis Added]

110.    On December 27, 2007, MAHER, MAHER FIRM and co-counsel SLAUGHTER, on behalf of
CONTROLLED COMPANIES, PBS and PSI, in furtherance of the PLAN and in addition to the
PALAXAR LITIGATION and CO-CONSPIRATOR'S demands the previous day, demanded an
additional $10,000,000 from PALAXAR for member Curry's "wrongful acts committed while a Director
and/or officer of MVI." Exhibit 45

111.    On January 8, 2008, now purporting to be civil counsel, MAHER, MAHER FIRM and co-
counsel SLAUGHTER, demanded yet another $20,000,000 from PALAXAR's member (bringing the
three month total demanded to $50,000,000) the combined limits of MVI's primary and excess D&O
Liability policies, all in furtherance of the PLAN. Exhibit 45

112.    On January 9, 2008, SLAUGHTER, MAHER, MAHER FIRM, SOONE, JAIMAN, MVI, AQMI
and Amodeo entered into a Trial Consultant Agreement wherein JAIMAN, STOLLENWERK and
WILLIAM's company, SOONE would receive five percent (5%) of *any amounts* recovered from PLAN.
Exhibit 46

113.    On March 5, 2008, the law firm of Bailey Cavalieri, LLP on behalf of MVI's D&O carrier, Arch
Insurance Company, put all CONSPIRATORS in the PLAN on further actual notice that their insurance
demands were baseless and without merit with an 11-page denial, responding to both MAHER's January
2, 2008, and BALCH's December 27, 2007 PLAN demand letters to PALAXAR's members and 33 other
former executives of MVI and NEXIA.   Arch denied the $20M and $10M coverage demanded
respectively, stating:

> Based on information now known by Arch, it appears that [Amodeo] is an Insured Person
> under the Policy.  Among other things, *Arch understands that [Amodeo] is a former*

*director of Nexia Strategy Corporation,* a wholly-owned subsidiary of MVI.  In addition, *Arch understands that throughout the relevant period, [Amodeo] was the sole Class A shareholder of MVI and had exclusive control over MVI and Nexia.  Arch further understands that [he] exercised his complete control over MVI and Nexia by, among other things, appointing or replacing officers and directors, vetoing board decisions, and controlling the day-to-day affairs and operations of MVI and Nexia.* [Emphasis Added] Exhibit 47.

114.    None of the CONSPIRATORS contested, appealed, challenged or responded to Bailey Cavalieri's analysis and reasons for denying the insurance demands, pursuant to the PLAN, made against PALAXAR and its members.

115.    In March 2008, BATES, MOKWA, WILLIAMS and STOLLENWERK compiled and communicated the PLAN'S *"Asset Recovery and Liquidation Report"* a division of responsibilities, status update and actions taken by the CONSPIRATORS in furtherance of the PLAN, illustrating the scorched-earth litigation strategy with which to improperly obtain $420,000,000 from PALAXAR and others, as part of the PLAN. It also evidences that MVI and NEXIA were not going concerns as of January 2007, and the business records were available to Amodeo while under criminal INVESTIGATION and facing indictment, all contrary to what was attested to in the PALAXAR LITIGATTION. Exhibit 48.

116.    SLAUGHTER, confirmed his involvement in the CONSPIRACY and the PLAN when he admitted to The District Court, Middle District of Florida, that "the filing of the [MVI, et al.,] bankruptcy totally impacted all of the civil cases that we had been working on." Exhibit 49.

## II.    THE PLAN - THE PALAXAR LITIGATION, RELATED LITIGATION AND DISCOVERY

117.    BALCH, BATES, CAMPBELL and ESTES attested that for months prior to October 12, 2007 filing of the malicious and knowingly false PALAXAR LITIGATION, they, together with LANGLEY, REESE, JAIMAN, WILLIAMS, STOLLENWERK, GOLDBERG and MOKWA, reviewed "thousands of documents [including the MVI and NEXIA corporate documents, PALAXAR member Curry's and others personnel files] and hundreds of hours of video tapes" before filing the knowingly false and baseless claims against PALAXAR demanding $7MM - $20MM in damages, *de facto* seizing the PALAXAR PROCESSES and further demanding a preliminary injunction. Exhibit 50.

118.    As support for their malicious and knowingly false PALAXAR LITIGATION and in furtherance of the PLAN, NEXIA, BATES, CAMPBELL and BALCH with the participation of JAIMAN, WILLIAMS, STOLLENWERK, GOLDBERG, MOKWA, LANGLEY, and REESE submitted to the Court, JAIMAN's knowingly false affidavit, together with an unsigned employment agreement and two obviously altered employee handbooks from a non-party to the suit (Common Paymaster "CPC").
Exhibit 51.

119.    MVI, CUTHILL, and LATHAM SHUKER attested that "Mirabilis is a completely separate legal entity from CPC...There are no agreements or facts that would indicate Mirabilis assumed the liabilities of CPC," Exhibit 84 and yet NEXIA, CUTHILL, COUNSEL and LAW FIRMS, in furtherance of the PLAN, planned, filed and maintained the PALAXAR LITIGATION using these as "evidence."

120.    October 12, 2007, BATES, and MOKWA, flew to Scottsdale, Arizona to attend the PALAXAR LITIGATION service of process.

121.    On October 15, 2007, BATES and MOKWA joined with Arizona process server, Thomas Zollars to serve publicly the PALAXAR defendants while waving a copy of the October 13, 2007 Orlando Sentinel newspaper with the headlines *"Mirabilis lost at least $220M"* in front of dozens of attendees at a professional auditing and anti-fraud conference where they believed PALAXAR's services were being promoted.

122.    Zollars declared, in his 22 years as a process server, he's never had attorneys "fly out to identify the subject being served." Exhibit 52.

123.    BATES testified that other than the October 2007 PALAXAR LITIGATION service of process, he's not before or since personally attended a service of process. Exhibit 83.

124.    On October 12, 2007 through February 2008, BATES, MOKWA, GOLDBERG, WILLIAMS, JAIMAN, and O'MALLEY assisted by SLAUGHTER, MAHER, MAHER FIRM, CAMPBELL, ESTES, REESE, LANGLEY, and BALCH issued and published a series of knowingly false, defamatory and misleading statements Exhibit 1, and press releases to national and international audience on the world-wide web and through blogs they controlled; damaging PALAXAR's reputation, goodwill and interfering

in PALAXAR's business relations, including, without limitation as follows:

    a) October 11, 2007 - *"Mirabilis Assets Divested, Claims sought to Recoup Losses;"*
    b) October 12, 2007 - *"Mirabilis Ventures announces lawsuits to recover $285M in losses;"*
    c) October 12, 2007 - *"Mirabilis winds down operations, Presidion defunct;"*
    d) October 13, 2007 - *"Mirabilis lost at least $220M"* announcing the PALAXAR
                 LITIGATION before the suit was served;
    e) October 17, 2007 - *"Anti-Fraud company sued for absconding assets"*
    f) October 17, 2007 - *"Mirabilis files suit against former execs"* and
    g) February 4, 2008 - *"Mirabilis says it's winning lawsuits."* Exhibit 24

125.    After filing the PALAXAR LITIGATION wherein MVI and NEXIA asked for an injunctions and that was so urgent that on October 13, 2007, BATES and MOKWA had to fly from Orlando, Florida to Scottsdale, Arizona and lay in wait for two days to serve it, NEXIA took no action for over two and one half months to schedule the preliminary injunction hearing, as a result of the delay, on December 31, 2007 the Court *sua sponte* scheduled the Preliminary Injunction Hearing for January 25, 2008.

126.    On November 21, 2007, SLAUGHTER, BATES, MOKWA, GOLDBERG, ESTES, CAMPBELL, LANGLEY, REESE, BALCH, JAIMAN, WILLIAMS, and STOLLENWERK were again given actual knowledge of the SEPARATION AGREEMENTS, the ASSIGNMENT AGREEMENTS, and the four (4) inventors on the PALAXAR PROCESSES at issue, Exhibit 11, as well as PALAXAR defendants' rights to indemnification as shown in the documents the above listed CONSPIRATORS themselves filed in the PALAXAR LITIGATION.

127.    On January 4, 2008, JAIMAN, STOLLENWERK, BATES, ESTES, CAMPBELL, and BALCH filed a knowingly false affidavit by JAIMAN, wherein she attested: "MVI paid all fees associated with the research and development of [PALAXAR's PROCESSES] totaling at least $1.5 million dollars" and included an "Exhibit 3" Exhibit 53, attesting to expenses purporting to be from MVI and NEXIA's valid business records and produced from QuickBooks during 2005-2006. Subsequent sworn testimony from STOLLENWERK, Exhibit 56, SHUKER and LATHAM SHUKER, Exhibit 65 disclosed that the "Exhibit 3" was not a business record, kept in the ordinary course of business as attested but was instead prepared for litigation from knowingly unreliable financial records.

128.    At the January 25, 2008 Preliminary Injunction hearing, ESTES and thus BALCH, with BATES

and JAIMAN in attendance, maliciously and falsely accused [PALAXAR's members] <u>Exhibit 54</u> of

"shutting down NEXIA by [PALAXAR's] theft" telling the United States District Court for the Middle

District of Florida:

> What's Nexia doing today? Well, Nexia is not in the antifraud business any more, and it's not because its president walked out the door and took its antifraud business with her [over a year prior to Nexia filing suit]. [Curry] took not only the [PALAXAR's PROCESSES application], she took the client lists, she took the prospects, she took the employees, she took the IT related to it, she took the notes. So therefore, we're not in business.

129.   The Court, at the conclusion of the hearing, immediately ruled from the bench, denying MVI and

NEXIA's Motion for a Preliminary Injunction stating:

> [MVI and NEXIA] have not shown a likelihood of success on the merits - *and certainly not a substantial likelihood of such success*. In sum, [MVI and NEXIA's] submissions do not establish a substantial likelihood of success on the merits or any of the other requisites for a preliminary injunction. <u>Exhibit 55</u>

130.   Despite the denial of MVI and NEXIA's preliminary injunction demand, PALAXAR was unable

to continue its ongoing contract negotiations for the sale or use of the PALAXAR PROCESSES during

the pendency of the PALAXAR LITIGATION because of the *de facto* seizure and cloud on the title of the

PALAXAR PROCESSES.

131.   On February 2, 2008, contrary to the sworn statements of JAIMAN proffered by BATES,

LANGLEY, ESTES, CAMPBELL, and BALCH in the PALAXAR LITIGATION, STOLLENWERK – a

current MVI Board Member during the planning and filing of the PALAXAR LITIGATION, in a related

case, testified that "even though he was not aware of any factual basis to conclude that the board of

directors of MVI approved [a material transaction involving the sale of a corporate asset]; given that [an

MVI board member did the transaction] tells him that the [MVI] board was aware and approved the

transaction." <u>Exhibit 56</u>

132.   On February 6, 2008, contrary to the sworn statements of JAIMAN proffered by BATES,

LANGLEY, ESTES, CAMPBELL, and BALCH in the PALAXAR LITIGATION, STOLLENWERK, in

a related case, testified that months prior to filing the PALAXAR LITIGATION, he was responsible for

securing the MVI and NEXIA QuickBooks financials and upon "running reports determined the financial

information contained therein unreliable and unusable. The last MVI financial statement STOLLENWERK found reliable was the MVI 2005 Audited Financials [prepared by MVI's outside auditing firm, James Moore & Company]." Exhibit 56

133.    On or about March 13, 2008, in their sworn *Answers and Affirmative Defenses* in the PALAXAR LITIGATION, ESTES, CAMPBELL, BALCH and BATES ostensibly representing JAIMAN, STOLLENWERK and WILLIAMS on behalf of MVI (even though in May 2007, the secured creditor AQMI had seized all of the assets of MVI and NEXIA and the companies were being liquidated) expressly denied knowledge of any grand jury INVESTIGATION or subpoenas Exhibit 57, contrary to what they attested to in their sworn *Answers and Affirmative Defenses* in related PLAN litigation and in Circuit Court in and for Duval County, Florida and Broward County, Florida. Exhibit 29

134.    On or before June 3, 2008, AUSA GOLD became aware that NEXIA, SLAUGHTER, MAHER, MAHER FIRM, BATES, CUTHILL, GREEN, SHUKER, LATHAM SHUKER, ESTES, CAMPBELL, MOKWA, GOLDBERG, LANGLEY, REESE, and BALCH had been using the PALAXAR LITIGATION as an improper discovery tool to aid in Amodeo's criminal defense, forcing GOLD to file a *Motion to Intervene and for a Stay of Discovery* Exhibit 59 stating:

> A surface reading of the complaint [against PALAXAR]...might suggest that the criminal investigation and the civil case do not substantially overlap.  A review of the discovery requests in the civil case, however, reflects that there is evidence being sought that is irrelevant to the civil case...contained in the requests for admissions are questions that deal with the theft of payroll taxes...the requested information is irrelevant to the Complaint...and if divulged, may well prejudice the United States' Investigation.

135.    On June 5, 2008, the Court granted GOLD's *Motion to Intervene and to Stay Discovery* and the PALAXAR case was stayed 18 months until December 2, 2009.

136.    On September 16, 2008, JAIMAN, Exhibit 60, individually and on behalf of MVI and NEXIA, recanted all of her prior affidavits submitted in related litigation and in furtherance of the PLAN, including her affidavit in the PALAXAR LITIGATION which was the only testimony submitted in opposition to PALAXAR's motion for summary judgment, and now stated that these affidavits were inaccurate, namely that Amodeo had owned and controlled MVI and NEXIA all along – contrary to what

certain of the CONSPIRATORS swore to in order to further and maintain the PLAN:

> Although [her prior] affidavits and documents may have stated otherwise... [Amodeo] knew he was the target of a federal grand jury investigation and he thought that if he paid the trust fund taxes to the IRS, a sentencing judge would be lenient with him. When seizure warrants were served on law firms which handled legal matters for [CONTROLLED COMPANIES] there was a concern...about how to save the [civil] litigation...

137. JAIMAN's previous affidavits that "stated otherwise" (drafted by BATES, MOKWA, GOLDBERG, ESTES, and/or CAMPBELL) were submitted in at least the following cases:

    a. Pennsylvania - Coleman v. Mirabilis, Case No: 07-02615 Chester County,  and
    b. Florida - Hendricks v. Mirabilis Ventures, Inc., Case No: 8:07-cv-661-T17EAJ, and
    c. Florida - MVI v. Palaxar, et al., Case No: 6:07-cv-01788-ORL-28-GJK, and
    d. Texas - HKS v. Mirabilis Ventures, Case No: 3-07CV0577-L (Doc. 8-4), and
    e. Ohio - Paysource Inc., v Mirabilis Ventures, Inc., Case No: 3:07CV0129 (Doc. 52-2), and
    f. Alabama - Chaviers et al., v. Mirabilis Ventures, Inc., and Amodeo, Case No: CV-07-0442-CLS.

138. No later than October 2009, CUTHILL with the assistance of GREEN, SHUKER, and LATHAM SHUKER hired BROAD, KOBERT, NORMAN and VILMOS to further and continue the PALAXAR LITIGATION, although CAMPBELL, ESTES, LANGLEY, REESE, and BALCH continued as counsel of record for a certain period thereafter.

139. CUTHILL later testified that he spent significant time evaluating whether MVI or NEXIA held the more valuable claim against PALAXAR, and that he reviewed a multitude of documents and the case file, and spent a lot of time analyzing and valuing the claims against PALAXAR, beginning in May 2008 when he became Liquidating President of Mirabilis, with the assistance of SHUKER, GREEN, ESTES, CAMPBELL, KOBERT, NORMAN, VILMOS through May 2010 and while preparing for a hearing in MVI's bankruptcy. Exhibit 61

140. On December 2, 2009, at the PALAXAR LITIGATION hearing to lift the stay, despite the 18 months that had passed since PALAXAR LITIGATION had been stayed to provide time to review the case, CUTHILL, KOBERT, NORMAN,  VILMOS and BROAD requested an additional 60 days stating they needed more time to review the case, and the Court denied the request.

141. On January 4, 2010, BROAD and BALCH, by their employees were pre-petition counsel for

NEXIA and MVI as shown by their Federal Rule of Civil Procedure 26(a) designations in related litigation and in furtherance of the PLAN. Exhibit 20

142. CAMPBELL, ESTES, LANGLEY, REESE, and BALCH did not withdraw from the PLAN at any time, as more fully described below.

143. On March 12, 2010, NEXIA, CUTHILL, KOBERT, NORMAN and VILMOS filed a *Motion to Amend Complaint and Add Parties* Exhibit 31 stating to the Court that after 34 months of litigation, hundreds of hours of research, review of thousands of pages of documents and hundreds of hours of videos, they "just became aware of the other two inventors, former employees of the MVI related entities" not named as party defendants in the PALAXAR LITIGATION. CUTHILL, BROAD, KOBERT, NORMAN and VILMOS' *Motion to Amend Complaint* was filed despite no less than 53 documents on the Court's docket, including 14 submitted by MVI and NEXIA, demonstrating that MVI and NEXIA not only knew the identities of all four (4) inventors when the PALAXAR PROCESSES application was filed in 2006 but that the other two (2) inventors had been MVI employees, one of whom had submitted an affidavit in January 2008 in the PALAXAR LITIGATION and who had been deposed several months earlier by KOBERT, NORMAN, VILMOS and BROAD attended by CUTHILL, in related litigation – and questioned specifically on the PALAXAR PROCESSES.

144. From the time the PALAXAR LITIGATION was initially filed, the PALAXAR Defendants made numerous discovery requests to MVI and NEXIA which were ignored by NEXIA, BATES, GOLDBERG, ESTES, CAMPBELL, BALCH, JAIMAN, STOLLENWERK, WILLIAMS, CUTHILL, KOBERT, NORMAN, VILMOS, and BROAD. On August 3, 2010, after months of requests and ultimately the filing of a *Motion to Compel*, the PALAXAR defendants were finally granted access to MVI and NEXIA's warehouse to conduct discovery. Rather than providing actual discovery responses, CUTHILL, KOBERT, NORMAN, VILMOS, and BROAD simply gave access to a warehouse full of documents and hard drives from the CONTROLLED COMPANIES, and after CUTHILL, KOBERT, NORMAN and VILMOS attested to its accuracy. Exhibit 32. The PALAXAR Defendants were provided an incomplete and inaccurate 95 page "warehouse inventory" listing from which PALAXAR was

expected to forage for the documents relevant to MVI and NEXIA's claims against them.

145.    On July 12, 2010, as evidence and in furtherance of the PLAN, CUTHILL authorized VILMOS and BROAD to offer to "dismiss the PALAXAR law suit...with prejudice, in exchange the [PALAXAR defendants] will execute releases which will include *all Mirabilis/Nexia attorneys past and present*..." [Emphasis Added] Exhibit 33.

146.    On August 3, 2010, NORMAN, KOBERT, VILMOS, BROAD, and CUTHILL on behalf of MVI and NEXIA filed a *Motion to Dismiss without Prejudice* stating after 34 months of pursuing the malicious and baseless litigation, CUTHILL suddenly determined "it was not in the best interest of the Debtors' bankruptcy estate to continue with the instant litigation because it appeared unlikely that it would generate any beneficial net recovery for the creditors of the Debtors' bankruptcy estate." Exhibit 34.

147.    On August 6, 2010 the Court granted PALAXAR'S *Motion for Summary Judgment* on all eight (8) counts and on August 9, 2010 *sua sponte* granted PALAXAR defendant Chu's *Motion for Summary Judgment*.

148.    On September 3, 2010, MVI and NEXIA, CUTHILL, VILMOS, NORMAN and BROAD and in furtherance of the PLAN, filed a *Motion for Reconsideration* Exhibit 35 in the PALAXAR LITIGATION in which they once again cited as valid evidence, the *Minutes of the January 25, 2006 Meeting of the Shareholders of MVI*: the very document that CUTHILL, GREEN, SHUKER, and LATHAM SHUKER denied existed in various court to maintain the MVI, et al., bankruptcy and thus the PLAN.

149.    In order to further the PLAN and to benefit the CONSPIRATORS, GREEN, SHUKER, LATHAM SHUKER and CUTHILL denied the existence of a critical document, the *Minutes of the January 25, 2006 Meeting of the Shareholders of MVI*, (if produced would have invalidated CUTHILL'S appointment, invalidated MVI's bankruptcy and terminated the PLAN, and thus the PALAXAR LITIGATION) before the United States Bankruptcy Court for the Middle District of Florida, the United District Court for the Middle District of Florida both as a court of original jurisdiction and as an appellate court for the MVI Bankruptcy, as set forth herein.

150.    On November 1, 2010, MAHER and MAHER FIRM together with MOKWA sent false and

misleading communication in furtherance of the PLAN to over 35 professional colleagues of PALAXAR further damaging PALAXAR by portraying it in a false light. Exhibit 36.

151.    On November 17, 2010, CUTHILL and NEXIA through KOBERT, NORMAN, VILMOS, and BROAD both individually and to maintain related PLAN litigation, argued their *Motion to Reconsider the Summary Judgment* and upon suggestion from the Court offered an *ore tenus* Motion to dismiss all counts against PALAXAR with prejudice in exchange the Court would vacate the order *Granting Summary Judgment* on all counts in favor of PALAXAR.

152.    On September 19, 2011, the Court in the PALAXAR LITIGATION entered its Final Order of Judgment ending the PALAXAR LITIGATION, but not the PLAN. Exhibit 37

153.    The PALAXAR LITIGATION was not based on law or fact and was interposed for improper purposes: the CONSPIRATORS planned, coordinated, acted in a concerted manner to file, publicize, prosecute, preserve and/or otherwise maintained the PALAXAR LITIGATION due to spite, ill will, hatred, and/or malice, and for personal financial gain and in furtherance of the PLAN as set forth herein.

## III.    SPITEFUL, MALICIOUS AND WILLFUL ACTIONS DURING THE PALAXAR LITIGATION AND OTHER PLAN LITIGATION

154.    NEXIA, SLAUGHTER, MAHER, MAHER FIRM, BATES, GOLDBERG, MOKWA, CAMPBELL, ESTES, LANGLEY, REESE and BALCH used knowingly baseless civil litigation and fraudulent insurance demands against PALAXAR and others to conduct improper criminal discovery Exhibit 59 for their client, and to attempt to extort hundreds of millions of dollars for their own personal benefit. Exhibit 1.

155.    SLAUGHTER, MAHER, and MAHER FIRM, in furtherance of the PLAN were receiving information produced from the civil PALAXAR LITIGATION to assist in Amodeo's criminal defense. Exhibit 104

156.    JAIMAN and CUTHILL, together with BALCH, ESTES, CAMPBELL, LANGLEY, REESE, LATHAM SHUKER, GREEN, SHUKER, BROAD, KOBERT, NORMAN and VILMOS falsely attested during the knowingly false and baseless PALAXAR LITIGATION as well as in other related litigation

that was part of the PLAN, that the documents, records, files and electronic media presented as evidence at trial were pursuant to Rule 803.6 of Federal Rules of Evidence, "legitimate [MVI and NEXIA] business records." This attestation despite the fact that such documents, records, files and electronic media while in the sole possession of SLAUGHTER for the criminal defense of his client, and with actual knowledge that critical corporate documents were altered, "substituted," Exhibit 62, forged Exhibit 63 and/or simultaneously concealed from various Courts, while being attested to in other Courts – or later in the same Court, but nonetheless, in the aggregate, were prepared in anticipation of litigation and *had not being used or maintained in the regular course of business since no later than March 2007* when all CONTROLLED COMPANIES, including MVI and NEXIA began liquidation. Exhibit 68.

157.    PALAXAR was denied discovery from MVI and NEXIA from Fall 2007 through August 2010, and when PALAXAR was ultimately given access to MVI's "warehouse full of documents" after a *Motion to Compel* was filed, BROAD and VILMOS falsely attested that all the documents, records, files and electronic media were made available when in fact, the inventory list provided to PALAXAR was not accurate, several hundred boxes were not included, NEXIA corporate records had been removed from the warehouse, and untold volumes of documents had been hidden with Amodeo relatives. Exhibit 32

158.    Beginning in early 2007, BATES, MOKWA, GOLDBERG, JAIMAN, STOLLENWERK and WILLIAMS began "working diligently creating documents in preparation of Amodeo's criminal defense..." Exhibit 65. Certain of these documents were falsely portrayed as "business records" in the PALAXAR LITIGATION and other related PLAN litigation, including but not limited to those submitted to support MVI and NEXIA's *Motion for Preliminary Injunction*, Exhibit 53 by BALCH, ESTES, CAMPBELL, LANGLEY, REESE, BATES, MOKWA, CUTHILL, BROAD, NORMAN, KOBERT, VILMOS, GREEN, SHUKER, LATHAM SHUKER and JAIMAN along with SLAUGHTER, MAHER and MAHER FIRM, GOLDBERG, WILLIAMS STOLLENWERK, and O'MALLEY in furtherance of the PLAN.

159.    Around the same time, SLAUGHTER, MAHER, and the MAHER FIRM took possession of all the records, documents and MATERIALS of Amodeo and the CONTROLLED COMPANIES as part of

Amodeo's criminal defense.

160.    On November 21, 2007, JAIMAN, STOLLENWERK and WILLIAMS purporting to be the "Board of Directors of MVI' gave [Amodeo], (although they maintained to various Courts that he was "never an employee, shareholder or director" of MVI or NEXIA) authority to "waive the attorney-client privilege" on behalf of MVI's 12 subsidiaries including NEXIA..." Exhibit 63.

161.    On December 6, 2007, JAIMAN, BATES, CAMPBELL, ESTES and BALCH filed another false affidavit stating the "former President of MVI [then a PALAXAR defendant] did not have the authority to approve the [August 1, 2006 Assignment Agreements] without board/shareholder approval." Exhibit 53.

162.    As evidence of the PLAN, in the first paragraph of the exhibits attached to JAIMAN's knowingly false affidavit, as filed by BATES, CAMPBELL, ESTES, and BALCH, the "*Written Actions of the Shareholders of Nexia Strategy Corporation dated December 13, 2006*" did indeed contain the necessary shareholder approval:

> Be it resolved that except as otherwise set forth herein [and there's nothing set forth], the Shareholders do hereby ratify and approve and effectuate all actions taken by the Board of Directors and Officers of the Corporation from the date of inception [2005] through December 13, 2006... [NOTE: the Assignment Agreements were signed August 1, 2006, and PALAXAR member Curry's Separation Agreement had been executed in October, 2006.]"   Under the NEXIA By-Laws, it requires "the transaction [be] authorized, approved or ratified by the shareholders." Exhibit 64.

163.    On January 25, 2008, ESTES accompanied in Court by BATES and JAIMAN at the Preliminary Injunction Hearing in the PALAXAR LITIGATION falsely represented to the Court, Exhibit 54 "The only person that can waive that privilege is NEXIA and NEXIA does not waive the privilege..." NEXIA's attorney-client privilege, contrary to what ESTES stated to the Court, had been waived two months earlier. Exhibit 63

164.    On or about September 26, 2009, CUTHILL, GREEN, SHUKER, ESTES, CAMPBELL, LANGLEY retained Thompson McMullen, local counsel in Henrico County, Virginia to obtain PALAXAR member Curry's 2000 divorce and custody litigation court records; billing an additional 40-plus hours to the bankrupt estate. Curry was employed with NEXIA from June 2005, through October 2006. Exhibit 106 There can be no legitimate reason for CONSPIRATORS to have sought that

information other than to further the PLAN.

165.     On December 2, 2009 the Court lifted its stay and reinstated the PALAXAR LITIGATION. The

CONSPIRATORS, completely undaunted by the volumes of evidence in their possession, before the

Courts, and publicly available, which was contrary, in whole and in part, to evidence in the PALAXAR

LITIGATION, continued prosecuting the PALAXAR LITIGATION in furtherance of the PLAN.

### III - A. SPITEFUL, MALICIOUS AND WILLFUL ACTION DURING THE PALAXAR LITIGATION - FRAUDULENT MVI and NEXIA "BUSINESS RECORDS" AND ACTIONS CONTRARY TO WHAT WAS MAINTAINED IN THE PALAXAR LITIGATION

166.     CUTHILL testified that shortly after [May 2008] he interviewed, JAIMAN, BATES, MOKWA,

SLAUGHTER and [Amodeo's attorney, upon information and belief, MAHER]:Exhibit 62

> ...I had been told that the [MVI and NEXIA] board minutes may have been doctored. And -- in other words, maybe there were subsequent board minutes written and substituted for previous board minutes. Surprise, surprise. ...the document production [from the Moore accounting firm against whom CUTHILL initiated a malpractice lawsuit in early 2009] really helped me solidify the corporate minutes, and who the owners were, and who the officers were, at least up through...June or July of '06.

167.     On July 23, 2010, GREEN, in the above referenced case in Federal District Court, submitted an

affidavit in Response to [Defendant's] Motion for Sanctions Exhibit 66 and SHUKER on behalf of

LATHAM SHUKER submitted its Response to the Motion for Sanctions. Exhibit 65 Their Motions and

attendant affidavit submitted confirm the PLAN, the CONSPIRACY and reveal the contradictory and

conflicting testimony, in the PALAXAR LITIGATION and other related litigation, as follows:

> SHUKER stated:

> Upon his appointment as President of MVI [May 28, 2008], Mr. Cuthill began the task of securing corporate records of MVI.  Prior to the Petition Date, MVI had two separate warehouses containing over 5,000 boxes of documents. **The boxes were not organized, indexed or accurately labeled, and some of the boxes were broken and falling apart. It was clear from inspection the boxes had been rummaged through and the documents were strewn about the warehouses.** [Emphasis Added]

> GREEN attested however:

> At the time of the Petition [May 28, 2008], all of the corporate books and records of MVI, including electronic records, were held by the United States of America pursuant to a grand jury subpoena...**Due to concerns about the effects on its criminal investigation, the USA would not give ...Mr. Cuthill access to the Document warehouse until early November, 2009**. Mr. Cuthill did have some very limited access

to MVI documents on one of the MVI servers.  [Emphasis Added]

BATES attested – never mentioning any issues with access to documents: <u>Exhibit 50</u>

...aside from asking  numerous questions, the investigation process included, without limitation: a) Speaking to former and current officers and directors of Mirabilis and Nexia; b) Reviewing all of the corporate governance of Mirabilis and Nexia; c) Reviewing thousands of pages of documents related to Mirabilis and Nexia; d) Reviewing hours of audio/video of former officers and directors of Mirabilis and Nexia; e) Reviewing financial records of Mirabilis and Nexia; and f) Reviewing certain promotional documents of Palaxar.

168.   Again confirming the PLAN, the conflicting and contradictory statements made in various

Courts, SHUKER attested that the documents LATHAM SHUKER, CUTHILL and GREEN relied on to

file and maintain the PALAXAR LITIGATION "were prepared in anticipation of Amodeo's criminal

defense" <u>Exhibit 65</u> yet they had been falsely portrayed to the Court by JAIMAN, BATES, ESTES,

CAMPBELL, CUTHILL, KOBERT, NORMAN and VILMOS as valid "business records:"

SHUKER stated: CUTHILL identified and reviewed the following documents:

ii. Employee Bio: The biographies of various professionals prepared by Aaron C. Bates, Esq., Matthew S. Mokwa, Esq., Shane Williams, Jay Stollenwerk and Jodi Jaiman, employees of MVI and entities owned by Amodeo, in preparation of Amodeo's criminal defense...

iv. Unsigned Frank Amodeo Affidavit:  The [April 2007] affidavit prepared by Aaron C. Bates, Esq., Matthew S. Mokwa, Esq., Shane Williams, Jay Stollenwerk and Jodi Jaiman, employees of MVI and entities owned by Amodeo, in preparation of Amodeo's criminal defense...

xi. Transparency Timeline Index: The Transparency Timeline Index prepared by Aaron C. Bates, Esq., Matthew S. Mokwa, Esq., Shane Williams, Jay Stollenwerk and Jodi Jaiman, employees of MVI and entities owned by Amodeo, in preparation of Amodeo's criminal defense...

xii.  Tax Timeline:  The Tax Timeline prepared by Aaron C. Bates, Esq., Matthew S. Mokwa, Esq., Shane Williams, Jay Stollenwerk and Jodi Jaiman, employees of MVI and entities owned by Amodeo, in preparation of Amodeo's criminal defense...

Draft complaints were also prepared by, or at the direction of Aaron C. Bates, Esq. Mr. Bates was a former employee and in-house counsel to MVI until June 2007. Mr. Bates was subsequently engaged by MVI to commence legal action against former officers, directors and professionals of MVI.  Due to the nature, length and scope of Mr. Bates' employment with MVI, Mr. Bates had *first-hand knowledge of the events in the Draft Complaint(s)*. [Emphasis Added]

GREEN further attested <u>Exhibit 66:</u>

**Page 43 of 72**

Prior to the Petition Date, the pre-petition lawsuits were being prosecuted by a number of law firms and were being overseen by [BATES and MOKWA]...

[BATES] had been the MVI in-house counsel from March 2006 for a period of approximately one year, and at the time of the filing of the petition, he was outside counsel for MVI.

At a meeting with GREEN [that occurred within weeks of MVI's May 28, 2008 Petition Date] [BATES] stated that he spent the previous year analyzing and gathering information related to the claims of MVI and assisting with an orderly wind down of MVI.

After... [February 19, 2009] but prior ... [March 18, 2009] [BATES] called and invited [GREEN] to lunch... [where] he gave [GREEN] a two page memorandum prepared by MVI.   [BATES] also gave [GREEN] a binder comprised of a number of documents...which were business records of MVI which [BATES] obtained from the Document Warehouse prior to the [May 28, 2008] Petition Date.

BATES contradicts this by stating: Exhibit 50

In approximately May 2008, the law firm of Latham, Shuker, Eden & Beaudine, began representing MVI and NEXIA in light of forthcoming bankruptcy proceedings.

At that time [May, 2008], BATES MOKWA was relieved of any authority to act on behalf of Plaintiffs by Mirabilis' liquidating President, CUTHILL.   At the direction of GREEN, BATES MOKWA subsequently turned over all litigation files related to Plaintiffs to GREEN and SHUKER...

CUTHILL testified: Exhibit 67

Most of my meetings with SLAUGHTER were in the beginning of the case [May 2008]. And most of them had to do with the custody of the -- what I'm going to call the Mirabilis documents. The -- when I got into the case, I couldn't tell who was in charge of the Mirabilis documents. And since I was Mirabilis, or representing Mirabilis at that point in time, if the documents belonged to Mirabilis, I wanted to take possession of them.

169.    CUTHILL further testified that he had actual knowledge that neither MVI nor NEXIA were run

by an independent Board of Directors nor a disinterested management team since December, 2006 and

that SLAUGHTER on behalf of his criminal client Amodeo, had all the corporate documents and records.

Exhibit 68

## III – B.  SPITEFUL, MALICIOUS AND WILLFUL ACTION DURING THE PALAXAR LITIGATION - SPITEFUL, MALICIOUS AND ILL WILL ACTIONS AGAINST PALAXAR - MVI BANKRUPTCY LITIGATION

170.    As set forth above, on August 2, 2007, LATHAM SHUKER and GREEN, JAIMAN,

STOLLENWERK, WILLIAMS, BALCH began preparation of the MVI, et al., bankruptcy as part of the

PLAN.

171.    As part of the PLAN, on April 30, 2008, BATES and MOKWA were notified by GREEN, SHUKER, and LATHAM SHUKER Exhibit 69 of the information needed for the "potential Chapter 11 filing." BATES was responsible for amassing and providing all the corporate information, to include the *January 26, 2006 Minutes of the Annual Shareholders Meeting of Mirabilis Ventures, Inc.* wherein the shareholders adopted the Bylaws of MVI.

172.    On May 14, 2008, GREEN, SHUKER, and LATHAM SHUKER met with GOLD and members of the IRS.  GREEN and LATHAM SHUKER had been engaged by AQMI as the "controlling secured creditor of debtor MVI, and together they were considering filing for bankruptcy protection for MVI under Chapter 11" Exhibit 60 which directly conflicted with the affidavits, pleadings and statements made in the PALAXAR LITIGATION and various Courts.  GREEN, with SHUKER present, stated to AUSA GOLD and others that the sole reason for filing the bankruptcy petition was to "use" the bankruptcy to continue the civil litigation [including the PALAXAR LITIGATION as part of the PLAN].

173.    On May 23, 2008, STOLLENWERK, JAIMAN and WILLIAMS resigned from MVI and NEXIA by letters addressed to AQMI. Exhibit 96

174.    On May 27, 2008, JAIMAN, STOLLENWERK and WILLIAMS, working together with BATES, MOKWA, ESTES, CAMPBELL, BALCH, GREEN, LATHAM SHUKER, CUTHILL,  KOBERT, and BROAD resigned from MVI, Exhibit 70 and in violation of MVI's and NEXIA's Articles of Incorporation and Shareholder Agreements, concealed both The *January 26, 2006 Minutes of the Annual Shareholders Meeting of Mirabilis Ventures, Inc.* which required a shareholder vote approving appointment of directors (that BATES, CAMPBELL and ESTES attested to reviewing prior to October 2007 Exhibit 50) as well as the fact that AQMI had seized all of MVI's assets over a year earlier.

175.    JAIMAN, STOLLENWERK and WILLIAMS were MVI shareholders in January 2006, WILLIAMS sent out the January 26, 2006 meeting notice and agenda, which included approval of the MVI Bylaws, and WILLIAMS' January 26, 2006 timesheet reflects his attendance at the MVI Shareholder Meeting. Exhibit 105.

176.    JAIMAN, STOLLENWERK and WILLIAMS, knowingly and without proper authority, appointed Michael Moecker as Director Exhibit 70 who then immediately appointed CUTHILL as Liquidating President of MVI.

177.    On May 27, 2008, in furtherance of the PLAN, CUTHILL, without valid and proper authority, together with JAIMAN, STOLLENWERK, WILLIAMS, KOBERT, BROAD, SHUKER, GREEN, and LATHAM SHUKER, filed a  Chapter 11 bankruptcy petition for MVI: a company that was insolvent since March 6, 2007 and whose assets had previously been seized by its secured creditor, AQMI on May 31, 2007.

178.    On May 27, 2008, MVI filed bankruptcy based on schedules prepared by GREEN and LATHAM SHUKER together with BATES, MOKWA, JAIMAN, STOLLENWERK and WILLIAMS. Exhibit 69. On July 11, 2008, MVI filed its schedules in the bankruptcy case and the schedule of liabilities *did not* indicate that the company faced any liability in regard to unpaid payroll taxes Exhibit 2 contrary to what was pleaded and published by the CONSPIRATORS in the PALAXAR LITIGATION.

179.    On September 23, 2008, GOLD filed a *Motion to Dismiss* [the MVI bankruptcy] *Based upon Its Bad Faith Filing*, and a *Motion to Supplement* on September 29, 2008 properly asserting the bankruptcy violated the Bylaws of MVI and neither its new president [CUTHILL, working together with KOBERT, BROAD, SHUKER, GREEN, and LATHAM SHUKER] nor its counsel [GREEN, SHUKER, and LATHAM SHUKER] had the authority to file the instant bankruptcy. Exhibit 60

180.    GOLD pointed out that as a result of the bankruptcy filing, the U.S. had no ability to seek a money judgment under any civil forfeiture statute and absent a conviction of MVI, the Government would have no legal entitlement to the $200,000,000 but CUTHILL, GREEN, SHUKER, LATHAM SHUKER, ESTES, CAMPBELL, and BALCH were seeking to preserve their personal financial stake in the CONSPIRACY in furtherance of the PLAN. Exhibit 82.

181.    In early October 2008, based on Amodeo's plea, the Government sought immediate seizure of all of the assets Amodeo agreed to forfeit, including those making up the MVI bankruptcy estate, and CUTHILL, GREEN, SHUKER, and LATHAM SHUKER responded by filing an emergency motion to

enforce the automatic stay. Exhibit 2.

182. CUTHILL with GREEN and LATHAM SHUKER present on October 6, 2008, testified that prior to accepting the position as president of MVI, et al., he consulted with his personal attorney KOBERT and BROAD as well as "delivered all the corporate records to LATHAM SHUKER." Exhibit 77

183. On November 25, 2008, GREEN, SHUKER, LATHAM SHUKER and CUTHILL negotiated a compromise with the Government. GOLD, on behalf of the Government, agreed to drop the *Motion to Dismiss [the MVI] Bankruptcy for Bad-Faith* Filing and CUTHILL agreed that the Government could obtain some but not all of the property in the MVI estate. Exhibit 2. As a result of the false statements in furtherance of the PLAN regarding the denial of the existence of The *January 26, 2006 Minutes of the Annual Shareholders Meeting of Mirabilis Ventures, Inc.,* the Bankruptcy Court approved the Compromise in March 2009.

184. CUTHILL also agreed to MVI's allowance of a $200 million forfeiture claim in favor of the Government, jointly and severally with Amodeo, which was $19 million more than the judgment entered against Amodeo. As a Court in related PLAN litigation later noted "MVI [CUTHILL as sole employee and representative] and its attorneys [GREEN and LATHAM SHUKER] had settled the Government's claim without having any idea of the amount of tainted money that flowed into the company, the penalties and interest it faced as a result, or the legal theory under which such liability might be imposed, …MVI had simply opted to settle for $200 million for no other reason than because the Government said it wanted that much." CUTHILL later testified with BROAD and NORMAN present that the $200 million figure he had agreed to "was the Government's number" and was made up of "$120 million worth of unpaid payroll taxes…$61 million of penalties and interest…and $19 million of rounding, upward rounding" CUTHILL further testified that in his view, "the company's [MVI] damages consisted of the $200 million allowed claim and that he therefore had spent little if any time investigating the potential liability to the Government." Exhibit 2.

185. On June 30, 2009, more than a year after having full access to all corporate records, in furtherance of the PLAN, (and contrary to the corporate documents attested to by the debtor's sole

employee, CUTHILL, no less than four (4) times, as well as BATES, CAMPBELL, and BALCH, MVI and NEXIA's counsel since 2006 and 2007 respectively): GREEN and LATHAM SHUKER falsely stated to the Bankruptcy Court that "MVI bylaws were not adopted by the MVI shareholders." Exhibit 71 GREEN and LATHAM SHUKER's knowingly false representations that the MVI bylaws were not adopted by the MVI shareholders, maintained and furthered the PLAN, and resulted in the Bankruptcy Court, as well as the United States District Court for the Middle District of Florida upholding the appointments of CUTHILL as liquidating president, SHUKER, GREEN, ESTES, and CAMPBELL and their firms LATHAM SHUKER and BALCH as well as KOBERT, NORMAN, VILMOS and BROAD as bankruptcy and litigation counsel – in furtherance of the PLAN including but not limited to the PALAXAR LITIGATION.

186.    On August 24, 2009, MVI's former General Counsel and shareholder, Tom Broadhead (hereinafter "Broadhead") submitted an affidavit prior to the MVI Bankruptcy hearing, and certainly prior to the Bankruptcy Court's Order dismissing the challenges to the bad-faith filing, attesting to his attendance at *the January 25, 2006 Annual Meeting of the Shareholders of Mirabilis Ventures, Inc.,* wherein the MVI Bylaws were adopted by the MVI shareholders. Exhibit 76. Despite receipt of Broadhead's affidavit, CUTHILL, GREEN, SHUKER, and LATHAM SHUKER did not make any attempt to contact him, to review the records attested to by BATES, ESTES, CAMPBELL and CUTHILL, and did not correct their false statements to the Bankruptcy Court and the United States District Court, Middle District of Florida, all made in furtherance of the PLAN.

187.    GREEN and LATHAM SHUKER falsely asserted "MVI bylaws were not adopted by the MVI shareholders" again on August 14, 2009, Exhibit 72 as did SHUKER and LATHAM SHUKER on February 5, 2010 Exhibit 73, February 8, 2010 Exhibit 74 Based on these false representations, the United States Bankruptcy Court believed the false assertions Exhibit 78 and denied the *Motion to Dismiss the Bankruptcy* Exhibit 79 and on appeal, the United States District Court for the Middle District of Florida upheld the decision. Exhibit 80.

188.    On February 12, 2010, four (4) days after CUTHILL's counsel SHUKER and LATHAM

SHUKER attested to the U.S. District Court for the Middle District of Florida that the MVI bylaws were not adopted by the MVI shareholders, CUTHILL submitted an affidavit attesting to his review and the validity of the MVI and NEXIA corporate documents and records, and included as an exhibit *The January 26, 2006 Minutes of the Annual Shareholders Meeting of Mirabilis Ventures, Inc.*, adopting the MVI bylaws – the very document GREEN, SHUKER, and LATHAM SHUKER denied to the Bankruptcy Court, Federal District Courts and Appellate Courts. Exhibit 81

189.    On March 5, 2010 SHUKER and LATHAM SHUKER did not correct the false and misleading assertion that the "MVI bylaws were not adopted by the MVI shareholders" in the Appellate Brief filed with the United States District Court, Middle District of Florida Exhibit 75.

190.    On February 12, and 24, 2010 CUTHILL again submitted the same affidavits, now notarized, filed by NORMAN, VILMOS, and BROAD attesting to the same documents that had been denied by GREEN, SHUKER, and LATHAM SHUKER, representing CUTHILL, to defeat a bad faith filing in the Bankruptcy Court, and its appeal to the Federal District Court. Exhibit 81

191.    ESTES, CAMPBELL, and BALCH, while retained as special counsel to debtor MVI similarly attested, with BATES, to the mid-2007 existence and review of *The January 26, 2006 Minutes of the Annual Shareholders Meeting of Mirabilis Ventures, Inc.* wrongfully and falsely denied in the Bankruptcy and Federal Courts by CUTHILL, GREEN, SHUKER and LATHAM SHUKER. Exhibit 50

192.    Between December 2010 and May 2011, KOBERT, NORMAN, VILMOS, BROAD and CUTHILL would attest to the existence, validity and authenticity of *The January 26, 2006 Minutes of the Annual Shareholders Meeting of Mirabilis Ventures, Inc.* in at least five successful pleadings: two (2) *Motions in Opposition to Summary Judgment*, an *Opposition to a Motion for Sanctions*, A *Motion to Reconsider*, and *a Joint Pretrial Statement* where the document was listed twice on Plaintiff MVI's Trial Exhibit List: Exhibit 85, Exhibit 86, Exhibit 87, Exhibit 88, Exhibit 35, and Exhibit 89.

193.    The PALAXAR LITIGATION was maintained, prosecuted and further funded through the knowingly bad-faith filing of MVI's bankruptcy in furtherance of the PLAN as set forth herein.

IV.    **PERSONAL STAKE – DIVERTED, PAID, SEIZED AS LAUNDERED FUNDS, AND**

**PAID FOR PROSECUTION AND/OR ASSISTANCE WITH BASELESS PALAXAR LITIGATION**

194.    As stated previously, in February 2007, GOLD mandated to MVI's one of four in-house counsel "that no payments [were to be made] to creditors particularly insiders that dealt with [PSI]...or it would be construed as money laundering." Exhibit 19.

195.    On March 1, 2007, WILLIAMS as Vice President of MVI, and in furtherance of the PLAN, agreed to "pay AQMI a monthly retainer of $150,000" from undisclosed funds as MVI and NEXIA had ceased all operations and were in liquidation prior to March 2007. Exhibit 91

196.    On March 6, 2007, MVI and NEXIA were insolvent "as of December 31, 2006," and remained insolvent continuously thereafter as attested to by CUTHILL and LATHAM SHUKER. Exhibit 84

197.    On April 5, 2007, STOLLENWERK wired $30,000 of diverted funds to BALCH, who employed LANGLEY, REESE, ESTES and CAMPBELL of which BALCH acknowledged receipt of $20,000. Exhibit 92.

198.    On June 16, 2007, STOLLENWERK, and JAIMAN became signatories on various CONTROLLED COMPANIES' including AQMI's bank accounts from which they subsequently deposited and transferred diverted funds. Exhibit 93, Exhibit 58.

199.    On August 3, 2007, JAIMAN and STOLLENWERK obtained a cashier's check from AQMI's account to pay GREEN and LATHAM SHUKER's $50,000 retainer. Exhibit 3

200.    On October 10, 2007, STOLLENWERK communicated with First Southern Bank seeking information on the $6,750,000 Certificate of Deposit which included $5,500,000 of the SUNZ insurance refund.   Exhibit 94 Several weeks later, $5,500,000 (hereinafter "DIVERTED FUNDS") was subsequently diverted and channeled to members of the CONSPIRACY in furtherance of The PLAN. Exhibit 27.

201.    On January 29, 2008, CUTHILL, BATES, JAIMAN and WILLIAMS retained KOBERT, NORMAN, VILMOS and BROAD as counsel for MVI; the following day STOLLENWERK wired $25,000 of DIVERTED FUNDS to BROAD, in furtherance of the PLAN.

202.    On February 11, 2008, in furtherance of the PLAN and contrary to what the CONSPIRATORS maintained in the PALAXAR LITIGATION, MAHER, SLAUGHTER, and Amodeo, on behalf of MVI entered into a civil litigation contingency agreement with a $100,000 initial retainer fee, whereby MAHER and SLAUGHTER reconfirmed that they would both share between 45 – 55% of all amounts recovered from the PLAN. Exhibit 46.

203.    On February 29, 2008, GOLDBERG invoiced Amodeo $10,000 for one month of "litigation support and preparation of [Amodeo's criminal] defense confirming that he remained a member of the PLAN. Exhibit 99.

204.    From November 14, 2007 through April 24, 2008, and during plea negotiations with AUSA GOLD, SLAUGHTER, MAHER, THE MAHER FIRM, BATES, MOKWA, CAMPBELL, LANGLEY, REESE, BALCH, KOBERT, NORMAN, VILMOS, BROAD, SHUKER, GREEN, and LATHAM SHUKER moved varying amounts of the diverted funds from their client trust accounts to their operating account thus avoiding seizure of the DIVERTED FUNDS. Exhibit 27.

205.    On April 24, 2008, the United States filed a Forfeiture in Rem, Exhibit 98 and Exhibit 27 seizing what remained of the DIVERTED FUNDS as follows:

   a.   from the CONTROLLED COMPANIES, SOONE and those controlled by JAIMAN, STOLLENWERK, WILLIAMS in the amount of $13,000;
   b.   BALCH in the amount of $253,487,
   c.   MAHER in the amount $100,000,
   d.   LATHAM SHUKER in the amount of $20,754.
   e.   BROAD in the amount of $12,528.51; and
   f.   Unsuccessfully attempted to seize the over $600,000 transferred to the law firm owned by BATES, MOKWA and GOLDBERG.

206.    GREEN, SHUKER, and LATHAM SHUKER attempted to negotiate a resolution of the civil forfeiture action with the Government but were unsuccessful. Exhibit 2.

207.    On April 2, 2009, giving actual notice to CUTHILL, KOBERT, NORMAN and VILMOS, GOLD through the US Attorney's Office, moved for an *Unopposed Final Order of Forfeiture* including confirmation of the funds seized from the law firms of the civil counsel, ESTES, CAMPBELL, LANGLEY, REESE - S253,487; MAHER - S100,000; KOBERT, NORMAN, VILMOS - $12,258;

GREEN and SHUKER - $20,754; STOLLENWERK, JAIMAN, and WILLIAMS - $13,100. - no member of the PLAN contested the Preliminary Exhibit 100 or Final Order of Forfeiture. Exhibit 101

208.    As of May 2010, the total cost of administering MVI's bankruptcy was approximately $4,000,000.00:  $2,000,000 of which was paid to CUTHILL, the remainder to GREEN, SHUKER, ESTES, CAMPBELL, LANGLEY, KOBERT, NORMAN, VILMOS, BALCH, BROAD and LATHAM SHUKER, and to others for professional and administrative fees. To date, not a dime has been distributed to creditors, including the United States Government.

209.    On or about June 2010, CUTHILL offered to dismiss the PALAXAR LITIGATION with prejudice in exchange for PALAXAR's commitment to give him 25% of any and all of PALAXAR's subsequent recoveries from BALCH, LANGLEY, ESTES, CAMPBELL and REESE, or as he described them: "the Boys in Birmingham." Exhibit 102. PALAXAR refused and CUTHILL continued to prosecute the PALAXAR LITIGATION in furtherance of the PLAN.

210.    On July 12, 2010, CUTHILL authorized VILMOS to offer to "dismiss the PALAXAR law suit...with prejudice, in exchange the [PALAXAR defendants] will execute releases which will include all Mirabilis/Nexia attorneys past and present..." Exhibit 33.

211.    On March 21, 2012 after prolonged litigation between IRS, MVI and the United States, CUTHILL working with SHUKER and LATHAM SHUKER, in furtherance of the PLAN sought to have the IRS refund approximately $24,000,000 paid by an MVI subsidiary so CUTHILL could get his bonus of approximately $750,000 on the amount "recovered," SHUKER and LATHAM SHUKER could get substantial litigation fees, and the remaining amount would be "repaid' to the IRS. The bankruptcy court and IRS conceded MVI owed no taxes and in fact, had overpaid the IRS in excess of $1,100,000. Exhibit 103

212.    Two years previously, CUTHILL, maintained and argued, in furtherance of the PLAN, a diametrically opposed position stating under oath, that while he believed MVI never really owed any taxes, Exhibit 2, he nonetheless accepted the Government's unsecured claim of $200 million, forcing the Government to indict MVI.  In exchange, the Government would not contest the Bankruptcy.  CUTHILL,

GREEN, SHUKER and LATHAM SHUKER were able to continue the PLAN and protect the CONSPIRATORS' personal financial stake.

213.    On March 21, 2012, the Bankruptcy Court concluded, contrary to all the statements of CUTHILL and other members of the PLAN, MVI had overpaid the IRS, which the IRS conceded was in excess of $1.1 million. Exhibit 103.

## V.    THE CONSPIRACY – WAYS, MEANS AND MANNER:

214.    JAIMAN, STOLLENWERK, WILLIAMS, BATES, MOKWA, GOLDBERG, O'MALLEY, SLAUGHTER, MAHER, THE MAHER FIRM, LANGLEY, ESTES, CAMPBELL, REESE, BALCH, KOBERT, NORMAN, VILMOS, BROAD, GREEN, SHUKER, and LATHEM SHUKER, received DIVERTED FUNDS or a portion of stolen payroll taxes for their work. All received fees or expected to be compensated by sharing in the proceeds of any amounts recovered through the PLAN.

215.    NEXIA and AQMI, and the other CONSPIRATORS furthered the PLAN as they facilitated, filed, publicized, maintained, and prosecuted, without basis in law or fact as set forth herein, the PALAXAR LITIGATION which was incapable of obtaining the relief sought under any circumstance.

216.    All the above acts were in furtherance of the PLAN and showed the personal financial stake of the members of the PLAN as CONSPIRATORS and as named Defendants herein.

217.    No one and thus no CONSPIRATOR ever took any action or provided any notice to withdraw from the PLAN and thus the CONSPIRACY.

218.    Even after the Court ruled from the bench and denied the preliminary injunction for lacking "any, let alone a substantial likelihood of success," the CONSPIRATORS continued the PLAN by:

    a.    knowing and possessing corporate documents which contradicted their factual allegations in the PALAXAR LITIGATION, and

    b.    being in possession of and reviewing a letter opinion from in-house counsel for MVI/NEXIA that the PALAXAR PROCESSES were not "stolen or absconded," and

    c.    knowing that MVI and NEXIA, prior to the PALAXAR LITIGATION, already owned a worldwide royalty-free license to use and profit from the PALAXAR PROCESSES, and

d. despite an 18-month stay that allowed CUTHILL and the CONSPIRATORS to review all corporate documents including a letter opinion from MVI's D&O insurance carrier stating the PLAN was not grounded in fact or law, and

e. prosecuting the PALAXAR LITIGATION was prosecuted with a Second Amended Complaint, and a third amendment was sought despite the fundamental and fatal defects known and available to them in their own documents and filings as well as in public records, thereby causing ongoing damage during such time to PALAXAR as set forth herein; and

f. by effectively seizing and maintaining control over PALAXAR's PROCESSES pending processes, causing termination of ongoing negotiations and expected contracts, and terminating teaming agreements for the sale and marketing of PALAXAR's PROCESSES pending processes and nearly fatally injuring and harming PALAXAR as set forth herein.

219.    The PALAXAR LITIGATION was part of a much larger conspiracy PLAN; the Honorable Judge Gregory A. Presnell, Senior United States District Judge, Middle District of Florida in related PLAN litigation Exhibit 2, pursued for three years in his Court, declared:

"I think this is a stick-up."

### COUNT I
### Tortious Interference with Existing Contract, Contract Expectancy, Prospective Business Relationship and Economic Advantage

220.    PALAXAR realleges and incorporates each of the allegations set forth in Paragraphs 1 through 219 as if fully set forth herein.

221.    PALAXAR engaged in partnering agreements and formed a confidential TEAMING AGREEMENT as described above to market and license the use of its PALAXAR PROCESSES including, without limitation, PricewaterhouseCoopers, Acxiom, Fair Isaac Corporation, Protivity, and Enspire (hereinafter the "TEAM").

222.    Based on these confidential TEAMING AGREEMENTS, PALAXAR and the TEAM engaged in negotiations with, including but not limited to, Wachovia Securities, the Commonwealth of Virginia, the United States Government, the Departments of Defense, and the I.R.S.

223.    PALAXAR was successful and along with certain member of the TEAM entered into contract negotiations with the United States Government.

224.    At the same time, PALAXAR marketed and attempted to license the PALAXAR PROCESSES itself.

225.    As set forth above, PALAXAR had a reasonable probability of economic benefit including but not limited to the license of its PALAXAR PROCESSES as part of the TEAM to the United States Government, Wachovia Securities, the I.R.S. and the Commonwealth of Virginia.

226.    As set forth above, the CONSPIRATORS had actual knowledge of PALAXAR's business relationships and economic expectancies.

227.    As set forth above, NEXIA, CAMPBELL, BALCH and BATES, all funded by AQMI using diverted funds, shortly thereafter were joined by ESTES along with JAIMAN, STOLLENWERK, WILLIAMS, MOKWA, GOLDBERG, LANGLEY, and REESE filed the PALAXAR LITIGATION not based in fact or law and together with O'MALLEY coordinated a public relations media smear campaign based on the baseless PALAXAR LITIGATION, and additionally with CUTHILL, GREEN, LATHAM SHUKER, VILMOS, KOBERT, NORMAN, and BROAD then prosecuted PALAXAR LITIGATION along with and furthered by Bankruptcy Court proceedings, for 34 months prior to offering a voluntary dismissal with prejudice, to further enable the PLAN, rather than have the Order granting Summary Judgment be entered in favor of PALAXAR in the PALAXAR LITIGATION.

228.    CAMPBELL, ESTES, LANGLEY, REESE, and BALCH along with SLAUGHTER, MAHER, MAHER FIRM, BATES, MOKWA, GOLDBERG, JAIMAIN, STOLLENWERK, WILLIAMS, AQMI, NEXIA, CUTHILL, VILMOS, KOLBERT, NORMAN and PUBLICIST or some combination thereof, helped plan, prepare and file the PALAXAR LITIGATION and together with PUBLICIST, engaged in the false public relations media smear campaign, the following occurred as a result thereof:

   a.   The United States Government ceased negotiations with PALAAR and the only TEAM that had the PALAXAR PROCESSES and walked away from the contract;

   b.   Wachovia Bank n/k/a Wells Fargo Bank ceased negotiations with PALAXAR and walked away

from the contract and further negotiations with PALAXAR;

c.  The Commonwealth of Virginia ceased negotiations with PALAXAR and walked away from the contract and further negotiations with PALAXAR;

d.  The I.R.S. ceased negotiations with PALAXAR and its team and walked away from the contract and further negotiations with PALAXAR; and

e.  PricewaterhouseCoopers, Acxiom, Fair Isaac Corporation, Protivity, and Enspire all ceased any efforts under the teaming agreements and refused to market and/or to further do business with PALAXAR as a provider of the anti-fraud and security PALAXAR PROCESSES.

229.   As described above, the CONSPIRATORS and/or some combination thereof, using unfair competition, unethical conduct, and/or other tort and/or other tortious conduct, used the PALAXAR LITIGATION that was not based in law or fact, a worldwide public relations smear campaign based upon the same, and baseless maintenance and prosecution of the PALAXAR LITIGATION to interfere with PALAXAR's contracts, business relationships, and/or business expectancies.

230.   As a result of the above described willful and malicious acts of the CONSPIRATORS, PALAXAR was damaged and injured including but not limited to losing ongoing negotiations, TEAMING AGREEMENTS, and thus access to big data aggregators with which to use, market and/or licenses the PALAXAR PROCESSES, all but completed contracts, and other reasonable business expectancies as set forth herein.

231.   As a result of the above described acts of CONSPIRATORS, PALAXAR was damaged and injured including but not limited to losing ongoing TEAMING AGREEMENTS with data providers and/or other big data companies due to the cloud placed on its titles to the PALAXAR PROCESSES and/or other injury to business goodwill and reputation.

232.   As a result of the above described acts of CONSPIRATORS, PALAXAR was damaged and injured as described above.

**COUNT II**
**Malicious Prosecution**

233.    PALAXAR realleges and incorporates each of the allegations set forth in Paragraphs 1 through 232 as if fully set forth herein.

234.    On April 21, 2010, MVI's Liquidating President CUTHILL testified in related PLAN litigation, regarding another former MVI officer "who filed claims in the MVI bankruptcy were sued in retaliation...not as a primary reason, but certainly one of them." Exhibit 62

235.    NEXIA, BATES, ESTES, CAMPBELL, BALCH, together with JAIMAN, STOLLENWERK, and WILLIAMS filed a civil law suit with no basis in facts or law against PALAXAR stating that PALAXAR stole "Nexia Certification," i.e. the anti-fraud and security processes subject to patents pending, and/or other intellectual property, and therefore should have been required to disgorge not only the stolen intellectual property but also profits to MVI and/or NEXIA.

236.    NEXIA, BATES, ESTES, CAMPBELL, BALCH, together with JAIMAN, STOLLENWERK, and WILLIAMS filed and additionally sought a preliminary injunction in the PALAXAR LITIGATION to prevent PALAXAR from using any of the allegedly stolen PALAXAR PROCESSES and/or intellectual property and then for three months, made no effort to schedule a hearing on their *Motion for Preliminary Injunction.*

237.    CONSPIRATORS filed and/or maintained the PALAXAR LITIGATION to extort funds from PALAXAR for their own individual benefit and enrichment and to wrongfully assist in the criminal defense of Amodeo as follows;

    a.    by providing a source of funds to Amodeo for restitution, and

    b.    to secure improper discovery through a civil proceeding for use in ongoing grand jury investigation, indictment, and trial for tax fraud, as evidenced by the Court granting AUSA GOLD's *Unopposed Motion to Intervene and Stay Discovery* and which unlawful efforts stayed the PALAXAR LITIGATION for more than 18 months.

238.    The AUSA GOLD's *Unopposed Motion to Intervene and Stay Discovery* together with the Court's granting of same should have caused COUNSEL, LAW FIRMS, and/or PARTICIPANTS to dismiss the PALAXAR LITIGATION as illegitimate and malicious purposes and for being instituted for

a controlling motive other than a good faith desire to further the ends of justice but rather, the CONSPIRATORS persisted.

239. Nevertheless, CONSPIRATORS continued the PALAXAR LITIGATION.

240. CONSPIRATORS continued the PALAXAR LITIGATION to secure their own personal stake including but not limited to ongoing payment of fees, potential receipt of "contingency fees," consulting fees, and/or other remuneration as set forth above.

241. Despite the September 2008 entry and the Court's acceptance of Amodeo's guilty plea and amended plea agreement, CONSPIRATORS continued the PLAN including but not limited to the PALAXAR LITIGATION for their own personal benefit, especially because NEXIA was solely reinstated for this ill-fated and unfounded litigation, and that the only entities and persons likely to receive any monies in this matter were the CONSPIRATORS.

242. CONSPIRATORS filed and maintained the PALAXAR LITIGATION in order to damage PALAXAR including but not limited to:

    a. causing PALAXAR to be unable to continue in negotiations for the use and/or sale of its PALAXAR PROCESSES by alleging the same were owned by MVI and/or NEXIA or otherwise stolen or absconded, thereby creating a cloud on the title and ownership of the PALAXAR PROCESSES; and

    b. causing PALAXAR and/or PALAXAR's insurance companies to settle the PALAXAR LITIGATION; and

    c. attempting to secure an advantage in the grand jury investigation, charging, and subsequent criminal prosecution of Amodeo through the restitution of monies exacted from PALAXAR in settlement of this false litigation; and

    d. oppressing the United States Attorney's sole testifying witness in the criminal prosecution, PALAXAR member Curry: MVI's former Board Member and "innocent decision maker;" Exhibit 85, and/or

    e. seeking improper discovery for the pending criminal defense through PALAXAR LITIGATION.

Exhibit 59.

243.     CONSPIRATORS filed the PALAXAR LITIGATION which was not based in facts or law as follows:

   a.  BATES, ESTES, CAMPBELL, LANGLEY, REESE, and BALCH assisted by SLAUGHTER, MAHER, MAHER FIRM, GOLDBERG, JAIMAN, STOLLENWERK, and WILLIAMS filed the PALAXAR lawsuit which was knowingly false, without probable cause, lacked legitimacy, and was unable from the very outset to succeed since the initial filing as supplemented by the filing of three (3) Complaints and seeking a fourth (a Third Amended Complaint) in the PALAXAR LITIGATION, failed to include as defendants all four (4) inventors.

   b.  CUTHILL and NEXIA retained and/or otherwise authorized KOBERT, VILMOS, and BROAD to continue the PALAXAR LITIGATION as part of the PLAN and in furtherance of the same as set forth above.

   c.  Even if the PALAXAR LITIGATION were successful, NEXIA and MVI would have not succeeded in gaining title to the PALAXAR PROCESSES because all four (4) inventors in the PALAXAR PROCESSES were necessary parties, but the PALAXAR LITIGATION named only the two (2) PALAXAR members who were co-inventors as defendants despite NEXIA and BATES, ESTES, CAMPBELL, LANGLEY, REESE, and BALCH and CUTHILL having clear knowledge of the other inventors - which is further evidence of CONSPIRATORS malicious and spiteful ill will; and

   d.  CONSPIRATORS knew both individually and on behalf of the PLAN that all four (4) inventors were necessary parties to the PALAXAR LITIGATION and not just PALAXAR members.

244.     In a belated attempt to legitimize the PALAXAR LITIGATION, on March 12, 2010, 30 months into the PALAXAR LITIGATION, CUTHILL, NEXIA, KOBERT, NORMAN, VILMOS and BROAD attempted, individually and on behalf of the PLAN, to conceal their malicious intent, which included among other things as set forth herein, the failure to name all four (4) inventors as necessary parties by claiming it was newly discovered, and asking the Court to amend the complaint for the third time. The

Court denied their motion.

245.    PALAXAR was using intellectual property which was properly conveyed to PALAXAR through member Curry and did not violate any contract, agreements, common law, statutory, or federal law.

246.    At the time they filed the PALAXAR LITIGATION, NEXIA, BATES, MOKWA, GOLDBERG, ESTES, CAMPBELL, LANGLEY, REESE, BALCH, JAIMAN, STOLLENWERK and WILLIAMS along with SLAUGHTER, MAHER, MAHER FIRM, and AQMI knew it was false because they had possession of and attested to reviewing MVI and NEXIA'S corporate documents and records, PALAXAR member Curry's personnel file and separation agreement including contemporaneous email communication by and between MVI's general counsel, MVI's Board Members with MOKWA, in his capacity as MVI's in-house counsel, all evidencing nothing was "stolen" or "absconded."

247.    On or about June 2010, CUTHILL demanded 25% of any and all recoveries by PALAXAR from BALCH, LANGLEY, ESTES, CAMPBELL and REESE, who he referred to as the "Boys in Birmingham," and CUTHILL would end the PALAXAR LITIGATION through a dismissal in favor of PALAXAR. PALAXAR refused, and CUTHILL continued to prosecute the PALAXAR LITIGATION.

248.    On July 12, 2010, CUTHILL authorized VILMOS to offer to "dismiss the PALAXAR law suit...with prejudice, in exchange the [PALAXAR et al.,] will execute releases which will include all Mirabilis/Nexia attorneys past and present ..." which further evidences the agreement and participation of all of the CONSPIRATORS in the PLAN. [Emphasis Added]

249.    After 34 months of litigation during which the property of PALAXAR was seized and rendered unmarketable and during which PALAXAR was forced to cease its negotiations and entry into contracts for its PALAXAR PROCESSES, on August 6, 2010, the Court granted summary judgment in favor of PALAXAR on all eight (8) counts of the third amended complaint in the PALAXAR LITIGATION.

250.    On November 17, 2010, CUTHILL, NEXIA and BROAD through KOBERT, NORMAN, VILMOS individually and on behalf of, and in furtherance of the PLAN, moved the *Court to Reconsider the Order Granting Summary Judgment* of the PALAXAR LITIGATION and upon suggestion from the Court moved *ore tenus* to vacate the summary judgment order granted in favor of PALAXAR on all eight

(8) counts, in exchange for a voluntary dismissal with prejudice.

251. On September 19, 2011, the Court by written order, entered its *Order of Final Judgment* of the PALAXAR LITIGATION.

252. CONSPIRATORS fulfilled the ends of their PLAN and the PALAXAR LITIGIATION including but not limited to their *Motion for Preliminary Injunction*, by placing a cloud upon PALAXAR's ownership of the PALAXAR PROCESSES rendering PALAXAR unable to continue its ongoing contract negotiations for the sale or use of the PALAXAR PROCESSES during the prosecution of the PALAXAR LITIGATION and thereby damaged PALAXAR's business as set forth herein.

253. CONSPIRATORS, during the pendency of the PALAXAR LITIGATION and the attendant false public relations smear campaign, seized the PALAXAR PROCESSES by placing a cloud on PALAXAR'S rightful ownership and title thereby causing the end of ongoing negotiations for sale and use of the PALAXAR PROCESSES, while at the same time rendering them worthless and unmarketable until the conclusion of the PALAXAR LITIGATION.

254. Even if they had prevailed in their unlawful quest against PALAXAR, under black letter patent and contract law, NEXIA, COUNSEL, LAW FIRMS and PARTICIPANTS would not have succeeded in getting title to the PALAXAR PROCESSES which was the purported aim of the suit – which indicates that the purported aim was something else entirely i.e. the extortion of funds from PALAXAR to benefit PLAN PARTICIPANTS.

## COUNT III
## Common Law Conspiracy

255. PALAXAR realleges and incorporates each of the allegations set forth in Paragraphs 1 through 254 as if fully set forth herein.

256. COUNSEL, LAW FIRMS, PARTICIPANTS and PUBLICIST conspired with the CONTROLLED COMPANIES to devise and carry forth a civil litigation plan and public relations campaign, herein referred to as the PLAN, using the CONTROLLLED COMPANIES including NEXIA and AQMI to demand $420,000,000 from businesses, former officers and directors of the same, save

STOLLENWERK, WILLIAMS and JAIMAN, various insurance companies, and in particular PALAXAR.

257.    CONSPIRATORS or some combination thereof engaged in multi-state and multi-jurisdiction CONSPIRACY, the PLAN, as set forth herein.

258.    SHUKER, GREEN, and LATHAM SHUKER at the behest of and with the agreement of AQMI, NEXIA, JAIMAN, WILLIAMS, STOLLENWERK, SLAUGHTER, BATES, MOKWA, GOLDBERG, ESTES, LANGLEY, CAMPBELL, REESE, BALCH, MAHER and MAHER FIRM were hired to file for bankruptcy in the United States Bankruptcy Court for the Middle District of Florida, to protect and further the PLAN.

259.    As part of the PLAN, CUTHILL was made liquidating president of MVI and pursued actions purportedly on behalf of NEXIA, and by Order of the Bankruptcy Court, CUTHILL was denied the protection of the Barton Doctrine. Exhibit 8

260.    NEXIA was reinstated solely to bring the PALAXAR LITIGATION against PALAXAR.

261.    CONSPIRATORS or some combination thereof combined by agreement and concerted action to do the following:

a.  Use the knowingly false and baseless litigation against PALAXAR to force PALAXAR and/or its Insurance Companies to settle; and

b.  Use the knowingly false and baseless litigation against PALAXAR to be the subject of false and misleading press releases published to interfere with ongoing contract negotiations, to damage the reputation of PALAXAR, and to seize the property of PALAXAR by placing a cloud upon its title and publicizing the same; and

c.  Use the knowingly false and baseless litigation against PALAXAR as a means of oppressing PALAXAR by forcing PALAXAR to fund its defense and at the same time oppressing PALAXAR members; and

d.  Use the knowingly false and baseless litigation against PALAXAR naming only two (2) of the four (4) inventors – all necessary parties, of the PALAXAR PROCESSES, evidencing their

malicious intent; and

e.  Use the knowingly false and baseless litigation against PALAXAR to oppress a PALAXAR member who was the only testifying witness in the criminal sentencing of Amodeo as confirmed by affidavit testimony and MVI's and NEXIA'S own production and findings of the Court; and

f.  Enable the bad-faith filing and maintenance of the MVI et al., Bankruptcy by withholding from the Bankruptcy Court and Federal District Court *the January 25, 2006 Minutes of the Annual Meeting of the Shareholders of Mirabilis Ventures, Inc.*, which evidence that the MVI shareholders did in fact adopt the Bylaws of MVI; thus prolonging the CONSPIRACY, protecting their personal financial interests and continuing to effectively seize the property of PALAXAR – as confirmed by BATES, CAMPBELL, GREEN and CUTHILL's affidavits as well as various pleadings in the Bankruptcy and various Federal Courts; and

g.  Improperly secure, without basis in law or fact, funds via settlements and/or recoveries from PALAXAR and 112 possible defendants  by falsely portraying documents and records held since January 2007 in the sole possession of criminal defense attorney SLAUGHTER and Amodeo,  as valid "business records" of the CONTROLLED Companies that had been insolvent since at least March 6, 2007, defunct and/or had been seized by the secured creditor – as acknowledged by JAIMAN, STOLLENWERK, SLAUGHTER, GREEN, and others in documents and various affidavits submitted in Bankruptcy and Federal District Court, and deposition testimony; and

h.  Conceal their own lack of independence and their financial interest in the outcome of the litigation – as acknowledged by SLAUGHTER in open court, deposition testimony of CUTHILL, and documents filed and attested to in Bankruptcy and Federal District Court by SHUKER; and those produced by MVI and NEXIA; and

i.  Fraudulently attempt to collect on various CONTROLLED COMPANIES' D&O insurance policies but more particularly made the same demand upon PALAXAR and/or its member's insurance companies – as acknowledged by members of the CONSPIRACY in documents and various affidavits submitted in Bankruptcy and Federal District Court, and deposition testimony;

and

j.  Use the PALAXAR LITIGATION as a means of conducting improper criminal discovery to aid their client Amodeo – as confirmed by the CONSPIRATORS and the Court when it granted AUSA GOLD's *Unopposed Motion to Intervene and Stay Discovery*; and

k.  Possess a personal interest and/or stake including but not limited to a contingent fee of up to up to 45-55% of all amounts recovered from the PALAXAR LITIGATION, and the PLAN, ongoing hourly fees for work done in furtherance, consulting fees for work done in furtherance, and/or other remuneration which was evidenced in part by GOLD's seizure of diverted and laundered monies from the accounts of the same as set forth above;

262.    At all times relevant hereto the CONSPIRATORS took over for their own means and ends the PALAXAR LITIGATION to further their personal stake by continuing the MVI bankruptcy and confirming, albeit improperly and in contravention of withheld documents, CUTHILL as liquidating president of MVI, and continuing with the baseless PALAXAR LITIGATION.

263.    On October 17, 2007, with the intent to interfere in PALAXAR's business expectancy, BATES, CAMPBELL, ESTES, JAIMAN, LANGLEY, REESE, BALCH and O'MALLEY issued the knowingly false press releases on PRNewswire on the worldwide web, including but not limited to: "Orlando-based private equity fund Mirabilis Ventures, Inc. has filed a lawsuit and a preliminary injunction against PALAXAR...to enjoin them from utilizing property, trade secrets and confidential/proprietary information that rightfully belongs to Mirabilis."    At the time the press release was issued, BATES, MOKWA, JAIMAN, CAMPBELL, ESTES, LANGLEY, and REESE knew it was false as prior to the commencement of the law suit, the terms of PALAXAR member Curry's separation agreement were discussed between BATES, MOKWA, GOLDBERG, JAIMAN, STOLLENWERK and WILLIAMS. MVI was functionally insolvent, and NEXIA was defunct since no later than March 4, 2007 and had ceased to exist once its assets were seized by its secured creditor, AQMI on May 31, 2007.

264.    In addition to the acts described above, SLAUGHTER as criminal counsel, individually and in furtherance of the PLAN,   retained sole possession of all corporate documents and records, thus

preventing civil discovery and/or otherwise hampering civil discovery in the PALAXAR LITIGATION

265.     In addition to the acts described above, O'MALLEY, individually and in furtherance of the PLAN, contracted with the CONTROLLED COMPANIES at the direction of SLAUGHTER, MAHER, MAHER FIRM, BATES, LANGLEY, ESTES, CAMPBELL, REESE, BALCH, JAIMAN, STOLLENWERK, WILLIAMS, MOKWA, and GOLDBERG, and coordinated, drafted and published false, misleading and defamatory publications about PALAXAR as part of the plan to damage PALAXAR's business and good will, to place a cloud upon the title to their PROCESSESs pending processes, to impair the ongoing negotiations for sale or use of PALAXAR's PROCESSES.

266.     In addition to the acts described above, JAIMAN, individually and in furtherance of the PLAN, testified falsely in the PALAXAR LITIGATION as well as other PLAN related litigation, concealed the real party in interest, concealed critical MVI corporate documents to enable CUTHILL's wrongful appointment as MVI's liquidating president, transferred diverted funds to facilitate and further the PLAN, engaged in a knowingly false publicity smear campaign relying upon these false facts to otherwise harm and damage PALAXAR and its marketing and sale of the PALAXAR PROCESSES.

267.     In addition to the acts described above, WILLIAMS, individually and in furtherance of the PLAN concealing the real party in interest, concealed critical MVI corporate documents to enable CUTHILL's wrongful appointment as MVI's liquidating president, transferred and/or concealed diverted funds to facilitate and further the PLAN, engaged in a publicity campaign relying upon these false facts to otherwise harm and damage PALAXAR and its marketing and sale PALAXAR PROCESSES.

268.     In addition to the acts described above, STOLLENWERK, individually and in furtherance of the PLAN concealed the real party in interest,   concealed critical MVI corporate documents to enable CUTHILL's wrongful appointment as MVI's liquidating president, transferred and/or concealed diverted funds to facilitate and further the PLAN, engaged in a publicity campaign relying upon these false facts to otherwise harm and damage PALAXAR and its marketing and sale of its PALAXAR PROCESSES, and created knowingly false financial summaries maliciously used in the PALAXAR LITIGATION.

269.     BATES, GOLDBERG and MOKWA, each a fact witness for AQMI, MVI and NEXIA since

2006, contracted with Amodeo and various of his CONTROLLED COMPANIES under criminal INVESTIGATION. In addition to the acts described above, GOLDGERG, BATES and MOWKA, individually and in furtherance of the PLAN concealed and/or assisted in the creation of documents alleged to be corporate business records of MVI and/or NEXIA and falsely used as the same, agreed and participated with the collection of actual corporation records of the CONTROLLED COMPANIES to be transferred to the possession of SLAUGHTER, MAHER, and/or MAHER FIRM as criminal counsel, who would retain sole possession of all the corporate documents and records, thus preventing discovery to any civil defendant in the PALAXAR LITIGATION; and along with SLAUGHTER, MAHER, LANGLEY, ESTES, CAMPBELL, REESE, and BALCH devised the PLAN and thus the CONSPIRACY from an office within their law offices and with MVI, NEXIA and AQMI and the CONTROLLED COMPANIES purporting to be operating adjacent thereto.

270. In addition to the acts described above, BATES and MOKWA, individually and in furtherance of the CONSPIRACY, were subsequently hired by MAHER who then allowed MAHER FIRM, without entering an appearance, to assist BATES and MOKWA in the PALAXAR LITIGATION by falsely portraying the MAHER FIRM and MOKWA as the attorney retained in the litigation, not as the counter-claim defendant.

271. GOLDBERG, a fact witness for MVI and NEXIA since 2005, contracted with Amodeo and various of his Controlled Companies while under criminal INVESTIGATION. In addition to the acts described above, GOLDBERG, individually and in furtherance of the PLAN concealed the real party in interest, concealed critical MVI corporate documents to enable CUTHILL's wrongful appointment as MVI's liquidating president; engaged in a publicity campaign relying upon these false facts to otherwise harm and damage PALAXAR and its marketing and sale of its PALAXAR PROCESSES, assisted in the filing and maintenance of the knowingly false PALAXAR LITIGATION, participated in the drafting and publishing of knowingly false and defamatory publications against PALAXAR, and concealed his personal financial interest in the outcome of the litigation.

272. ESTES, CAMPBELL, LANGLEY, REESE and thus BALCH, contracted with AQMI, MVI,

NEXIA and Amodeo and various of his CONTROLLED COMPANIES while under criminal INVESTIGATION. In addition to the acts described above, ESTES, CAMPBELL, LANGLEY, REESE and thus BALCH, individually and in furtherance of the PLAN participated in the planning, filing, execution and maintenance of the knowingly false PALAXAR LITIGATION, filed knowingly false documents in the PALAXAR LITIGATION, participated in the drafting engaged in a publicity campaign relying upon these false facts to otherwise harm and damage PALAXAR and its marketing and sale of its PALAXAR PROCESSES, continuing as litigation counsel to MVI's bankruptcy estate.

273.    GREEN, SHUKER, and thus LATHAM SHUKER   contracted with Amodeo and various of his Controlled Companies while under criminal INVESTIGATION. In addition to the acts described above, GREEN, SHUKER, and LATHAM SHUKER, individually and as part of the conspiracy, participated in the planning, filing, execution and maintenance of the knowingly false MVI bankruptcy which maintained the PALAXAR LITIGATION against PALAXAR through NEXIA, a newly reinstated subsidiary:  filed knowingly false documents in the United States Bankruptcy Court for the Middle District of Florida and before the United States District Court for the Middle District of Florida continuing the false MVI bankruptcy and thereby continuing the false and baseless PALAXAR LITIGATION; sought the appointment of CUTHILL as liquidating president for MVI while ignoring or deliberately overlooking valid corporate documents of MVI and NEXIA which would have foreclosed such an appointment, continued bankruptcy, and otherwise; failed to dismiss with prejudice the MVI Bankruptcy and thereby end the baseless PALAXAR LITIGATION but instead continued as bankruptcy counsel both before the United States Bankruptcy Court and on appeal to the United States District Court.

274.    In addition to the acts described above, NORMAN, KOBERT, and VILMOS and BROAD, individually and in furtherance of the PLAN, maintained the PALAXAR LITIGATION, namely joining as co-counsel with CO-CONSPIRATOR COUNSEL by joining PALAXAR LITIGATION as counsel and ultimately prosecuting the PALAXAR LITIGATION long after any reasonable lawyer and/or law firm knew or should have known that the PALAXAR LITIGATION was false, malicious, not well based in fact or law, and such that a recovery for NEXIA as well as MVI and their clients was not only unlikely

but impossible; and filed knowingly false motions to vexatiously maintain the baseless litigation against PALAXAR.

275.    In addition to the acts described above, KOBERT and BROAD, individually and in furtherance of the CONSPIRACY and PLAN, reviewed and approved MVI's bankruptcy filing, in the planning, filing, execution and maintenance of the knowingly false bankruptcy, maintained the knowingly false litigation against PALAXAR, concealed critical evidence to allow CUTHILL's appointment as MVI's president, while continuing as litigation counsel to MVI's bankrupt estate.

276.    In addition to the acts described above, VILMOS and BROAD, individually and in furtherance of the CONSPIRACY, and PLAN attempted to settle the PALAXAR LITIGATION and protect the COUNSEL CONSPIRATORS with an offer to dismiss the same in exchange for a release of "*all MVI and NEXIA attorneys past and present.*"

277.    In addition to the acts described above, CUTHILL, individually and in furtherance of the CONSPIRACY testified, that for about a year prior to [his May 2008] appointment [that he] did...research on MVI...reading news articles, reading court pleadings, whatever information [he] could get about MVI to learn more about the company. After three more years as liquidating president of MVI and thus NEXIA as well as substantial hours of researching documents and evidence, CUTHILL said there was "[n]ever a point in time when [he] agreed with the government that MVI was a co-conspirator with [Amodeo] in the actual stealing of the payroll taxes, not simply receiving some of the stolen payroll taxes." In spite of CUTHILL's admission, he pursued the PALAXAR LITIGATION, individually and as part of the PLAN, and also entered a no contest plea when MVI and NEXIA were criminally indicted even though CUTHILL maintained that MVI and thus NEXIA were not responsible for the failure to pay payroll taxes.

278.    CUTHILL, as liquidating president for MVI and thus NEXIA, used MVI's bankruptcy to prevent the Government from seizing all of the assets of Amodeo activities which were used in part to fund both the MVI bankruptcy and which allowed the PALAXAR LITIGATION to continue. All the while the CONSPIRATORS earned fees and monies for work done and thus evidenced a personal stake in the MVI

Bankruptcy and the ongoing PALAXAR LITIGATION continued as result thereof.

279.     Of particular note, CUTHILL, NEXIA, NORMAN, VILMOS, KOLBERT, and BROAD, individually and on behalf of the PLAN, stated to the Court during *ore tenus* Motion to Reconsider the Granting of Summary Judgment that the PALAXAR LITIGATION after 34 months of litigation, three (3) Amended Complaints, and extensive discovery was not likely to recover any assets for the MVI/NEXIA bankrupt estate.

## COUNT IV
### Statutory Business Conspiracy Under Virginia Code §§18.2-499, et seq.

280.     PALAXAR realleges and incorporates each of the allegations set forth in Paragraphs 1 through 279 as if fully set forth herein.

281.     CONSPIRATORS or some combination thereof combined, associated, agreed, mutually undertook and joined together to prosecute the PALAXAR LITIGATION by and through the acts described above and incorporated herein.

282.     CONSPIRATORS or some combination thereof acted intentionally, purposefully, and without lawful justification, including but not limited to the above acts.

283.     Moreover, CONSPIRATORS, or some combination thereof intended their acts, continued the PALAXAR LITIGATION without bases, engaged in multiple and prolonged false statements to multiple tribunals or otherwise failed through act or omission to present proper documents and/or facts in their immediate and/or collective possession that would have persuaded any reasonable litigants to dismiss with prejudice the PALAXAR LITIGATION.

284.     As a result of the above acts of CONSPIRATORS, or some combination thereof, PALAXAR was thereby injured in its business including, without limitation, as set forth above as well as the ongoing contract negotiations for the sale or use of its PROCESSES pending processes, the Wachovia deal, Department of Defense, the I.R.S., and Commonwealth of Virginia ongoing negotiations as more particularly set forth above and incorporated herein; the economic benefits from marketing and/or otherwise negotiating and then contracting for the use and/or sale of said PROCESSES pending processes

as more particularly set forth above and incorporated herein; having seized by the baseless PALAXAR LITIGATION said PALAXAR PROCESSES or rendering the same unmarketable or otherwise worthless during the pendency of the PALAXAR LITIGATION by the filing of the same and publicity campaign that put a cloud upon PALAXAR's rightful title to its PALAXAR PROCESSES as set forth above and incorporated herein.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs PALAXAR demands judgment against Defendants SLAUGHTER, MAHER, BATES, MOKWA, GOLDBERG, JAIMAN, WILLIAMS, STOLLENWERK, ESTES, CAMPBELL, LANGLEY, REESE, O'MALLEY, KOBERT, NORMAN, VILMOS, GREEN, SHUKER, LATHAM SHUKER, MAHER FIRM, BROAD, BALCH, AQMI and NEXIA as follows:

**As to COUNT I - TORTIOUS INTERFERENCE WITH EXISTING CONTRACT, CONTRACT EXPECTANCY, PROSPECTIVE BUSINESS RELATIONSHIP AND ECONOMIC ADVANTAGE**

a) Awarding PALAXAR compensatory damages against each Defendant, in an amount to be determined at trial, but not less than $49,000,000, together with prejudgment and post-judgment interest at the maximum rate allowable by law;

b) Awarding PALAXAR punitive damages against each Defendant in an amount to be determined at trail but not less than $98,000,000;

c) Awarding PALAXAR such other and further relief as this Court may deem just and proper.

**As to COUNT II – MALICIOUS PROSECUTION**

a) Awarding PALAXAR compensatory damages against each Defendant, save O'MALLEY, in an amount to be determined at trial, but not less than $49,000,000, together with prejudgment and post-judgment interest at the maximum rate allowable by law;

b) Awarding PALAXAR punitive damages against each Defendant in an amount to be determined at trail but not less than $98,000,000;

c) Awarding PALAXAR such other and further relief as this Court may deem just and proper.

**As to COUNT III – COMMON LAW CONSPIRACY**

a) Awarding PALAXAR compensatory damages against each Defendant in an amount to be determined at trial, but not less than $10,000,000, together with prejudgment and post-judgment interest at the maximum rate allowable by law;

b) Awarding PALAXAR such other and further relief as this Court may deem just and proper.

**As to COUNT IV – STATUTORY BUSINESS CONSPIRACY UNDER VIRGINIA CODE §§18.2-499, et seq.**

a) Awarding PALAXAR compensatory damages against each Defendant in an amount to be determined at trial, but not less than $49,000,000, together with prejudgment and post-judgment interest at the maximum rate allowable by law;

b) Awarding PALAXAR treble damages, in an amount to be determined at trial but not less than $147,000,000, plus interest, costs and attorneys' fees on Count IV of the Complaint;

c) Awarding PALAXAR costs, including reasonable attorney's fees, incurred in connection with this action;

d) Awarding PALAXAR such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Pursuant to Fed. R. Civ. Proc. 38, Plaintiffs in the above captioned matter demand a trial by jury of all issues in this matter and respectfully request this matter to be placed on the jury docket.

Respectfully submitted this 18th day of September, 2013,

By:     PALAXAR GROUP, LLC.
        PALAXAR HOLDINGS, LLC.

RICHARD J. KNAPP, Esq., V.S.B 15834
Richard J. Knapp, P.C.
2800 Patterson Avenue, Suite 101
Richmond, VA 23221
804-377-8848 (Telephone)
804-377-8851 (Fax)
Richard@RKnappesq.com

Counsel for Plaintiffs


DARREN MARSHALL HART, Esq., V.S.B 36794
9025 Forrest Hill Avenue, 1ST Floor
Richmond, VA 23221
804-673-9339 (Telephone)
804-673-9969 (Fax)
Info@Richmond-Law.com
Counsel for Plaintiffs