UNITED STATES

MIDDLE DISTRICT OF FLORIDA

ORLANDO DIVISION

PALAXAR Group, LLC and
PALAXAR Holdings, LLC,
                    respondents

versus                              Case #: 6:14-cv-758-Orl-28-GJK

Shane Williams, Jay Stollenwerk, et. al.

_____/

## APPENDIX IN SUPPORT OF OBJECTIONS TO THE MAGISTRATE'S ORDER OF AUGUST 12, 2014

On August 12, 2014, the magistrate ordered certain motions filed by me on behalf of AQMI Strategy Corporation and Nexia Strategy Corporation stricken or denied or both. That order, however, authorized me to file objections. Those objections and a motion for reconsideration were file on August 24th and 25th respectively. A memorandum in support of the objections and reconsideration will be filed on August 27, 2014. This appendix contains corroborative evidence for the factual allegations and factual statements contained in those pleadings.

Respectfully submitted this 29th day of August 2014, by:

Frank L. Amodeo, 48883-018
FCC – Low  Unit B-3
PO Box 1031
Coleman, FL 33521-1031

## Certificate of Service

This appendix was hand delivered to the Clerk of the Court on August 29, 2014. All parties to be served are registered with the CM/ECF docketing system; thus the Respondent requests that notice of the filing and services of the appendix be made to the United State's attorney of record via the electronic system.

Frank L. Amodeo

Appendix

of

Frank L. Amodeo's Mental Health and Guardian History

August 10, 2014

(Standardized for Submission in Multiple Cases)

# Appendices

Appendix 'A'    Chronology and Summary of Frank L. Amodeo's Mental Health History

Appendix 'B'    Ward's Suggestion of Capacity Report

Appendix 'C'    Bureau of Prison's Treatment Information

Appendix 'D'    2008 Appointment of Plenary Guardian

Appendix 'E'    McLean Hospital Psychiatric Evaluation

Appendix 'F'    General Explanation of Bipolar Disease

Appendix A

Chronology and Summary of Frank L. Amodeo's Mental Health History

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

Frank L. Amodeo,

      Movant,

-vs-

                                     Case No.

United States of America,

      Respondent.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

A verified statement listing the date and individuals who diagnosed or treated Frank L. Amodeo for his mental illness.

- In 1995, Dr. Cydndey Yerushalmi, on behalf of the Social Security Administration, conducted a disability examination of Amodeo. She concluded Amodeo was the most manic person she ever examined, but she did not inform Amodeo of his disorder, because Amodeo failed the financial test.

- In 1998, Dr. Phillip Tell, a mental health therapist in Orlando, began treating Amodeo as a result of Amodeo's wife insistance. Amodeo's set treatment gets interrupted by Amodeo's first criminal prosecution.

- In 1998, Dr. Stephen O'Hagan at the request of the Federal Defenders Office conducts a psychiatric examination and evaluation of Amodeo. The results of this evaluation are never been disclosed; even though the evaluation was conducted its after the U.S. Probation Office's pretrial investigation suggested Amodeo should be examined.

- In 2000, Dr. Janet Lewis, a Bureau of Prisons psychiatrist, diagnosed Amodeo as having Cyclothymia, experiencing caffeine psychosis, and abusing Psuedophedrine primarily in the form Sudafed.

- In 2001, Dr. Joseph Trim began treating Amodeo after Amodeo's release from the Pensacola prison camp. Eventually, Amodeo could not afford the private pay rates and had to stop the treatment.

- In 2003, Diane Shuker, a mental health specialist, chosen by U.S. Probation Office, began treating Amodeo after the district court modified Amodeo's criminal judgment to permit Probation to pay for the care.

- In 2004, Robert Pollack, M.D. became a business associate of Amodeo and, as that relationship developed, Amodeo stopped seeing other doctors. Dr. Pollock never assumed a formal role as a treating doctor, except for prescribing certain medicines, (not antipsychotics or mood control drugs) but he was suppose to ensure Amodeo did not get to "far afield".

2

- In 2005–2006, Amodeo is untreated.

- In 2007, Dr. Jeffery Danzinger is hired by Harrison Slaughter to conduct a forensic examination of certain recordings in order to ascertain Amodeo's past mental health. Dr. Danzinger's status as Mr. Slaughter's hired forensic expert ethically prevented Dr. Danzinger from establishing a treatment relationship with Amodeo, thus Dr. Danzinger referred Amodeo to Dr. Krotenberg.

° In June 2007, Dr. Krotenberg diagnosed Mr. Amodeo as an Axis-I bipolar with psychotic features (presumably delusions). Dr. Krotenberg began Amodeo on a regimen of mood control and antipsychotic drugs.

° In 2008, Dr. Darlene Antonio, on behalf of the State's appointed committee, issues a report finding that Amodeo is bipolar, incapable of managing his own affairs and that plenary guardianship is required.

° In August 2008, McLean Hospital in Belmont, Massachusetts admitted Amodeo for inpatient treatment. There, Amodeo was examined by several different psychologists, psychiatrists and mental health professionals: Dr. Evan Murray, Dr. Susan Parks, Dr. Peter Choras, Dr. Jennifer Taylor, Specialist Andrea O'Rourte, Dr. Alexander Vukovic, etc. McLean's assessment was Axis-I bipolar with psychotic features and persistent delusion. They prescribed new medications, 18 month therapy plan, and a 72 hour decision making lag-time, etc.

° In or about November of 2008, Dr. Peter Choras commences treatment of Amodeo via telephone, because the pending civil and criminal litigation prevented Amodeo from obtaining a treating professional in Orlando. Dr. Danzinger could not conduct the treatment because of his witness status, but Dr. Danzinger did agree to prescribe the medication since Dr. Choras was not licensed in Florida, and because Magistrate Kelly had ordered continued use of the medicine as a condition of bond.

° In or about May 2009, Dr. Danzinger contacted probation officer Donna Weebe and told her to find Amodeo immediately because blood tests revealed the court mandated medicine had reached toxic levels and could kill Amodeo if he did not stop taking medication.

° On May 26, 2009, immediately after sentencing, Orange County Jail Psychology Department on behalf of the United States Marshal Service placed Amodeo in the Acute Mental Health Unit of the Orange County jail.

° In July 2009, Dr. V. Davilla of the Coleman (Low) Health Services put Amodeo on chronic care and prescribed the medication as recommended by McLean Pavilion.

3

° 2009 – 2012, Two different BOP psychiatrist both named Dr. Garcia counsel Amodeo, and Dr. Davilla continued to prescribe Amodeo an ever decreasing dose of the psychiatric medications.

° February 2012, Dr. Garcia approved my complete cessation of the medication. But, Dr. Davilla suggested Amodeo continue to keep the Depakote-equivalent available just in case Amodeo needed to take it, especially for a few months.

° In September 2013, Dr. Darlene Antonio at the direction of the State of Florida came to Coleman (Low) prison and conducted an examination to determine my current mental health status. Dr. Antonio concludes Amodeo has improved but still lacks capacity to manage his own affairs or make major decisions.

° In January 2014, Dr. Dexter James of the Bureau of Prison's Psychology department conducted a formal interview, which was followed by a couple of informal interviews to ascertain my current mental state, and whether Amodeo was continuing to remain stable while in general population.

I declare, under penalty of perjury in accordance with 28 U.S.C. §1746 that the foregoing statement is true and correct to the best of my knowledge.

Frank L. Amodeo #48883-018
FCC – Low        Unit B-3
P.O. Box 1031
Coleman, Fl 33521-1031

## Treatment Summary

| Date | Treating Professional | Agency |
|---|---|---|
| 1995 | Cydndey Yerushalmi | Social Security Adm. |
| 1998 | Phillip Tell | Private |
| 1998 | Stephen O'Hagan | Private |
| 2000 | Janet Lewis | Bureau of Prison's |
| 2001 | Joseph Trim | Private |
| 2003 | Diane Shuker | Probation Office Cont. |
| 2004 | Robert Pollock(Informally | Private |
| 2007 | Jeffery Danzinger | Private |
| 2007 | Jeffery Krotenberg | Private |
| 2008 | Darlene Antonio | State of Florida |
| 2008 | Peter Choras | Private |
| 2008 | Alexander Vukovic | Private |
| 2008 | Susan Parks, et. al. | Private |
| 2009 | P. V. Davilla | Bureau of Prisons |
| 2009 | J. Garcia | Bureau of Prisons |
| 2012 | J. Garcia (Different) | Bureau of Prisons |
| 2013 | Darlene Antonio | State of Florida |
| 2014 | Dexter James | Bureau of Prisons |

Appendix B

Ward's Suggestion of Capacity Report

ward

## Darlene B. Antonio, Ph.D., LLC
### Licensed Psychologist

2700 Westhall Lane, Suite 110, Maitland, Florida 32751
407-475-1025   407-475-1027 (Fax)

## SUGGESTION OF CAPACITY EVALUATION

**NAME:** Frank Amodeo

**CASE NUMBER:** 2008-CP-001369.

**DATE OF BIRTH:** September 1, 1961 (Age: 52)

**DATE OF EVALUATION:** September 13, 2013

**DATE OF REPORT:** November 7, 2013

**REFERRAL QUESTION:** Mr. Amodeo was referred for a Suggestion of Capacity evaluation per Court order dated August 8, 2013 by the Honorable Belvin Perry, Jr. of the **Ninth Judicial Circuit** in and for Orange County, Florida, Probate Division.

## REVIEW OF MEDICAL RECORDS AND COLLATERAL INTERVIEWS:

1. August 2008 medical records from McLean Hospital.

2. Collateral phone interviews:

   September 22, 2013. **Dr. Jeffery Danziger.** Psychiatrist who previously evaluated Mr. Amodeo in 2008.

   September 23, 2013. **G. Michael Adkins.** President & Founder, All Clear Investigations. Mr. Adkins was formerly employed by Mr. Amodeo as a private investigator and body guard and was also a partner in one of his corporations.

   September 23, 2013. **Marty Flynn.** Private Investigator. Mr. Flynn has known Mr. Amodeo since 2000. He considers Mr. Amodeo to be a friend. In the past Mr. Amodeo worked as a consultant for Mr. Flynn's company. Mr. Flynn has also been employed by Mr. Amodeo and they have been partners in various companies and ventures. He currently assists Mr. Amodeo with his appellate cases.

   September 24, 2013. **Deborah Milotte.** Mr. Amodeo's sister.

   September 24, 2013. **Claire Holland.** Mr. Amodeo's wife.

FILED IN OFFICE
PROBATE MENTAL HEALTH
2013 NOV 12  PM 3:42
LYDIA GARDNER
CLERK CIRCUIT COURT
ORANGE CO. FL

FRANK AMODEO
Suggestion of Capacity Evaluation
September 13, 2013

2008-MH-001369-O

3. Additional relevant information about Mr. Amodeo's case was obtained from his attorneys, Myra Nicholson, Esquire and Laurence J. Pino, Esquire.

## PROCEDURES AND TESTS:
- Clinical Interview with Mr. Amodeo
- Saint Louis Mental Status(SLUMS) Examination
- Minnesota Multiphasic Personality Inventory-2 (MMPI-2)

**BACKGROUND INFORMATION:** On June 11, 2008 the Court appointed a three person examining committee to evaluate Mr. Amodeo in response to a Petition To Determine Incapacity. As a member of the examining committee, this psychologist evaluated Mr. Amodeo on June 26, 2008.

Mr. Amodeo has a history of impressive business success with his company, Mirabilis Ventures. During his June 2008 evaluation with this psychologist he provided photographs and other documents to illustrate his international business activities. These included a photograph of himself with President Bush reportedly taken when Mr. Amodeo was attending a foreign policy meeting with high level government and NATO officials. During the evaluation, Mr. Amodeo exhibited a fixed delusional belief that he would be "Emperor of the World". He also asserted that he had special powers and could perform miracles to convince others to support his ambitions. Mr. Amodeo was under psychiatric treatment at that time and was diagnosed with Bipolar I Disorder with psychotic features. On June 30, 2008 the Court determined Mr. Amodeo to be mentally incapacitated and unable to make informed decisions for himself and a plenary guardianship was granted.

On August 6, 2008 Mr. Amodeo was admitted to The Pavillion at McLean Hospital, Harvard Medical School, Belmont, Massachusetts. While there he underwent a comprehensive evaluation, including medical, neurological, psychiatric, and neuropsychological examinations. Based on these test results, he was given diagnoses of Bipolar Disorder, Manic, with psychotic features and Mixed Personality Disorder, with narcissistic and antisocial features. Mr. Amodeo was also diagnosed with a history of stimulant (caffeinated beverages) dependency (partial remission). He was discharged on August 21, 2008 with medications including Depakote ER 3000 mg. h.s., Geodon 80 mg., and Rozerem 8 mg. h.s.

Mr. Amodeo's psychological tests results from McLean Hospital indicate that when he is emotionally stable his reality testing is likely to be adequate, however, when he experiences shifts in his moods and more intense emotions his reality testing becomes impaired. During these episodes his ability to think logically and coherently is impaired. He may exhibit delusional/paranoid thinking, misinterpret the actions or intentions of others, and have difficulty anticipating the

consequences of his own actions or recognizing the boundaries of appropriate behavior.

Mr. Amodeo's attorney, Myra Nicholson, provided this psychologist with the following details of Mr. Amodeo's legal case.

- On August 6, 2008, the United States government issued an indictment against Mr. Amodeo for various criminal actions, including conspiracy, wire fraud, obstruction of an agency proceeding, and failing to remit payroll taxes.

- On September 24, 2008, Mr. Amodeo signed an Amended Plea Agreement where he entered a guilty plea to conspiracy to defraud an agency of the United States, conspiracy to commit wire fraud, conspiracy to obstruct an agency proceeding, failure to collect and remit payroll taxes, and obstruction of an agency proceeding.

- On May 21, 2009 the Court accepted the Amended Plea Agreement and Mr. Amodeo was sentenced to 22 years and six months in federal prison. He has served approximately four years of this sentence to date.

**MENTAL HEALTH EXAMINATION:** Mr. Amodeo was examined in a private conference room in the visitor's center at the Coleman Federal Prison Low in Sumterville, Florida. He explained that he has petitioned for restoration of his rights because he believes that his thinking and judgment are no longer impaired. He discontinued his psychotropic medications about a year and a half ago because he thinks that the medications actually exacerbated his symptoms and delusions. He asserted that they also sedated him to the extent that he was cognitively impaired. He noted that his family (parents and siblings) has always been against the use of psychiatric medications or mental health treatment. The influence of this negative family attitude likely played a part in his decision to discontinue treatment.

Mr. Amodeo reported that soon after his incarceration at Coleman he began working at the prison law library as a clerk and took a class in appellate advocacy. Since that time he has been actively involved in assisting other inmates in filing appeals in their cases, not only at Coleman, but nationwide. He maintained that his success rate in these cases is the highest in the nation as compared to other attorneys. He believes it was a "miracle" that led him to this position of being able to help others.

Mr. Amodeo is adamant that he was wrongfully convicted. He is working on his own appeal, which he described as pending due to multiple complications. He asserted that after his rights are restored he will have his license as an attorney reinstated and then proceed with his appeal. He noted that he will never again

leave legal decisions affecting him in the hands of others. He expects that within five to six months his conviction will be overturned.

After his conviction is overturned and he is released from prison, Mr. Amodeo plans to pursue his aspirations to "change the world". He stressed that it is "impossible for me to let the world remain as it is because I cannot tolerate the injustices I see". Mr. Amodeo related that he will first publish treaties that illustrate his knowledge of economics, math, and physics. He will then incorporate this information into a "better version of the law". His second step will be to gain access to the heads of nations through NATO using financial incentives to gain support of world leaders and politicians. He believes there are many people that are interested in "realigning" with him to pursue these goals. His third step will be to "influence the electorate" through his skills as a speaker to explain the concept of the "Capital Genesis Business Model".

Mr. Amodeo stated that since his incarceration that he has learned to recognize the signs and symptoms of his Bipolar Disorder and therefore can manage these symptoms more effectively than in the past. He does allow that being in the structured environment of a prison helps him regulate his behavior. He stated that if released from prison that he will need and is agreeable to resuming treatment with medications. He acknowledged that there "is some truth to my Bipolar behavior". However, he also asserted that God means for him to change the world and that the doctors at McLean eventually recognized that he is so "high functioning that his ideas depart from the norm". However, they also told him that his grandiose plans served as a way of defending himself against depression. He noted that it does not concern him if others do not believe the things he says because he is so confident in himself that it does not matter. On the other hand, he does recognize how expressing these beliefs have hurt his credibility with others.

Mr. Amodeo was administered the Minnesota Multiphasic Personality Disorder-2 (MMPI-2). The MMPI-2 is currently the most widely used and researched objective personality test. The MMPI-2 consists of a series of quantitative scales that can be used to diagnose psychiatric and personality disorders. Mr. Amodeo's profile is only marginally valid because he responded in a very careful manner to avoid giving the impression of having psychological problems. His scores on validity scales suggest a clear tendency to present an overly positive self image and to minimize personal faults. In spite of his effort to present a positive image some problems are evident in his MMPI-2 profile.

Mr. Amodeo's profile suggests that he has personality characteristics of emotional lability, overactivity, moodiness, and impulsiveness that may cause difficulties for him at times. Although he has a high need for achievement, his unconventional attitudes and inadequate judgment may make his performance variable. He is likely to behave erratically at times and have mood swings. He may perpetuate stress for himself due to his disorganized thinking. He reported a

number of psychological concerns, persistent personality features, and unusual thoughts. This profile type is often associated with a severe personality disorder.

Mr. Amodeo's test responses suggest that he is an impulsive and somewhat hyperactive person who may be experiencing the symptoms of a mood disorder. He scored in the range that is consistent with a pattern of accelerated speech, delusions of grandeur or grandiose aspirations, and an exaggerated sense of self-worth and self-importance. People with these scores tend to have episodes of irritability, hostility, and aggressive behavior. He is not likely to recognize his own limitations and may make plans that are not realistic. He shows little interest in routine or detail and easily becomes bored and restless. He tends to have a low frustration tolerance and may have trouble inhibiting the expression of his impulses.

Mr. Amodeo was administered the **Saint Louis University Mental Status (SLUMS) Examination**, which is a brief oral/written screening exam given to people to assess for cognitive or memory impairment. Mr. Amodeo's score of 30 out of 30 on the **SLUMS** falls in the Normal Category, indicating that no significant memory or cognitive deficits were identified. He was able to give the correct year, day of week, month, and date. He was able to give his state of residence and to do simple addition and subtraction. He was able to recall five out of five objects after a short delay. He scored eight out of eight points on memory for details of a short story. He was able to remember and repeat up to four numbers in reverse order.

**COLLATERAL PHONE INTERVIEWS:** Mr. Adkins, Mr. Flynn, and Mrs. Millotte all reported that they have not observed any behaviors on the part of Mr. Amodeo that would cause them to have concerns about his ability to make informed decisions. Mrs. Holland did express concern that when Mr. Amodeo is experiencing a manic episode that he is likely to make impulsive decisions that are not in his best interest, particularly related to business and financial matters. Dr. Danziger was not able to provide any relevant information as he has had no contact with Mr. Amodeo since 2008.

**SUMMARY OF RESULTS:** Mr. Amodeo endorsed fewer symptoms on the current MMPI-2 than in 2008. However, validity scales indicate that he was putting forth effort to minimize and deny psychological problems on the MMPI-2. Mr. Amodeo's test results suggest that he is emotionally unstable. He continues to exhibit and report symptoms associated with mania. He remains grandiose in his aspirations and exhibits an exaggerated sense of self-worth and self-importance. He is not likely to recognize his own limitations. His test results indicate a low frustration tolerance and risk for impulsive behavior. He may have episodes of irritability, hostility, and aggressive behavior.

FRANK AMODEO
Suggestion of Capacity Evaluation
September 13, 2013

2008-MH-001369-O

**PROGNOSIS:** Mr. Amodeo's prognosis is guarded. Mr. Amodeo was discharged from McLean Hospital in August of 2008 with medications for treatment of his Bipolar I Disorder. Mr. Amodeo has discontinued these medications because he does not feel that he needs them. At this time his symptoms are not being treated or monitored by a psychiatrist or other mental health professional. This puts him at risk for episodes of mood swings and impaired reality testing, which impact his ability to think logically and coherently.

**OPINION AND RECOMMENDATIONS:** Legislative intent in adopting the current version of the Florida Guardianship Law is to make available the least restrictive form of guardianship to assist persons who are only partially incapable of caring for their needs, with incapacitated persons to be able to participate as fully as possible in all decisions affecting them.

In Mr. Amodeo's case, determining what decision-making he is capable of without risk of endangering his personal, medical or financial wellbeing is somewhat complicated. He is an intelligent person with many skills and abilities, which have allowed him to be impressively successful in business endeavors. On the other hand, his mood swings and grandiose and delusional thinking has significantly impacted his judgment and reasoning at times to his detriment.

Mr. Amodeo has discontinued his psychiatric medications against medical advice. He continues to experience symptoms that can impact his capacity to make informed decisions. His current confinement in a structured, predictable environment is helpful in terms of providing some behavioral controls for him. However, outside of this structured environment and without psychiatric management of his symptoms, he is at risk for mood swings and impaired judgment and thinking.

It is recommended that Mr. Amodeo have ongoing psychiatric management of his Bipolar Disorder and that he follow the recommendations of his treating psychiatrist. If he resumes medications and is psychiatrically stable he could be re-evaluated for restoration of any rights that have been removed.

FRANK AMODEO
Suggestion of Capacity Evaluation
September 13, 2013

2008-MH-001369-O

## EVALUATION OF ALLEGED INCAPACITATED PERSON'S ABILITY TO RETAIN RIGHTS (WITHOUT LIMITATION)

| Yes | No | |
|---|---|---|
| ___ | No | Make informed decisions regarding his/her right to marry. |
| Yes | ___ | Make informed decisions regarding his/her right to vote. |
| Yes | ___ | Make informed decisions regarding his/her right to personally apply for government benefits. |
| Yes | ___ | Make informed decisions regarding his/her right to have a driver's license or operate a motor vehicle. |
| Yes | ___ | Make informed decisions regarding his/her right to travel. |
| Yes | ___ | Make informed decisions regarding his/her right to seek or retain employment. |
| ___ | No | Make informed decisions regarding his/her right to contract. |
| Yes | ___ | Make informed decisions regarding his/her right to sue, or assist in the defense of suits of any nature against him/her. |
| ___ | No | Make informed decisions regarding his/her right to manage property or make any gift or disposition of property. |
| Yes | ___ | Make informed decisions in determining his/her residence. |
| ___ | No | Make informed decisions regarding his/her right to consent to medical treatment. |
| Yes | ___ | Make informed decisions affecting his/her social environment or other social aspects of his/her life. |

FRANK AMODEO
Suggestion of Capacity Evaluation
September 13, 2013

2008-MH-001369-O

**SCOPE OF GUARDIANSHIP:** Those areas where the Mr. Amodeo LACKS THE CAPACITY to make informed decisions regarding his rights and where a less restrictive method of protective services is not adequate to protect him from a substantial risk of harm to his welfare or financial affairs.

<u>Lacks</u>  <u>Has</u>

_____  Has  Decisions concerning travel or where to live.

Lacks  _____  Consent to or refusal of medical or other professional care, counseling, treatment or service.

Lacks  _____  Permitting access to, refusal of access to or consent to release of confidential records and papers.

Lacks  _____  Control or management of real or personal property or income from any source.

Lacks  _____  Management of a business.

Lacks  _____  Acting as a member of a partnership.

Lacks  _____  Making contracts.

Lacks  _____  Payment or collection of debts.

Lacks  _____  Making gifts.

Lacks  _____  Initiation, defense or settlement of lawsuits.

Lacks  _____  Execution of a will or waiving the provisions of an existing will.

_____  Has  Decisions concerning education.

Lacks  _____  Admission to Florida State Hospital or any other public treatment facility on a voluntary basis under the provisions of applicable state law.

_____  _____  Other (explain): _____

The scope of the guardianship services recommended is:  LIMITED

Due to his legal issues and interest in a broad range of business activities, it is recommended that, if possible, Mr. Amodeo's appointed Guardian be an attorney or law firm. The Guardian should operate exclusively in that capacity, as a disinterested party, free of undue influence or conflicts of interest. Specifically, the Guardian should not be involved in any personal, business, or other legal relationship with Mr. Amodeo, his attorneys, or business associates, past or present.

8 of 9

FRANK AMODEO
Suggestion of Capacity Evaluation
September 13, 2013

2008-MH-001369-O

It is believed that this is a correct characterization and report of the information accumulated by this examiner and presented in this report. If there is any information felt to be substantially misleading, unclear, inaccurate, or misreported, or if there is any substantial or significant information that is omitted, please notify this examiner immediately and indicate the information to be added or corrected. Otherwise, all information and records received will be assumed to be substantially accurate and complete as stated, observed, and attributed.

Thank you for allowing me to evaluate Mr. Amodeo. Should you have any questions or concerns regarding this evaluation, please do not hesitate to contact my office.

Executed this 7th day of November, 2013.


*Darlene B. Antonio, Ph.D.*

Darlene B. Antonio, Ph.D.
Licensed Psychologist


A copy of this report was mailed
11-12-13.

*Mary Lynn Jewell*
Deputy Clerk

IN THE CIRCUIT COURT OF THE NINTH JUDICIAL
CIRCUIT IN AND FOR ORANGE COUNTY, FLORIDA
PROBATE DIVISION

IN RE:  GUARDIANSHIP OF
FRANK AMODEO

2008-CP-001369

## ORDER GIVING NOTICE OF FILING SUGGESTION OF CAPACITY AND APPOINTING PHYSICIAN TO EXAMINE WARD

A Suggestion of Capacity having been filed in this proceeding with respect to Frank Amodeo, the Ward, it is

ADJUDGED as follows:

1.    There is no guardian appointed for the Ward; therefore, no notice is required.

2.    Notice of this Order is to be informally served on the Ward, the attorney for the Ward, and the following additional interested person:

Claire Holland          1130 University Blvd.          Spouse of Ward
                        Suite B9 #361
                        Tuscaloosa, AL 35401

3.    Service of this Order constitutes Notice of Filing Suggestion of Capacity.

4.    Any objections to the Suggestion of Capacity must be filed within twenty (20) days after service of this Notice and copies of such objections shall be served on all interested persons.

5.    Dr. Darlene Antonio, a clinical psychologist, is hereby appointed by the Court to examine the Ward and file a report of the examination with the Court within twenty (20) days after the date of this Order.

6.      As Dr. Antonio will be required to travel to Coleman Federal Penitentiary, Petitioner will pay reasonable costs and fees to Dr. Antonio.

DONE AND ORDERED in Chambers in Orlando, Orange County, Florida this _____ day of _____, 2013.

W BELVIN PERRY, JR.

_____
HONORABLE BELVIN PERRY, JR.
Chief Judge

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished via U.S. Mail on this _____ day of _____, 2013, to Mr. Frank Amodeo, #48883-019, FCI Coleman Low, P/ O. Box 1031, Coleman, FL  33521, Myra P. Nicholson, Esq., PinoNicholson, PLLC, 189 South Orange Avenue, Suite 1650, Orlando, FL 32801, and Claire Holland, 1130 University Blvd, Suite B9 #361, Tuscaloosa, AL 35401.

_____
Judicial Assistant/Attorney

Appendix C

Bureau of Prison's Treatment Information

**SENSITIVE BUT UNCLASSIFIED*



# Federal Bureau of Prisons
## Psychology Data System

**Date-Title:** 01-27-2014 - Clinical Intervention - Clinical Contact
**Reg Number-Name:** 48883-019 - AMODEO, FRANK T.   **Unit/Qtrs:** B-3, B09-005L
**Author:** DEXTER JAMES, Psy.D, DRUG ABUSE PROG COORD
**Institution:** COL - COLEMAN LOW FCI

Inmate AMODEO was seen for a follow-up after being off Bipolar medication for over two years. He remains stable and is able to function on the compound. He is able to program and is currently teaching a law class and a business class to other inmates. Inmate AMODEO states that he is able to recognize the signs and symptoms of his manic cycles and implement coping strategies when needed to remain stable. Upon mental status examination, inmate AMODEO was alert and well oriented. Hygiene and grooming were adequate. Behavior was appropriate and within normal limits. Speech and thought processes appeared to be logical and coherent. Attention and concentration appeared to be intact. Mood was described as euthymic with appropriate affect. No hallucinations nor delusions were observed or reported. The presence of suicidal thoughts, intentions, or plans was denied. He did not appear to be at imminent risk for harming himself or others. Judgment appeared to be adequate. He appeared to be in good personal control and able to function adequately on the compound. No crisis intervention appears to be necessary at this time. Inmate will be seen on an as needed basis by Psychology Services.

**SENSITIVE BUT UNCLASSIFIED**

2700 Westhall Lane
Suite 110
Maitland, FL 32751
407-475-1025
407-475-1027 (Fax)



**DARLENE B. ANTONIO, PH.D., LLC**

# Memo

**To:**  Bruce Chambers

**From:**  Dr. Antonio

**CC:**

**Date:** September 6, 2013

**Re:**  Frank Amodeo Evaluation

Myra Nicholson, Mr. Amodeo's attorney, asked me to notify you of all materials I will need to bring for my evaluation with him.

I will be bringing one leather satchel containing the following materials:

- MMPI test booklet and answer sheet.

- 2 pens and 2 pencils

- Legal notepad

- Mr. Amedeo's case file of my previous evaluation with him.

- Forms:  Consent Forms, Saint Louis Univ. Mental Status Exam (SLUMS)

I understand that you are Mr. Amodeo's counselor. I hope to be able to discuss his treatment and current status with you and to be able to review his mental health treatment records.  Please let me know if that can be arranged.

Thank you for your help.

1

UNITED STATES GOVERNMENT

# Memorandum

FEDERAL BUREAU OF PRISONS
Federal Correctional Complex
Coleman, Florida  33521

FCC Coleman (Low)

September 4, 2013

MEMORANDUM FOR  DEPUTY CAPTAIN RODRIGUEZ

FROM:                          B. Chambers, Unit Management, B-3

SUBJECT:                     Inmate Amodeo 48883-019 – Legal Visit


US Circuit Court of the Ninth Judicial Circuit in and for Orange County Florida,
2008-CP-001369, by order of Honorable Belvin Perry, Jr., Chief Judge – Order Giving
Notice of Filing Suggestion of Capacity and Appointing Physician to Examine Ward
(Frank Amodeo)

On Friday and/or Saturday, September 8 13TH and/or September 7 14th, 2013, by order of the Honorable
Belvin Perry, Jr., Dr. Darlene B. Antonio is required to conduct a psychological evaluation of
inmate Frank Amodeo 4883-019.  After consultation with Dr. James, Dr. Darlene should be
authorized a brief case containing a writing pad, pen/pencil and other written material needed to
conduct the psychological evaluation.  Additionally, Dr, Darlene B. Antonio is authorized to use
a "legal room" to conduct her evaluation.  Dr. Antonio fully understands what is required, and
shall follow the protocol for entrance and departure from the visiting room.

Should you have any questions concerning the above, please feel free to contact me.


cc:    Front Desk Officer
        Control Officer

UNITED STATES GOVERNMENT
# Memorandum
FEDERAL BUREAU OF PRISONS
Federal Correctional Complex
Coleman, Florida 33521

*FCC Coleman (Low)*

September 4, 2013

MEMORANDUM FOR DEPUTY CAPTAIN RODRIGUEZ

FROM:          B. Chambers, Unit Management, B-3

SUBJECT:       Inmate Amodeo 48883-019 – Legal Visit

US Circuit Court of the Ninth Judicial Circuit in and for Orange County Florida, 2008-CP-001369, by order of Honorable Belvin Perry, Jr., Chief Judge – Order Giving Notice of Filing Suggestion of Capacity and Appointing Physician to Examine Ward (Frank Amodeo)

On Friday and/or Saturday, September 6 and/or September 7, 2013, by order of the Honorable Belvin Perry, Jr., Dr. Darlene B: Antonio is required to conduct a psychological evaluation of inmate Frank Amodeo 4883-019. After consultation with Dr. James, Dr. Darlene should be authorized a brief case containing a writing pad, pen/pencil and other written material needed to conduct the psychological evaluation. Additionally, Dr, Darlene B. Antonio is authorized to use a "legal room" to conduct her evaluation. Dr. Antonio fully understands what is required, and shall follow the protocol for entrance and departure from the visiting room.

Should you have any questions concerning the above, please feel free to contact me.

cc:   Front Desk Officer
      Control Officer

FCC COLEMAN
MEDICATION CARD

AMODEO, FRANK
48883-019
COL - B10-915L
09/02/09

YOU ARE TO REPORT TO THE
PHARMACY WINDOW AT THE
FOLLOWING TIMES.

7:45 PM

EXPIRES   11/1/09

PHARM TECH

STAFF SIGNATURE

Appendix D

2008 Appointment of Plenary Guardian

IN THE CIRCUIT COURT FOR ORANGE COUNTY,
FLORIDA                                    PROBATE DIVISION

IN RE: GUARDIANSHIP OF

FRANK AMODEO                    File No.
                                48-2008-CP-1369-O

                                Division

# AMENDED ORDER APPOINTING EMERGENCY TEMPORARY GUARDIAN

On the petition of Dr. Jeffrey Danziger for appointment of an emergency temporary guardian for Frank Amodeo, an alleged incapacitated person, who is represented by counsel in these proceedings, and it appearing to the court that there is an imminent danger that the physical or mental health or safety of the alleged incapacitated person will be seriously impaired or that the property of that person is in danger of being wasted, misappropriated or lost unless immediate action is taken; and the court having jurisdiction and being fully advised; it is

ADJUDGED as follows:

1.     Dr. Harvey Moore, PhD is qualified to serve and is hereby appointed as plenary emergency temporary guardian of the person and property of Frank Amodeo (the Ward).

2.     Upon taking the prescribed oath, filing designation of resident agent and acceptance and entering into bond in the amount of $ *none at this time* payable to the Governor of the State of Florida and all successors in office, conditioned on the faithful performance of all duties by the guardian, letters of emergency temporary guardianship shall be issued to the plenary emergency temporary guardian granting the following powers and duties: *Plenary*.

3.     The Court is not aware whether the Ward, prior to incapacity, has executed any valid advance directive under Chapter 765, Florida Statutes. If any such advance directive exists, the guardian shall exercise no authority over a health care surrogate until further order of this Court.

4.     Unless further extended by order of this Court, the authority of the plenary emergency temporary guardian will expire ninety (90) days after the date of this order, or when a guardian is appointed pursuant to Section 744.344, Florida Guardianship Law, whichever occurs first.

ORDERED on June 2 d, 2008.

_____
Circuit Judge

6/13/2008 3:42 PM FILED IN OFFICE LYDIA GARDNER CLERK CIRCUIT COURT ORANGE CO FL

IN THE CIRCUIT COURT FOR ORANGE COUNTY, FLORIDA
                              PROBATE DIVISION

IN RE:  GUARDIANSHIP OF

FRANK AMODEO
                    File No.
                    48-2008-CP-1369-O

                    Division  Probate

## AMENDED PETITION FOR APPOINTMENT OF PLENARY GUARDIAN
### (Incapacity - person and property)

Petitioner Dr. Jeffrey Danziger alleges:

1.     Petitioner's business address is 2300 Maitland Center Parkway, Suite 230, Maitland, FL 32751 and petitioner's post office address is 2300 Maitland Center Parkway, Suite 230, Maitland, FL 32751.

2.     Frank Amodeo (the Ward) is an alleged incapacitated person whose date of birth was September 1, 1961, who is 46 years of age.  The residence of the Ward is 1159 Delaney, Orlando, FL 32801, and the post office address of the Ward is 1159 Delaney, Orlando, FL 32801.

3.     The nature of the Ward's alleged incapacity is Bipolar Disorder, Type 1, current episode mania with psychotic features.

4.     It is necessary that a plenary guardian be appointed to exercise all delegable rights of the Ward.

5.     The names and addresses of the next of kin of the Ward are:

| NAME | ADDRESS | RELATIONSHIP |
|---|---|---|
| a. Claire Amodeo | 709 Euclid Avenue Orlando, Florida 32801 | spouse |
| b. James Gentry Fields | —————— | step-child |
| c. Mia Amodeo | 709 Euclid Avenue Orlando, Florida 32801 | child |

6.     The proposed guardian Harvey A. Moore, PhD, whose business address is 101 East Kennedy Boulevard, Tampa, Florida 33602; whose post office address is 101 East Kennedy Boulevard, Tampa, Florida 33602; and who is sui juris and otherwise qualified under the laws of Florida to act as plenary guardian of the person and property of the Ward is not a professional guardian. The relationship and previous association of the proposed guardian to the Ward is none. The proposed guardian should be appointed because he has the skills and expertise to address the special needs of the alleged incapacitated person.

7.     The nature and value of the property subject to guardianship is as follows:

| NATURE OF PROPERTY | VALUE |
| --- | --- |
| a. various assets | $ unknown |

8.     Reasonable search has been made for all of the information required by Florida law and by the applicable Florida Probate Rules. Any such information that is not set forth in full above cannot be ascertained without delay that would adversely affect the Ward or the Ward's property.

9.     There are no alternatives to guardianship known to the petitioner that may sufficiently address the problems of the Ward in whole or in part.

Petitioner requests that Harvey A. Moore, PhD be appointed plenary guardian of the person and property of the Ward.

Under penalties of perjury, I declare that I have read the foregoing, and the facts alleged are true, to the best of my knowledge and belief.

Signed on June 11, 2008.

_____
Dr. Jeffrey A. Danziger
Petitioner

Catherine E. Davey
Attorney for Petitioner
Florida Bar No. 0991724
Post Office Box 941251
Maitland, FL 32794-1251
Telephone: (407) 645-4833
Fax: (407) 645-4832

[Print or Type Names Under All Signature Lines]

6/10/2008 1:41 PM FILED IN OFFICE LYDIA GARDNER CLERK CIRCUIT COURT ORANGE CO.FL

IN THE CIRCUIT COURT FOR ORANGE COUNTY,
FLORIDA                                    PROBATE DIVISION

IN RE:  GUARDIANSHIP OF

FRANK AMODEO                    File No.
                                48-2008-CP-1369 -0

                                Division _____

An alleged incapacitated person

## PETITION FOR APPOINTMENT OF EMERGENCY TEMPORARY GUARDIAN

Petitioner Jeffrey Danziger, MD alleges:

1.      Petitioner's business address is 2300 Maitland Center Parkway, Suite 230, Maitland,
Florida 32751, petitioner's post office address is 2300 Maitland Center Parkway, Suite 230,
Maitland Florida 32751 and petitioner's telephone number is (407) 782-5178 / 407-678-6400

2.      A Petition for Determination of Incapacity has been filed in this Court with respect
to Frank Amodeo, an alleged incapacitated person, but a guardian has not been appointed.

3.      Petitioner is an adult interested in the welfare of the alleged incapacitated person.

4.      There appears to be an imminent danger that the physical or mental health or safety
of the alleged incapacitated person will be seriously impaired or that the property of that person is
in danger of being wasted, misappropriated or lost unless immediate action is taken because: due to
the very severe nature of the Ward's illnesses and the assets of the Ward's and others' whom he
controls, a guardian is sought for his immediate personal and financial protection.

5.      Frank Amodeo is an alleged incapacitated person whose date of birth was January
20, 1960 and who is 48 years of age.  The residence of the alleged incapacitated person is 1159
Delaney, Orlando, Florida 32801, and the post office address of the alleged incapacitated person is
1159 Delaney, Orlando, Florida 32801.

6.      The nature of the alleged incapacitated person's alleged incapacity is suffers from
*Bipolar Disorder, Type I, Current Episode Mania with Psychotic Features*.

7.      The names and addresses of the next of kin of the alleged incapacitated person are:

| NAME | ADDRESS | RELATIONSHIP |
|------|---------|--------------|
| a.  Claire Holland | 709 Euclid Avenue Orlando, Florida 32801 | spouse |
| b.  James Gentry Fields | _____ | step-son |

c.  Mia Amodeo              709 Euclid Avenue              daughter
                           Orlando, Florida 32801

8.    The proposed plenary emergency temporary guardian Dr. Harvey Moore, whose residence is 101 East Kennedy Blvd, Suite 3040, Tampa, Florida 33602, and whose post office address is 101 East Kennedy Blvd, Suite 3040, Tampa, Florida 33602; and who is sui juris and otherwise qualified under the laws of Florida to act as guardian of the alleged incapacitated person is a professional guardian.  The relationship and previous association of the proposed plenary emergency temporary guardian to the alleged incapacitated person is none.  The proposed plenary emergency temporary guardian should be appointed because based on his training and experience in complex guardianship matters; he is well suited to act as emergency temporary guardian in this matter.

9.    The nature and value of the property subject to guardianship is as follows:

NATURE OF PROPERTY                              VALUE

various personal assets/property                    $ unknown

Petitioner requests that summary proceedings be held upon this petition, that the court appoint an attorney to represent the alleged incapacitated person in these proceedings, and that a plenary emergency temporary guardian of the person and property be appointed for the alleged incapacitated person.

Under penalties of perjury, I declare that I have read the foregoing, and the facts alleged are true, to the best of my knowledge and belief.

Signed on June 09, 2008.

Dr. Jeffrey A. Danziger
Petitioner

Catherine E. Davey
Attorney for Petitioner
Florida Bar No. 0991724
Post Office Box 941251
Maitland, FL 32794-1251
Telephone: (407) 645-4833
Fax: (407) 645-4832

6/11/2008 11:06 AM FILED IN OFFICE LYDIA GARDNER CLERK CIRCUIT COURT ORANGE CO. FL

State of Florida
# Ninth Judicial Circuit of Florida
Office of:
Lawrence R. Kirkwood
Circuit Court Judge
ORANGE COUNTY COURTHOUSE
425 N. ORANGE AVENUE
ORLANDO, FLORIDA 32801
www.ninthcircuit.ORG

GUARDIANSHIP OF:                      CASE NO.:
Frank Amodeo                          2008-CP-001369-O

## OBSERVATIONS:

The items marked by an "X" were omitted from the file and/or pleadings submitted. Please file corrective pleadings and mail to: Clerk of Court Probate Division, P. O. Box 4994, Orlando, Florida, 32802-4994, for submission to the Court. If you object to this request and feel you have complied with the Florida Statutes, the Probate Rules, and the case law with what you have previously filed, please set your case for a scheduled hearing (NOT AT EX PARTE) and give notice to all parties.

Please Note: The clerk will not submit the proposed orders to the court for review until all items have been received..

- ☐ Inventory of assets (as of date of appointment; include supporting documents).
- ☐ Inventory audit fee ($75.00) – if the corpus exceeds $25,000.
- ☐ Depository's Acceptance and Receipt of Assets.
- ☐ Initial plan of guardian(s) of person.
- ☐ Service to:
- ☐ Current report of physician.
- ☐ Wards receipt of assets: _____
- ☐ Annual audit fee: $_____
- ☐ Bank verification of interest paid and account balances on all accounts: _____
- ☐ Copies of all pages of all monthly investment statements.
- ☐ Proof of current homeowner's insurance.
- ☐ Proof of payment of property taxes.
- ☐ Copies of billing statements for: _____

Observation continued.

☐    Evidence of new counsel (attorney of record).

☐    Designation of successor resident agent an acceptance.

☐    Discharge of guardian of: _____.

☐    Change of residence and transfer of venue to: _____.

☐    Documents from termination of guardianship upon change of domicile out-of-
     state to: _____.

☒    Other:  The Order Appointing Emergency Temporary Guardian appoints Kelly

     Pitman as Emergency Temporary Guardian.  An Amended Order needs to be

     submitted to reflect the proper Guardian.  A Joinder and Consent to the Petition

     for Appointment of Guardian and the Petition for Emergency Temporary

     Guardian signed by Harvey Moore, indicating that he is sui juris and qualified to

     serve needs to be filed.


The court requests you submit the above documents no later than June 27, 2008.

Date Reviewed:  6/11/2008

CC:

CATHERINE EUGENIA DAVEY, ESQUIRE
P. O. BOX 941251
MAITLAND, FL  32794-1251

IN THE CIRCUIT COURT OF THE
NINTH JUDICIAL CIRCUIT, IN AND FOR
ORANGE COUNTY, FLORIDA

IN RE: GUARDIANSHIP OF
Frank Amodeo

PROBATE MENTAL HEALTH DIVISION
CASE NUMBER: 2008-MH-000651-O
DIVISION 1

Dr. R.E. Ballentine

### REPORT OF EXAMINING COMMITTEE

The undersigned, being the committee appointed to examine Frank Amodeo
reports that they have examined that person, as directed by the Order Appointing Examining
Committee and the report of the comprehensive examination, with evaluations and
recommendations, is as follows:

I.     GENERAL INFORMATION

Name of Person: Frank Amodeo

Date of Examination :  June 29 2008

Date of Birth: 09/01/1961

Residence of Person: 1159 Delaney
Orlando FL 32801

Name and address of Extended Care Facility (if any):


Alleged Incapacity is: Bipolar Disorder - Manic

DIAGNOSIS(short summary) Bipolar Disorder Type I manic.


PROGNOSIS (short summary) guarded


RECOMMENDED COURSE OF TREATMENT (short summary) Supervisory care
a Psychiatric treatment of Bipolar Disorder


EXHIBIT A

COPY      RECV #3
JUL 02 2008
BY:

II.    EVALUATION OF ALLEGED INCAPACITATED PERSON'S ABILITY TO RETAIN
RIGHTS (without limitation)

THE EXAMINING COMMITTEE IS CHARGED WITH DETERMINING WHETHER THE
ALLEGED INCAPACITATED PERSON HAS THE ABILITY TO EXERCISE THOSE RIGHTS
SPECIFIED IN SECTION 744.3215, FLORIDA GUARDIANSHIP LAW,  WITH SPECIFIC
ATTENTION TO THOSE RIGHTS ENUMERATED IN THE PETITION TO DETERMINE
INCAPACITY.

(NOTE: Legislative intent in adopting the current version of the Florida Guardianship Law is to
make available the least restrictive form of guardianship to assist persons who are only partially
incapable of caring for their needs, with incapacitated persons to be able to participate as fully
as possible in all decisions effecting them.)

The alleged incapacitated person has the capacity to:  (Circle yes or no)

| | | |
|---|---|---|
| YES | NO | make informed decisions regarding his/her right to marry. |
| YES | NO | make informed decisions regarding his/her right to vote. |
| YES | NO | make informed decisions regarding his/her right to personally apply for government benefits. |
| YES | NO | make informed decisions regarding his/her right to have a driver's license or operate a motor vehicle. |
| YES | NO | make informed decisions regarding his/her right to travel. |
| YES | NO | make informed decisions regarding his/her right to seek or retain employment. |
| YES | NO | make informed decisions regarding his/her right to contract. |
| YES | NO | make informed decisions regarding his/her right to sue, or assist in the defense of suits of any nature against him/her. |
| YES | NO | make informed decisions regarding his/her right to manage property or make any gift or disposition of property. |
| YES | NO | make informed decisions in determining his/her residence. |
| YES | NO | make informed decisions regarding his/her right to consent to medical treatment. |
| YES | NO | make informed decisions affecting his/her social environment or other social aspects of his/her life |

## III. COMPREHENSIVE EXAMINATION AND ATTENDING PHYSICIAN'S REPORT

Please give the results of the comprehensive examination and the committee members' assessment of information provided by the attending or family physician, if any. Attach extra sheets, if necessary. If the attending or family physicians is available for consultation the committee must consult with the physician.

Physical Examination: *47 year old Ambulatory white male with a history of asthma irregular heart beat and hypertension*

*P-70  P-17*

*cranial nerves II-XII with in normal limits*

Mental Health Examination: *range of motion - reflexes 1+ 2 bilaterally*

*47 year old married white male who was casually groomed and dressed. He was alert cooperative and oriented x3. His mood was euphoric. His memory was good. He was hyperverbal and his thoughts were pressured and tended to ramble with grandiose thought (Grandiose Scheme Enterpreneurial)*

Functional Assessment: *able to do basic activities of daily living but his Bipolar impaired his decision making.*

If any of the three parts of the comprehensive examination were not indicated or could not be accomplished for any reason, the reason for the omission must be explained.

Consultation with Family Physician:

Yes_____ No _✓_ . If no, why? *None listed - Dr Danziger's 5/28/ evaluation reviewed*

Assessment of prior clinical history, treatment records, social records, and reports, if any:

*He has a long history of hyperactivity and productivity. Graduated from law school and practiced law in Georgia with/ convicted of mail fraud. In prison was diagnosed Cyclothymic. Recently treated by Dr Haskew with Seroquel and Depakote with some improvement.*

III.     SCOPE OF GUARDIANSHIP

(NOTE:  Florida law grants authority to a guardian only in those areas of decision making in which the evidence indicates the person is incapacitated.  This allows the individual to retain control over the other aspects of his or her life.)

Please indicate those areas where the person LACKS THE CAPACITY to make informed decisions regarding his/her rights and for which a less restrictive method of protective services is not adequate to protect the person from a substantial risk of harm to his/her personal welfare or financial affairs.

(Circle lacks or has)

| | | |
|---|---|---|
| LACKS | HAS | Decisions concerning travel or where to live. |
| LACKS | HAS | Consent to or refusal of medical or other professional care, counseling, treatment or service. |
| LACKS | HAS | Permitting access to, refusal of access to or consent to release of confidential records and papers. |
| LACKS | HAS | Control or management of real or personal property or income from any source. |
| LACKS | HAS | Management of a business. |
| LACKS | HAS | Acting as a member of a partnership. |
| LACKS | HAS | Making contracts. |
| LACKS | HAS | Payment or collection of debts. |
| LACKS | HAS | Making gifts. |
| LACKS | HAS | Initiation, defense or settlement of lawsuits. |
| LACKS | HAS | Execution of a will or waiving the provisions of an existing will. |
| LACKS | HAS | Decisions concerning education. |
| LACKS | HAS | Admission to Florida State Hospital or any other public treatment facility on a voluntary basis under the provisions of applicable state law. |
| LACKS | HAS | Other (list): |

Specific evidence of the person's incapacity to exercise informed decisions in the

If the committee member has determined that the alleged incapacitated person is incapacitated, the scope of the guardianship services recommended is:

PLENARY          LIMITED      (Circle One)

The member of the examining committee certifies to have examined the alleged incapacitated person in accordance with the requirements of Section 744.331 of the Florida Guardianship Law, performing the examination necessary to determine which if any, of the rights the petitioner has requested to be removed the allegedly incapacitated person can no longer sufficiently nor adequately exercise.  These conclusions, evaluations and recommendations are hereby presented to the Court.

(At least one member of the committee has knowledge of the type of incapacity alleged in the Petition to Determine Incapacity.)

Executed this __30__ day of __June__, __2008__

Signature: __R E Ballentine MD__

A copy of this report has been served on the Petitioner's Attorney and the Court appointed Attorney for the alleged incapacitated person on __June 30, 2008__

Deputy Clerk

IN THE CIRCUIT COURT IN AND FOR ORANGE COUNTY, FLORIDA

IN RE: GUARDIANSHIP OF )    PROBATE MENTAL HEALTH DIVISION

FRANK AMODEO )    Case Number 2008-MH-000651-0
)    DIVISION I
)

Darlene B. Antonio, Ph.D.
## REPORT OF EXAMINING COMMITTEE

The undersigned, being the committee appointed to examine, FRANK AMODEO reports that they have examined that person, as directed by the Order Appointing Examining Committee and the report of the comprehensive examination, with evaluations and recommendations as follows:

I.    GENERAL INFORMATION

Name of Person: FRANK AMODEO

Date of Examination:  June 26, 2008

Date of Birth: September 1, 1961

Residence of Person: 1159 Delaney, Orlando, FL 32801

Name and address of extended care facility (if any):

Alleged incapacity is: Bipolar Disorder, Type I, current episode Mania with Psychotic Features.

DIAGNOSIS (short summary): Mr. Amodeo presents with symptoms consistent with a Bipolar Disorder and also exhibits an associated Delusion Disorder. His treating psychiatrist, Dr. Krotenberg is also considering a diagnosis of Schizoaffective Disorder.

PROGNOSIS (short summary): Guarded. Mr. Amodeo is reported to be noncompliant with treatment in the past. His delusional beliefs appear to be quite long-standing and ingrained.

RECOMMENDED COURSE OF TREATMENT (short summary): Mr. Amodeo's long-standing, severe symptoms require intensive psychiatric treatment. He reported that his attorney is making arrangements for his admission into an inpatient psychiatric treatment program.

EXHIBIT B


COPY #2

FRANK AMODEO

2008-MH-000651-0

## II. EVALUATION OF ALLEGED INCAPACITATED PERSON'S ABILITY TO RETAIN RIGHTS (WITHOUT LIMITATION)

THE EXAMINING COMMITTEE IS SPECIFICALLY CHARGED WITH DETERMINING WHETHER THE ALLEGED INCAPACITATED PERSON HAS THE ABILITY TO EXERCISE THOSE RIGHTS WHICH THE PETITIONER HAS REQUESTED BE REMOVED IN THE PETITION TO DETERMINE INCAPACITY.

Legislative intent in adopting the current version of the Florida Guardianship Law is to make available the least restrictive form of guardianship to assist persons who are only partially incapable of caring for their needs, with incapacitated persons to be able to participate as fully as possible in all decisions affecting them.

| Yes | No | |
|-----|-----|---|
| X | ___ | Make informed decisions regarding his/her right to marry. |
| X | ___ | Make informed decisions regarding his/her right to vote. |
| X | ___ | Make informed decisions regarding his/her right to personally apply for government benefits. |
| X | ___ | Make informed decisions regarding his/her right to have a driver's license or operate a motor vehicle. |
| X | ___ | Make informed decisions regarding his/her right to travel. |
| X | ___ | Make informed decisions regarding his/her right to seek or retain employment. |
| ___ | X | Make informed decisions regarding his/her right to contract. |
| ___ | X | Make informed decisions regarding his/her right to sue, or assist in the defense of suits of any nature against him/her. |
| ___ | X | Make informed decisions regarding his/her right to manage property or make any gift or disposition of property. |
| X | ___ | Make informed decisions in determining his/her residence. |
| ___ | ___ | Make informed decisions regarding his/her right to consent to medical treatment. |
| X | ___ | Make informed decisions affecting his/her social environment or other social aspects of his/her life. |

FRANK AMODEO

2008-MH-000651-0

## III. COMPREHENSIVE EXAMINATION AND ATTENDING PHYSICIAN'S REPORT

Please give the results of the comprehensive examination and the committee members'

assessment of information provided by the attending or family physician, if any.  Attach extra

sheets, if necessary. If the attending or family physician is available for consultation the

committee must consult with the physician.

Physical Examination: This examiner defers to the psychiatrist, who is a medical doctor for this part of the evaluation.

Mental Health Examination: Mr. Amodeo was neatly groomed and dressed in business attire at the time of the evaluation. He reported that he graduated from law school and worked for some time as an attorney before he was disbarred and incarcerated on charges of defrauding a client. He also completed two years of a doctoral economic program. Mr. Amodeo reported that he was first diagnosed with Bipolar Disorder in 1995 or 1996 and participated in treatment with a psychiatrist and a therapist from 2000-2003. Mr. Amodeo reported symptoms (e.g. racing thoughts) consistent with a Bipolar Disorder and acknowledged that he often makes impulsive decisions, frequently involving large sums of money. For example, he stated that he once make a decision in 15 minutes to purchase a clothing boutique.

Mr. Amodeo interacted appropriate with this examiner. He was oriented to person, place, time, and date. On the Saint Louis University Mental Status Examination (SLUMS) Mr. Amodeo's score of 27 out of 30 fell in the Normal range and he exhibited only mild attentional problems. Rate of speech was normal. Affect was appropriate to situation. He denied homicidal or suicidal ideation or intent. Form of thought was relevant and coherent at times and at other times disorganized and illogical.

Content of thought was notable for Mr. Amodeo's delusional beliefs. He frankly discussed his plan to establish an empire and become "Emperor of the World" and asserted that "It's not a joke and I've made great strides toward this." Mr. Amodeo explained that he has been planning this since his teenage years. He related that he read a book that "gave me a decision criteria that would let me do it well, as long as I made decisions that are in everyone's best interest." He also stated that when the movie "The Omen" was released that "people thought I was the Antichrist. Since then I prayed every day and decided to see what path God would take me down."

Mr. Amodeo indicated that he has been separated from his wife over the past year due to their frequent conflicts about the "empire stuff" and noted that his wife "hates to hear this." He has recently moved back into the home. Mr. Amodeo reported that he frequently sees "colors and lights" and that he sees stars in the sky "shift and move." He stated that he can "focus" and have an out-of-body experience at will. Mr. Amodeo believes that in the future he will be able to "transmute molecules" and maintained that as a child he was once able to transport himself and a group of friends off of a railroad track to avoid an oncoming train. He believes he will be able to

**FRANK AMODEO**

perform miraculous feats, such as "solidifying or crystallizing the air". He further explained "any miraculous event that is repeatable, so that it is no longer deniable, is enough to trigger people to follow the plan." He gave as an example, miracles performed by Christ that inspired people to follow him.

Mr. Amodeo maintained to this examiner that he has "prophetic visions" that allow him to foresee the outcome of business transactions and his legal situation. He asserted that his attorneys are wrong in their handling of his case and are not "reading the law correctly." He believes that he has a better understanding of the law and that his attorneys should "take an entirely different approach." He sometimes makes plans (e.g. "to hold a press conference and reveal everything") that his attorneys object to. In regard to his current legal difficulties he believes he can see the "final outcome" and that the "U.S. Attorney's office will have to swallow the fact that they made a big mistake and will drop the suit. I will then go on with my plan and have some credibility." He estimated that he will have ten million in assets after his case is concluded and that it will take approximately eleven years to accomplish his goal of establishing his empire. When asked how he would react if things did not turn out well for him, he stated that he believes he will die if the legal issues facing him are not resolved satisfactorily. He asserted "I think this is it for me. I will win this time or end up dead." Initially he visualized his death as an "Elijah fire in the sky event" but his recent problems with high blood pressure have led him to consider that there are "lots of ways it could just be over."

This examiner administered the Minnesota Multiphasic Personality Inventory-2 (MMPI-2) to Mr. Amodeo. The MMPI-2 is currently the most widely used and researched objective personality inventory. The MMPI-2 consists of a series of quantitative scales that can be used to diagnose abnormal behavior. Mr. Amodeo's MMPI-2 profile appears to be valid. On this inventory, Mr. Amodeo's profile suggests delusional beliefs and schizoid personality traits. His profile indicates severe long-term psychological problems.

Functional Assessment: Mr. Amodeo is capable of performing activities of daily living (e.g. personal hygiene, preparing food, dressing).

Consultation with Family Physician:

 Yes    No    If not, why?

This examiner consulted with Dr. Jeffrey Danziger (407-679-6400), a psychiatrist, who conducted a forensic psychiatric evaluation of Mr. Amodeo, and with Dr. Jeffrey Krotenberg (407-324-0405), Mr. Amodeo's current treating psychiatrist.

# FRANK AMODEO

2008-MH-000651-0

Assessment of prior clinical history, treatment records, social records, and reports, if any:

- o   May 28, 2008 letter from Dr. Danziger to attorney, Harrison Slaughter, detailing Dr. Danziger's evaluation of Mr. Amodeo.

- o   June 11, 2008 Orlando Sentinel article about Mr. Amodeo and his legal case.

- o   Portions of Mirabilis Ventures, September 2005 Presentation DVD, featuring Mr. Amodeo as speaker.

- o   Portions of Amodeo/Evsiven Inteview on DVD.

- o   High school newspaper articles provided by Mr. Amodeo, describing how Mr. Amodeo, as student council president, envisioned his high school as a country instead of a school and created "Imperialism Day" as an "unorthodox approach to school spirit."

- o   Various photographs provided by Mr. Amodeo, including his attendance at a foreign policy meeting with President Bush and high level government and NATO officials.

- o   Papers detailing Mr. Amodeo's sponsorship and speaking engagement through the "Riga NATO summit 2006 Support Committee".

- o   Various documents detailing aspects of Mirabilis' acquisition strategies, due diligence and risk analysis for international transactions, etc.

- o   Records have been requested from Joseph Trim, LMHC who saw Mr. Amodeo in therapy from 2000-2003.

- o   Draft of Memorandum #24 – Star Wars, prepared by Mr. Amodeo's staff that details his mental health history.

If any of the three parts of the comprehensive examination were not indicated or could not be accomplished for any reason, the reason for the omission must be explained below.

FRANK AMODEO

2008-MH-000651-0

## IV. SCOPE OF GUARDIANSHIP.

Florida law grants authority to a guardian only in those areas of decision-making in which the evidence indicates the person is incapacitated. This allows the individual to retain control over the other aspects of his/her life.

Please indicate those areas where the person LACKS THE CAPACITY to make informed decisions regarding his/her rights and where a less restrictive method of protective services is not adequate to protect the person from a substantial risk of harm to his/her welfare or financial affairs.

(Check appropriate line)

Lacks   Has

____   __X__   Decisions concerning travel or where to live.

__X__   ____   Consent to or refusal of medical or other professional care, counseling, treatment or service.

__X__   ____   Permitting access to, refusal of access to or consent to release of confidential records and papers.

__X__   ____   Control or management of real or personal property or income form any source.

__X__   ____   Management of a business.

__X__   ____   Acting as a member of a partnership.

__X__   ____   Making contracts.

__X__   ____   Payment or collection of debts.

__X__   ____   Making gifts.

__X__   ____   Initiation, defense or settlement of lawsuits.

__X__   ____   Execution of a will or waiving the provisions of an existing will.

____   __X__   Decisions concerning education.

__X__   ____   Admission to Florida State Hospital or any other public treatment facility on a voluntary basis under the provisions of applicable state law.

____   ____   Other (explain): _____

Page 6 of 7

FRANK AMODEO                                                2008-MH-000651-0

Please list specific evidence of the person's incapacity to exercise informed decisions in the

categories previously checked.

On examination, Mr. Amodeo exhibits a fixed delusional belief that he will be "Emperor of
the World". He believes that he has special powers and will be able to perform miracles to
convince others to support his cause. He has been diagnosed with a Bipolar Disorder and
reports symptoms consistent with this disorder. Mr. Amodeo's psychiatric symptoms and
delusional beliefs are long-standing, dating back to his teenage years. Mr. Amodeo's
delusional beliefs, disorganized thinking, and impulsive, reckless behaviors significantly
impair his ability to make informed decisions regarding his medical care, and legal and
financial affairs.

If the committee has determined that the alleged incapacitated person is incapacitated, the

scope of the guardianship services recommended is:   PLENARY        LIMITED

The members of the examining committee further state that they have each examined the

alleged incapacitated person in accordance with the requirements of Section 744.331 of the

Florida Statutes, performing the examination necessary to determine which, if any of the rights,

which the petitioner has requested be removed, the allegedly incapacitated person can no longer

sufficiently nor adequately exercise, and they hereby present to the Court their conclusions,

evaluations and recommendations.

At least one member of the committee has knowledge of the type of incapacity alleged in the

Petition to Determine Incapacity.

Executed this 30th day of June 2008.


_Darlene B. Antonio, PhD_
Darlene B. Antonio, Ph.D.,
Licensed Psychologist
2700 Westhall Lane, Suite 110, Maitland, FL 32751
407-475-1025


A copy of this report has been served on Petitioner's Attorney and on the Court appointed
Attorney for alleged incapacitated person on_____20____.


_____
                              Deputy Clerk

Appendix E

McLean Hospital Psychiatric Evaluation

 **McLEAN HOSPITAL**

 **HARVARD MEDICAL SCHOOL**

The Pavilion at McLean Hospital
115 Mill Street
Belmont, Massachusetts, 02478-9106

E-mail: pavilion@mclean.org

Tel: 617 855-3570
Fax: 617 855-3768

Alexander Vuckovic, M.D.
*Medical Director*

## PAVILION DISCHARGE SUMMARY
Frank Amodeo

b. 09/01/1960

| | |
|---|---|
| Admitted to The Pavilion: | August 6, 2008 |
| Discharged to Intensive Outpatient Follow-Up via Dr. Choras and Ms. O'Rourke: | August 21, 2008 |

### History of Present Illness:

This 48 year old married White man was referred to The Pavilion in the context of a likely longstanding Bipolar Mood Disorder as well as a history of legal difficulties stemming from an alleged tax fraud. Mr. Amodeo has been under the care of Dr. Jeffrey Krottenberg in Florida since November of last year, and has been noted to be suffering from a significant elevation of mood, irritability, euphoria, and a likely delusional system, in the context of which he has stated that he wished to become emperor of the world. Complicating the situation has been that Mr. Amodeo has indeed had a great deal of business success, as well as contacts with powerful figures around the nation and the world. Further complicating the matter is that Mr. Amodeo's legal difficulties have led to the likelihood of an imminent indictment on tax fraud charges. The patient has already had a felony conviction, and has been disbarred as an attorney. Mr. Amodeo has recently been on a regime that includes valproic acid and had a brief trial of quetiapine, with unclear impact on his symptom state. He comes here for a thorough evaluation, as well as treatment recommendations.

At the time of Mr. Amodeo's initial assessment his mental status was of a somewhat obese, pleasant gentleman who showed no psychomotor agitation, retardation, tics, tremors, or adventitious movements. He made good eye contact, and was friendly, voluble, with spontaneous speech that was occasionally pressured and tangential, but redirectable. The patient denied any mood disturbance, appeared to be elevated in his mood, and seemed remarkably unconcerned with his serious legal difficulties. He denied obsessions, compulsions, suicidality or homicidality. While he denied delusions, he appeared grandiose, and readily admitted that he believed that he was destined to be emperor of the world, and that his many business activities were geared toward making such an outcome occur. He was grossly cognitively unimpaired. He

appeared to be of above average intelligence.  His insight was limited by his delusional symptomatology. His social judgment was grossly appropriate.

Mr. Amodeo was admitted to The Pavilion with a provisional diagnosis on Axis I of Psychosis, NOS, R/O Bipolar Disorder, Manic, with psychotic features, R/O Schizoaffective Disorder, Bipolar Type, and a history of stimulant abuse, specifically pseudoephedrine. On Axis II, we deferred a diagnosis, but had a concern about the likelihood of Narcissistic and Antisocial Personality Disorder. On Axis III, previously diagnosed Obstructive Sleep Apnea was noted, as was previously diagnosed Early Adult Onset Diabetes Mellitus, hypertension, and a history of asthma.

Mr. Amodeo underwent a number of evaluations, consultations, and lab examinations.  They included urinalysis, which was benign, urine drug screens which were negative for substances of abuse, a lipid panel, which was notable for cholesterol of 191, triglycerides of 176, HDL of 43, and LDL of 113 mg per deciliter. Serum prolactin was slightly elevated for a male at 19 nanograms per milliliter, with normal of less than 13. Morning cortisol was normal at 15.8 micrograms per deciliter.  TSH was normal at 2.42 Miu/ml.  B12 was normal at 716 picograms per milliliter, and folic acid was normal at 8.8 nanograms per milliliter. Hemoglobin A1C was elevated at 7.1%.      Serum homocysteine was elevated at 10.2 micromoles per liter. Methylmalonic acid was normal at .14 micromoles per liter. A total testosterone was low at 138 nanograms per deciliter.  Free testosterone was low at 7.5 nanograms per deciliter.  A liver profile was normal, except for a trivially elevated ALT of 45 IU/l, presumably due to valproic acid therapy.  A repeat prolactin level remained elevated at 24 nanograms per milliliter.  The patient's PSA was normal at 1.3 nanograms per milliliter.  Sex hormone binding globulin was low at 6.9 nanomoles per liter. Cardio CRP was elevated at .572 mg per deciliter.  The patient's CBC and differential were essentially within normal limits.  Valproic acid levels varied, but stayed within the normal range in the 71 to 83 micrograms per milliliter range.  The patient's EEG was read as a normal awake, drowsy, and sleep EEG.  The patient's overnight sleep study confirmed a likely obstructive sleep apnea syndrome.  CPAP was administered and was helpful at 13 centimeters of water pressure. Dr. Evan Murray saw the patient in neurologic consultation and noted non-specific findings, likely related to the effects of his mood disorder, also possible impact of insufficient sleep, and medication side-effects.  His clinical history was not very suggestive of a Seizure Disorder or a neuro-degenerative condition, but a very early neuro-degenerative condition could not be entirely excluded. His elemental neurologic examination was unremarkable.  EKG showed a possible old anterior infarct.  Dr. Marian Klepser saw the patient in medical consultation. She noted obesity, hypertension, and metabolic syndrome, and changed his Toprol XL to Labetalol therapy. She recommended follow-up with cardiology. She noted a history of  heel pain and leg weakness, and felt that he might have a mild plantar fasciitis.  The patient's MRI exam, without contrast, showed no anatomical brain abnormality. At the time of this dictation we are awaiting a repeat MRI with gadolinium, including a pituitary study due to the patient's mild hyperprolactinemia. Cardiologic evaluation by Dr. John Levinson resulted in a recommendation for an echocardiogram, and a nuclear treadmill stress test. These have been done,  and we await results.  Psychologic and neuropsychologic testing were performed by Dr. Susan Parks, whose results are appended.  Dr. Parks felt that the patient showed no significant cognitive deficits, and concurred with the likely clinical diagnosis on Axis

I of a Bipolar Disorder, with psychotic features.  On Axis II, Mixed Personality Disorder, with narcissistic and antisocial traits was noted.

Mr. Amodeo's Pavilion course was relatively uneventful. He took part in multiple consultations willingly and saw individual treaters, including Dr. Peter Choras, who was his Pavilion attending psychiatrist, myself on a daily basis, and Ms. Andrea O'Rourke, who acted as a liaison to family, and more particularly his wife. Dr. Jennifer Taylor performed a substance abuse evaluation, and felt that the patient fulfilled criteria for a past psychostimulant dependency. She noted that he still was dependent on caffeinated beverages, in large amounts.

We initiated a trial of antipsychotic medication, first olanzapine, at dosages increasing to 7.5 mg at night. Strikingly, within a week of the administration of olanzapine Mr. Amodeo's previously intractable delusional system appeared to soften considerably, as he acknowledged that he might indeed be suffering from symptoms of Bipolar Illness, and also acknowledged that his hope of becoming emperor of the world was quite unrealistic.  He remained seemingly unconcerned about the potential impact of his legal problems, even though during the course of his time here he discovered that he had been indicted on multiple counts of tax fraud, and would be expected to turn himself over to federal authorities upon his return to Florida. During his time here Mr. Amodeo also took part in a forensic consultation by Dr. Katz of Dr. Thomas Gutheil's forensic evaluation group. We are not privy to the results of that consultation. Mr. Amodeo complained of a significant increase in his hunger on olanzapine therapy, and the drug treatment was changed to ziprasidone in the several days prior to his treatment conference. Once again he tolerated this, appeared to lose his severe hunger, and continued to have improvement in his delusional symptoms.

On the 20th of August a treatment conference was held attended by the patient, his Florida forensic psychiatrist, Dr. Danziger, by conference call, and his local treatment team consisting of myself, Dr. Choras, Ms. O'Rourke, Dr. Parks, and Dr. Taylor.

We reviewed the results of Mr. Amodeo's  evaluation at The Pavilion and confirmed a likely diagnosis on Axis I of a Bipolar Disorder, Manic, with psychotic features, as well as a history of stimulant dependency, presently in a degree of partial remission. On Axis II, we established that Mr. Amodeo did likely suffer from a Mixed Personality Disorder, with narcissistic and antisocial features.  On Axis III, we noted multiple medical problems including metabolic syndrome, prodromal AODM, obstructive sleep apnea syndrome, and a newly discovered hypogonadism. We await the results of the patient's MRI pituitary study.

We strongly recommended continuing local therapy until the patient's Geodon dosage was in a fully therapeutic range, and to that end I increased the patient's dose from 60 to 80 mg on the day of his Pavilion discharge. He was agreeable to staying in the area for the course of the next week, during which time he would be seeing Dr. Choras and Ms. O'Rourke on a regular basis prior to returning to Florida, where he understands he needs to turn himself in to federal authorities.

Mr. Amodeo was discharged outright from The Pavilion on the 20th of August in a moderately improved condition with discharge diagnoses as above.

His medications on discharge included Depakote ER 3000 mg at bedtime, Fish Oil 3 grams twice daily, Labetalol 300 mg twice daily, enteric coated aspirin 81 mg in the morning, folic acid 1 mg in the morning, Geodon 80 mg at suppertime and Rozerem 8 mg at night. Dr. Danzinger is in the process of obtaining psychiatric aftercare for Mr. Amodeo in Florida for his return, as Dr. Krottenberg will not be able to follow the patient. Mr. Amodeo is aware of this.

At the time of his discharge he was non-suicidal, cooperative with treatment, and willing to follow the treatment team's recommendations.

We are available to Mr. Amodeo and his treaters in any way they deem appropriate in the future.

Alexander Vuckovic, M.D.

Imaging Center — McLean Hospital — MRI Report

AMODEO, Frank

MRN: 170910

8/8/08 3:00 pm

HALL: Pavilion

Referred by Dr. Vuckovic

**MRI EXAMINATION OF THE BRAIN**

## Clinical History

Bipolar disorder.

## Technique

We obtained sagittal T1 weighted images followed by axial proton density, FLAIR, gradient echo, T1, T2 and diffusion weighted images. Coronal FLAIR and SPGR images were obtained.

## Findings

No radiographic abnormality is seen.

Ventricular system and subarachnoid spaces are within normal limits. There are no intracranial collections, mass lesions, deformity of ventricular system or shift of midline structures. There are no foci of abnormal signal intensity within the brain parenchyma. No abnormality is seen at craniocervical junction. Midline structures are intact. Vascular flow voids are maintained and paranasal sinuses are essentially clear.

## Impression

No anatomical brain abnormality is seen.

AAZ:    8/10/08
emp:    8/10/08

Amir A. Zamani, M.D.  7:30 am        DATED: 8/23/08



**Harvard Medical School**

Donald A. Davidoff, Ph.D., ABPDC
*Director*
Donald L. Round, Ph.D.
*Assistant Director*
Susan Parks, Ph.D.
*Director of Training*

**McLean Hospital**

*An Affiliate of the
Massachusetts General Hospital
Partners Healthcare System, Inc.*

## Department of Neuropsychology

### Neuropsychological and Psychodiagnostic Evaluation

Name:                AMODEO, FRANK  .
DOB:                 9/1/1960
Date of Evaluation:  8/12/2008
Clinician:           Susan Parks, Ph.D.
Unit:                The Pavilion
Referral:            Alex Vuckovic, MD

**SOURCES OF INFORMATION:** Information contained in this report was derived from direct contact with Mr. Amodeo and McLean Hospital records.

**REFERRAL QUESTION:** Mr. Amodeo is a 47 year old, right-handed, Caucasian, separated man who was self referred to The Pavilion for a diagnostic evaluation and treatment recommendations.

**HISTORY OF PRESENT ILLNESS:** Mr. Amodeo came to The Pavilion for a psychiatric evaluation requesting an "objective view" of his manic symptoms. He reported that he was currently under a criminal investigation related to money that is owed to the government following changes in his business. He has reportedly been diagnosed with bipolar disorder and includes grandiose and bizarre thoughts involving beliefs around becoming emperor of the world. He reports being open to psychiatric treatment. Mr. Amodeo has been under the care of Dr. Jeffrey Krotenberg since November 2007.

**PAST PSYCHIATRIC HISTORY:** Mr. Amodeo reports experiencing symptoms of mania since college and reports suffering from undertreated "mild bipolar disorder" for the past 8 years. He believes his episodes are consistent with a rapid cycling subtype and symptoms have included delusional and grandiose thinking, decreased sleep, racing thoughts, and impulsive spending including impulsively buying a million dollar house and buying a clothing store after walking in it simply to shop. He reports he has been prescribed and taking Depakote since November 2007 with good effects.

**PAST MEDICAL HISTORY:** Remarkable for high blood pressure, sleep apnea (CPAP for 2 months) diagnosed in September 2007.

**SUBSTANCE USE HISTORY:** Mr. Amodeo denied any past or current use of illegal drugs or alcohol. He does drink large amounts of caffeinated beverages. Mr. Amodeo is a non-smoker.

McLean Hospital, 115 Mill Street, Belmont, Massachusetts 02478-9106
Telephone (617) 855-2645, FAX (617) 855-3246, Email: ddavidoff@mclean.harvard.edu

Amodeo
Page 1 of 8

**FAMILY HISTORY:** Mr. Amodeo's father is reportedly a gambler and was diagnosed with liver cancer in 1987. His brother is reportedly "isolative" with possible psychiatric problems. His mother suffered a CVA a year ago.

**SOCIAL, DEVELOPMENTAL AND ACADEMIC HISTORY:** Mr. Amodeo was a product of a vaginal birth with the only complication including his mother smoking during his pregnancy. He was born in Detroit and was raised in Orlando. He met all developmental milestones appropriately although he did report having a surgery to correct a stomach blockage in his first year of life. Mr. Amodeo reports himself as a good student and never experienced any academic difficulties earning mostly As. When asked to describe himself as a child, he reported that he was "smart, ....charismatic, ....I got along with others." He played football and baseball. He attended the University of Central Florida and graduated in 1983 with a degree in Political Science. He attended Emory Law School from 1984-87 while he was attending Georgia State where he was reportedly enrolled in a Doctoral Program. He started his own business while he was in school. He reportedly worked for a law firm from 1988-1990 and has been self employed since 1990.

When asked about abuse, Mr. Amodeo reported two events including having a babysitter who was abusive to his brother (age 5) and his aunt being murdered after she left from babysitting Mr. Amodeo. He stated, "I was probably the last person in our family to see her alive."

Mr. Amodeo's father, Frank is 67 and his mother, Margaret is 65. She has been recovering from a CVA suffered in April 2007. Mr. Amodeo was married previously for 3 years and he had no children from that marriage. Mr. Amodeo has been remarried to Claire for 19 years, but the couple is currently going through a difficult time. They have one daughter, Mia, who will be 18 in a month, is a senior in high school and will be going to college next year. Claire has a son, Gentry, to a previous marriage. He is 22 years old and reportedly has Down's syndrome. Mr. Amodeo is the eldest of three.

**BEHAVIORAL OBSERVATIONS:** Mr. Amodeo is a well appearing male who appears his stated age. He was comfortably dressed in casual clothes and his grooming was neat. He sat in an upright position and made good eye contact. He was attentive to the examiner which remained consistent throughout the evaluation. Speech was fluent with normal rate, tone, rhythm and volume and reflected an average lexicon. His affect was stable. He put forth good effort on all neuropsychological and psychological tests. He denied suicidal and homicidal ideation. His associations were generally logical and coherent with a goal directed stream of thoughts; however, he did endorse thoughts of being the world leader and that he refers to the "committee on his hands." He talked about how it is difficult for him to know what is reality and what is delusional given his high powered career, achievements and connections. He did not appear to attend to internal stimuli during the testing session. He demonstrated some, but limited insight into his psychiatric symptoms. Due to Mr. Amodeo's good effort and attention, this evaluation is regarded as an adequate representation of his current level cognitive functioning and psychological functioning.

**SYNTHESIS OF TEST FINDINGS AND RECOMMENDATIONS:** Mr. Amodeo is a 47 year old, right-handed, Caucasian, separated man who was self referred to The Pavilion for a diagnostic evaluation and treatment recommendations. He was diagnosed with Bipolar Disorder and has been taking Depakote as prescribed since November 2007.

Mr. Amodeo's clinical presentation is quite complex and suggests the presence of a mood disorder with psychotic features and unique personality characteristics that highly influence his behaviors. His mood disorder is consistent with a Bipolar I Disorder with rapid cycling. Although testing strongly and clearly supports the presence of longstanding depressive issues, it is very likely that Mr. Amodeo utilized his manic symptoms as a way to avoid his depression. Additionally, his cognitive features associated with his manic presentation (i.e., over-incorporation, grandiosity) may have been a strength in achieving the impressive progress that he has historically demonstrated. This appears to have begun many years ago when he was concurrently completing two graduate programs and continued throughout his lifetime, being involved in multiple high level corporate situations simultaneously. However, when Mr. Amodeo's symptoms of his bipolar disorder are not adequately managed, he demonstrates delusional symptoms including grandiosity and poor reality testing. Thus, he runs a fine line between using the energizing aspects of his mood disorder and tilting into a state of severe symptoms that are destabilizing. Clinical history juxtaposed against his test findings suggest the latter has more recently occurred and his recent state of distress has made it more difficult for him to function. Caution should be made that as his manic symptoms are better managed, his depression and issues accompanying his depression (i.e., poor self image, issues about his impending future) may become overwhelming to him and his suicide risk factors may become more of a pressing issue. Thus, careful monitoring of depressive and manic symptoms is highly suggested and careful discussion around suicidal ideation is highly recommended.

Mr. Amodeo's clinical presentation is underscored by the presence of narcissistic and antisocial features. In the context of mania, these symptoms may have become amplified, making it difficult to discern what behaviors resulted from the mood disorder, as well as what behaviors were being driven by his personality features as there is some overlap (i.e., grandiosity, impulsivity). Mr. Amodeo does not reach the full diagnostic criteria for neither Narcissistic nor Antisocial personality disorders exclusively. However, he does present with features of both of these disorders that negatively impact his functioning and relationships with others; thus, his presentation is most consistent with a Personality Disorder Not Otherwise Specified with Narcissistic and Antisocial features.

A multimodal treatment approach is recommended. Careful psychopharmacology will be required because of his extreme medication sensitivity. With regard to psychotherapy, Cognitive Behavioral Therapy is suggested because of his cognitive style where he is over-incorporative and at times loses touch with reality. Thus, straight-forward and structured, skill-focused work that CBT encourages appears to be the best fit for Mr. Amodeo. Dialectical Behavioral Skills could also be woven into his psychotherapy. Specific techniques that are suggested include self assessment (i.e., gaining self awareness of the earlier warning signs of emotions), detection of early, moderate, and significant warning signs of his illness (both mania and depression), mood monitoring with focus on reframing distorted thinking, reality testing, distress tolerance skills and practicing mindfulness. At times, Mr. Amodeo's emotions may feel so overwhelming that he may periodically be at risk to act impulsively. Therefore, impulse control skills should also be reviewed, even if not the primary focus of therapy. In addition to management of his Bipolar illness, Mr. Amodeo demonstrates character traits consistent with a Personality with Narcissistic and Antisocial traits. These symptoms may become more amplified during periods of mood instability and this should be addressed in psychotherapy.

Mr. Amodeo's performance on the neuropsychological evaluation revealed strong cognitive abilities. Testing suggests adequate abilities in simple attention, concentration, executive controls, language abilities, visuospatial functioning and memory. Mr. Amodeo is a bright individual (FSIQ=109,

VIQ=109, PIQ=107) with many cognitive strengths.  His pattern of IQ test scores suggests the presence of well developed cognitive abilities with no indication of learning difficulties.

DIAGNOSTIC IMPRESSIONS:

| | | |
|---|---|---|
| Axis I | 296.64 | Bipolar I Disorder, Most Recent Episode Mixed, Severe with psychotic features |
| Axis II | 301.9 | Personality Disorder Not Otherwise Specified (Narcissistic and Antisocial Traits) |
| Axis III | | High Blood Pressure, Sleep Apnea |
| Axis IV | | Life Stressors |
| Axis V | | GAF=50-55/100 |

EVALUATION PROCEDURES:
Wechsler Abbreviated Scale of Intelligence (WASI)
Digit Span
Trail Making A and B
Controlled Oral Word Association Test and Semantic Fluency
Stroop Color Word Test
Boston Cancellation Test
Boston Naming Test 15 card screen of the Boston Diagnostic Aphasia Examination
Rey-Osterreith Complex Figure
Logical Memory I and II -Stories A and B of the Wechsler Memory Scale-Revised
California Verbal Learning Test II Short Form (CVLT-II-SF)
Wisconsin Card Sorting Test (64 card version)
Clock Drawing Test
Rorschach Inkblot Test (Exner Scoring System)
Millon Clinical Multiaxial Inventory –III
Beck Hopelessness Scale
Beck Depression Inventory-II
Beck Suicide Scale
Sentence Completion
Clinical Interview
Record Review

COGNITIVE TEST RESULTS (please refer to attached score page for scores and ranges):
Orientation, Intellectual and Motor Skills: Mr. Amodeo was oriented to self, date, place and circumstances around his evaluation and hospitalization.  He showed no difficulty with left-right orientation.  His performance on the WASI revealed a FSIQ estimate of 109 which falls within the Average range with commensurate verbal (VIQ estimate=109, average) and performance (PIQ estimate=107, average) based skills.

Language Functions: Mr. Amodeo's confrontation abilities fell within normal limits (13/15 BNT). He missed the two most difficult items, initially calling a yoke a "bridle."  He benefited from phonemic cues for both missed items.  His performance on the Vocabulary subtest of the WASI indicated above average abilities in expressive vocabulary, verbal knowledge and fund of information.  His average performance on the Similarities WASI subtest indicates adequate verbal abstraction and reasoning abilities.

Visuospatial Functions: Mr. Amodeo's performance on the WASI matrix reasoning subtest indicated average abilities in nonverbal fluid reasoning. Of note, there was notable intratest scatter within this subtest. His performance on the Block Design test also fell within the average range indicating adequate abilities in visual construction. He was able to complete all of the 2x2 designs and earned maximum speed points for all of these designs. He was able to quickly see the gestalt and utilized a block by block approach to solve each item. He was only able to complete one of the four 3x3 designs. The design completed was done quickly and utilizing his good approach strategies and earned speed points. However, he began to struggle with the next designs, breaking configuration once. When asked to copy the Rey Complex figure, his final score fell within normal limits despite utilizing a part oriented and fragmented approach. His final product resembled the exemplar with mild inaccuracies.

Learning and Memory: Mr. Amodeo's performance on verbal memory tests was largely within normal limits. His performance on a 9 word list learning task (CVLT-II-SF) indicated mildly impaired abilities on the first of the 4 learning trials, a measure of concentration and working memory (Standard Score -1.5, mildly impaired). However, he demonstrated an adequate learning curve over the complete learning trial portion of this test (4, 8, 8 and 7/9 words, T=50). He was able to recall 8/9 words at the short delayed free recall trial (average, Standard Score 0.5). After a longer delay, he was able to recall 8/9 words without cuing (above average, Standard Score 1) and 8/9 with cueing (above average, Standard Score 1). Discriminability was solid and he was able to identify 9/9 words on a recognition trial (Standard Score 0.5) with no false positives (Standard Score 1, above average). He tended to utilize a serial clustering strategy to learn the words, meaning that he tended to learn and recall them in the order than they were presented, rather than using a semantic clustering strategy which involves clustering the information into meaningful categories to make learning more efficient. On a second verbal learning test (WMS-R Logical Memory, contextual learning), he was able to take in 31/50 details across 2 stories (average) and after a delay was able to recall 33/50 details (above average). On a recognition format trial, he was able to correctly answer 18/21 questions, consistent with his acquisition trial.

Mr. Amodeo's performance on the Rey Visual Memory recall trials indicated adequate storage and recall of complex visual information after short and long delay conditions with no loss of information, despite mild difficulties on the copy trial. His approach was more organized and careful. He first addressed the gestalt, followed by the details. His final result was accurate with mild omission and misplacement of details.

Executive Functions: Mr. Amodeo's maximum forward digit span on a test of simple auditory attention fell within the average range for his age (DF=7, consistent). His responses were quick and accurate. His maximum backward digit span also fell within the average range suggesting adequate abilities in concentration and working memory (DB=5, consistent). His performance on a test of visual scanning was quick and accurate (Trails A, 0 errors, 16 seconds) and fell within the above average range. On Trails B, a more difficult test of divided attention and set shifting, he had no difficulty and completed the trial with good speed, accuracy and self-monitoring (33", 0 errors, above average). A second test evaluating visual scanning and the ability to focus on target stimuli while ignoring irrelevant stimuli (Boston Cancellation Test) fell solidly within the average range on structured and unstructured subtests with novel and over-learned stimuli (Unstructured Symbol: 73", 0 omissions; Unstructured Letter: 63", 1 right and 1 left omission; Structured Symbol 66", 0 omissions; Structured Letter: 78", 1 right omission). He was able to draw a clock to command and set the time to "10 after 11" without difficulty. On the Stroop Color test, a test of his ability to

focus on target stimuli while disregarding irrelevant stimuli, his performance fell within the average to the above average range. Phonemic fluency fell within the above average range (F=20, A=16, S=20). Semantic fluency fell within the average range (21 animals). On the Wisconsin Card Sorting test, Mr. Amodeo's performance was solid as he was able to complete four categories in 64 trials. He was able to complete the first category within 11 trials.

## PSYCHOLOGICAL TEST RESULTS:

Response Style: Mr. Amodeo's responses on his MCMI-II, as well as other psychological tests, suggest no odd test taking behavior and he approached tests in an open and flexible manner.

Psychological Resources/Cognitive Organization: Mr. Amodeo's test results suggest he is in a state of mild, but chronic stimulus overload, making it difficult to access adequate psychological coping resources. This appears to be related to internal and external events that he is currently experiencing and may be related to psychological pain resulting in some object loss. This finding is somewhat unexpected, given evidence on testing that suggests the presence of above average adaptive capacities when compared to others. This leaves him at risk for recurrent episodes of anxiety, tension, nervousness and irritability. During times when he experiences limited frustration tolerance, he may be at risk for acting impulsively or demonstrating emotional outbursts. Currently, he appears to be experiencing substantial levels of intrusive ideation which he has little control over and may involve concern about his future and the lack of needs being met. Interestingly, Mr. Amodeo tends to take in more information than he can organize efficiently and he tends to examine situations to a point beyond necessity. However, when success hinges on his performance, he tends to harness this quality in a positive manner, utilizing it in an efficient manner. Conversely, in time demanding or more stressful situations, his over-incorporative style tends to interfere with effective decision making processes.

Reality Testing: Mr. Amodeo's test results suggest that when he is calm he has an increased chance of engaging in adequate reality testing. However, when he experiences shifts in his mood, resulting in experiencing more intense emotions, his reality testing becomes impaired. He gives evidence of experiencing a diminished ability to think logically and coherently and cannot keep a connected flow of ideas. As a result, he may demonstrate instances when he utilizes arbitrary and circumstantial reasoning and display moments where his thought processes are loose, scattered and confusing to himself and others. He may demonstrate ruminative and circumstantial thinking, ideas of reference and disorganized speech. During these times it may appear that he is out of touch with others and is unable to order his thoughts in a manner where he can adequately communicate with others. Testing suggests the presence of ideas of reference, feelings of grandiosity and irrational jealousy that reaches delusional (paranoid) levels. Cognitive mediation abilities are impaired in that he demonstrates mild to moderate impairment in his ability to form accurate impressions of himself and others. He is vulnerable to misinterpretation of the actions or intensions of others and may have difficulty anticipating the consequences of his own actions or recognizing the boundaries of appropriate behavior.

Although he does not appear to suffer from a pervasive psychotic disorder, Mr. Amodeo's test results suggest that he may suffer from "mini episodes" marked by disorganization, paranoia/suspiciousness, or delusions. This appears to be primarily related to his mood disorder in that his psychosis appears to fluctuate with the changes in the intensity of his mood state. He seems to work quite hard to manage his disorganized and sometimes odd thoughts and when his mood

symptoms are better managed, theses features are often within his awareness. When he is not suffering from rapidly shifting moods, he is typically able to utilize adequate reality testing abilities.

Affect/Impulse Control: Mr. Amodeo's results suggest he is susceptible to episodes of affective disturbance with marked features of depression and mania. While he may frequently be depressed and morose, at other times he may be erratically moody, complaining with underlying feelings of intense anger and discontent that may be directed in a passive aggressive or direct manner. Although he may not openly report feelings of depression, he gives evidence of being predisposed to affective malaise that interferes with his being able to function optimally. Mr. Amodeo shows a maladaptive way of processing affect in which he exerts little control over his emotions which does not suggest that he is incapable of self control, but rather, he chooses not to do so. His Depression Index via the Rorschach Exner Scoring system reached significant levels (5/5). His BDI-II score of 16 is elevated. Endorsed depressive features include feeling sad, discouraged about the future, decreased enjoyment, guilt, expectation to be punished, disappointment in self, self-critical thoughts, irritability, difficulty making decisions, difficulty with initiation, fatigue, decreased appetite with some weight loss and decreased interest in sex. His score of 1/20 on the BHS does not signify concerning levels of hopelessness.

Mr. Amodeo's manic episodes appear to involve a display of expansive and hostile character features, rather than euphoria. During these times he gives evidence of being talkative, restless, hostile, distractible, subject to tantrums and interpersonally disruptive. Evidence of emotional dyscontrol include feeling erratic, quick changing moods and feeling like things are out of control when things do not go as planned.

Mr. Amodeo denies suicidal ideation and his Beck Suicide Scale of 0 suggests no overt suicidality. Of note, his Rorschach Suicide Constellation Scale was clinically significant (8/8) suggesting some suicide potential. Risk factors include feeling emotions quickly and intensely, grandiosity, periods of decreased reality testing, impulsivity, anger and oppositional traits, and a sense of being disconnected from others. He endorsed one item on the Self-Destructive Potential MCMI-III scale including "I feel deeply depressed for no reason I can figure out." It is important to note that the discrepancy between his report of suicidal ideation and the strong indicators of suicide potential elucidated by this evaluation demonstrate diminished awareness which may have implications in treatment regarding his recognition of possible indicators of suicidality.

Self/Interpersonal: Mr. Amodeo's test results suggest he is not paying sufficient attention to himself and may purposefully self avoid; however, despite narcissistic and grandiose features, this tendency towards avoidance may be in effort to avoid engaging in negative self examination. When he does pay attention to himself, he may compare himself unfavorably to others or he may be sensitive to how his actions may affect others. He may attempt to deal with uncertainty about his image of himself or concerns about his self-value in an overly intellectualized manner and he may distort or overlook realistic considerations. Thus, his avoidance has a protective motivation. He appears to have a limited capacity to identify comfortably with others, despite a desire to be close to others. He appears to expect that interactions with others will be characterized by a larger measure of competition, rather than collaboration. Thus, he is at risk of approaching interpersonal relationships too assertively and aggressively. He tends to be a socially withdrawn person and be isolated. Although he may have many people in his life who are important to him, it may not be easy for him to establish and sustain meaningful interpersonal relationships.

Mr. Amodeo appears to experience limited and diminished self-esteem. He tends to have persistent self-deprecation and a tendency to undermine his constructive opportunities. His poor self image of feeling worthless and ineffectual may make ordinary stresses and responsibilities seem excessively demanding. He may have limited capacity to comfortably identify with individuals in his life may feel apprehension or mistrust towards others. His heightened anxiety may become associated with social avoidance. Additionally, his anxiety may cause him to appear edgy, restless and indecisive, which only further exacerbates interpersonal difficulties. He may have a history of feeling disappointed in others and may struggle with trusting and opening up to others because of a fear they will also disappoint him. Because he is not always able to trust others, it may lead to overt destruction, self-defeating behaviors, or expressions of anger. Because he may worry about the consequences of his overtly expressed anger, he may express resentment in a passive aggressive manner or withdrawal from others.

<u>Personality:</u> Mr. Amodeo's MCMI-III resulted in elevated scores on the narcissistic and antisocial personality traits.

Thank you for this referral. It was a pleasure working with Mr. Amodeo.

Susan Parks, Ph.D.
Licensed Psychologist
Neuropsychologist
Training Director, Neuropsychology Post Doctoral Training Program
Instructor in Psychology, Department of Psychiatry, Harvard Medical School

McLean Hospital
Harvard Medical School
115 Mill Street
Belmont, MA 02478

Name: Amodeo, Frank
DOB: 09/01/60
DOE: 08/12/08
Age: 47
Gender: 1

MRN: 170910
Hall: Wyman
Referral: Vuckovic
Education: 19

| T-Score | Level of Functioning |
|---------|---------------------|
| 0-39 | Above average |
| 40-59 | Average |
| 60-64 | Borderline |
| 65-69 | Mildly Impaired |
| 70-79 | Moderately Impaired |
| 80-89 | Severely Impaired |
| 90+ | Profoundly Impaired |

**Adult Neuropsychological Test Battery**
**Summary of Scores**
© 2001 Miles Tarter, Psy.D.

| Table of Contents | Raw | T-Score | %ile | Level of Functioning |
|---|---|---|---|---|
| **Intelligence** | | | | |
| Vocabulary (WASI) | 63 | 37 | 90% | above average |
| Similarities (WASI) | 50 | 50 | 50% | average |
| Block Design (WASI) | 57 | 43 | 75% | average |
| Matrix Reasoning (WASI) | 53 | 47 | 61% | average |
| Verbal IQ | 109 | 44 | 73% | average |
| Performance IQ | 107 | 45 | 68% | average |
| Full 4 IQ | 109 | 44 | 73% | average |
| | | | | |
| **Attention/Concentration** | | | | |
| Digits Forward (WMS-R) points | 10 | 43 | 79% | average |
| Digits Backward (WMS-R) points | 8 | 44 | 73% | average |
| | | | | |
| **Executive Controls** | | | | |
| Trails A | 16 | 34 | 95% | above average |
| Trails B | 33 | 29 | 98% | above average |
| Cancellation Letters | | 46 | 68% | average |
| Cancellation Symbols | | 49 | 58% | average |
| Cancellation Structured | | 50 | 53% | average |
| Cancellation Unstructured | · | 45 | 73% | average |
| COWAT | 56 | 30 | 98% | above average |
| Semantic Fluency: Animals | 21 | 55 | 34% | average |
| Stroop Word | 117 | 38 | 88% | above average |
| Stroop Color | 79 | 47 | 61% | average |
| Stroop Color/Word | 43 | 47 | 61% | average |
| Interference | | 55 | 30% | |
| Wisconsin Card Sorting Test | Errors=10 | 48 | | average |
| Perseverations | 5 | 56 | | average |
| Learing to Learn | 0 | | | within expected range |
| | | | | |
| **Language** | | | | |
| Boston Naming Test (BDAE) | 13 out of 15 | Mean = 12.9 | SD = 1.9 | average |
| Vocabulary (WASI) | 63 | 37 | 90% | above average |
| Similarities (WASI) | 50 | 50 | 50% | average |
| | | | | |
| **Visuospatial** | | | | |
| Rey-O Copy | 31 | | 2-5% | mildly impaired |
| Block Design (WASI) | 57 | 43 | 75% | average |
| Matrix Reasoning (WASI) | 53 | 47 | 61% | average |
| | | | | |
| **Memory** | | | | |
| Logical Memory I (WMS-R) | 31 | 44 | 75% | average |
| Logical Memory II (WMS-R) | 33 | 38 | 90% | above average |
| Logical Memory Recognition | 18 | 86% | | |
| Logical Memory Retention | | 106% | | |
| CVLT-II SF; List A Trial 1 | 4 | SS -1.5 | | mildly impaired |
| CVLT-II List A Trial 1-4 | 27 | 50 | 50% | average |
| CVLT-II Short Free | 8 | SS 0.5 | | average |
| CVLT-II Long Free | 8 | SS 1 | | above average |
| CVLT-II Long Cued | 8 | SS 1 | | above average |
| CVLT-II Recognition Hits | 9 out of 9 | SS 0.5 | | average |
| Discriminability | | SS 1 | | above average |
| Semantic Clustering | | SS -0.5 | | average |
| Serial Clustering | | SS 2.5 | | above average |
| Rey Immediate Recall | 18.5 | 54 | 34% | average |
| Rey Delayed Recall | 21 | 49 | 53% | average |
| Rey Retention | | 114% | | |

Imaging Center — McLean Hospital — MRI Report

AMODEO, Frank

MRN: 170910

8/18/08 11:00 am

HALL: Pavilion

Referred by Dr. Vuckovic

**MRI OF PITUITARY WITH AND WITHOUT CONTRAST.**

### Clinical History

Hyperprolactinemia.

### Technique

Sagittal T1 and coronal T1 weighted images were obtained before and after injection of contrast. Movement artifacts are present on many of these images.

### Findings

Sella turcica is not expanded. The dorsum sella is asymmetric being larger on the right side and more hyperintense. This is likely insignificant. The pituitary itself is rather small. It has a concave superior margin. It is best seen on coronal T1 weighted noncontrast images no. 10 and 11. With injection of contrast, the enhancement is more or less homogeneous as seen on image no. 11. Infundibulum of pituitary is minimally shifted to the left side but no cause for this infundibula shift is evident on this examination. Suprasellar cistern is clear. Optic chiasm is unremarkable. No parasellar abnormality is seen.

### Impression

I doubt there is any pituitary abnormality. Minimal deviation of infundibulum from right to left is likely insignificant. No pituitary or suprasellar mass is detected.

AAZ:  8/23/08
emp:  8/24/08

*Amir A. Zamani*

Amir A. Zamani, M.D.  7:30 am        DATED:  8/28/08

Amodeo, Frank
170910
WYM

Recording Date :8/13/2008                    Report Date: 8/13/2008

## Background Activity:

This is a digitally acquired electroencephalogram . Both referential and differential montages are examined. Electrodes are placed in accordance with the international 10-20 system.

### Alpha:

Frequency: 9-10 Hz        Amplitude: 40-70 uV        Location: Occipital

Alpha activity was symmetric and reactive to eye opening.

### Beta:

Frequency: 15-28 Hz        Amplitude: 5-10 uV        Location: Anterior

## Other Activity:

No focal slowing or epileptiform activity is noted. EKG reveals a sinus rhythm.

## Hyperventilation:

Normal response.

## Sleep:

Normal drowsiness and sleep. Stage I and II present. Loud snoring with snoring associated arousals occurred.

## Photic Stimulation:

Normal photic response. A small amount of photic driving occurred between 15-20Hz.

## Interpretation:

Normal awake, drowsy and sleep EEG. Loud snoring with snoring associated arousals suggest obstructive sleep disordered breathing. Clinical correlation and follow up of this finding is recommended.

Evan D. Murray, MD
Department of Neurology
McLean Hospital



GEMS IT MAC1200    FRANK AMODEO 000170910, MOBILEXUSA
Male, 47 Years (09/01/1960)

FACILITY: MCLEAN          UNIT: PAU

Measurement Results:

QRS        : 82 ms
QT/QTcB    : 392 / 404 ms
PR         : 168 ms
P          : 108 ms
RR/PP      : 916 / 920 ms
P/QRS/T    : 14/ -33/ 15 degrees

< P  ......
< T  -----
< QRS ----

Interpretation:
*** Age and gender specific ECG analysis ***
Normal sinus rhythm
Left axis deviation
Inferior infarct , age undetermined *no acute changes*
Abnormal ECG

*unchanged nd r/1/08*

HR 64 bpm

To: Joyce Quigley   Page 2 of 4                    2008-08-21 15:39:37 (GMT)                    17816582052  From: Nicole Colantu



## Sleep Health *Centers* ®
*Better Sleep. Better Health.*

*Affiliations: MA - Brigham and Women's Hospital • Beth Israel Deaconess Medical Center • Faulkner Hospital • Hallmark Health • Marlborough Hospital Massachusetts Eye and Ear Infirmary • McLean Hospital • New England Sinai Hospital • Southcoast Hospitals Group • NY - Beth Israel Medical Center*

Date:  08/18/08

Re:  Frank Amodeo
DOB:  09/01/60

Dr. Alexander Vuckovic.

Dear Dr. Vuckovic:

Thank you for referring Frank Amodeo. He is a patient with obstructive sleep apnea. He is a 47-year-old man who has been in the pavilion undergoing a complete evaluation for possible bipolar disease. He has been on Depakote at 3000 mg and still states that he maintains a low level. He has gained weight with the Depakote, and that may be contributing in part to his sleep apnea.

The patient has had obstructive sleep apnea diagnosed previously in Florida, and he states that he was diagnosed a year ago, September 2007 in Orlando, and he has just started using CPAP July 2008. His symptoms are excessive daytime sleepiness and loud snoring. He has no longer been able to sleep with his significant other, and that has prompted him to start using his CPAP.

Sleep History: The patient goes to bed at approximately 11 to 11:30 p.m., wakes at 6:30 to 7:30 a.m. He thinks that he sleeps 6-7 hours in bed. Before Depakote he was taking a nap for an hour on Saturday and Sunday, and since he has been using Depakote he has been napping daily.

He has a nasal pillow for his CPAP and he does sleep on his side, so a mask change to a different type of nasal pillow may be warranted. Unfortunately he did not bring any of his equipment with him.

The patient considers himself retired.

He does not have symptoms of restless legs. He will wake up in the morning feeling his legs and feet somewhat weak and painful. He also notices that when he sits for a long period of time and then it goes away with movement.

The patient rarely has a feeling of being suffocated at night. He always snores and frequently wakes up gasping for air. He will wake once a night with the need to go to the bathroom.

| www.sleephealth.com | telephone: 1.877.SLEEPHC | fax: 781.271.0601 |

*Locations: MA – Bedford, Beverly, Boston, Brighton, Framingham, Jamaica Plain, Marlborough, Medford, North Dartmouth, Stoughton, Weymouth, Worcester
NY – Manhattan; RI – Cumberland*

Re: Frank Amodeo
DOB: 09/01/60
Page 2

Epworth Sleepiness score is 13/24, and in the last 6-7 months he has had an unpleasant dry mouth in the morning.

**Family History:** Notes he has 2 children and 3 siblings. Mother is 64 and has had a stroke. Father is 67 and has had cancer. His children are age 22 and 18, and there is no known sleep apnea in the family.

**Social History:** The patient is married, has had a complicated business social situation. He does not consume ethanol or tobacco but does have 2-1/2 galloons of iced tea a day with sweetener, from a restaurant.

On exam Frank is 5 feet 6 inches tall, weighs 230 pounds. Neck is 47 cm. Blood pressure is 122/81, pulse is 71, and pulse oximetry 97% saturation. Mallampati score is III/IV. His uvula tends to sit on the back of his tongue. It folds. It is long and thick. I do not see significant tonsillar tissue, but there are prominent posterior tonsillar folds. His nose is blocked. He has used Nasonex in the past.

**Medications:** The patient has recently started Geodon and a different blood pressure medicine. He does not remember what, but he had been on Depakote at high dose of 3000 mg a day. He did feel that it helped, but it does not sound like he has ever been on Lamictal.

This patient has known sleep apnea. He had a polysomnogram on August 8, 2008 and it was done as a titration study as ordered, but he had some events at the lower pressures, 5 and 6 cm. At 5 cm of pressure his respiratory disturbance index was significantly elevated. It was considered 120, but that was only because it was a very short time until he went up to 6 cm. At 6 cm his respiratory disturbance index was 11.3, and he did very well at 10 cm with an index of 4.35. Snoring stopped at 10 cm, and he thinks that is what he set it at home.

Unfortunately the patient received his CPAP from Walgreens Home Care, and he has had no followup.

I suggested that the patient continue to use his CPAP at 10 cm. If he wanted to bring his machine in to check it, we would be happy to do that. He should be seen by a home care respiratory therapist when he gets back to Florida, which is his choice, and if he loses 20 or 30 pounds he might become a very good candidate for surgery. I would like to see him back any time the patient feels that it is necessary, but I understand he will be leaving in a few days.

| www.sleephealth.com | telephone: 1.877.SLEEPHC | fax: 781.271.0601 |

Locations: MA   Bedford, Beverly, Boston, Brighton, Framingham, Jamaica Plain, Marlborough, Medford, North Dartmouth, Stoughton, Weymouth, Worcester
NY – Manhattan RI – Cumberland

Re: Frank Amodeo
DOB: 09/01/60
Page 3


He clearly does have sleep apnea, does benefit from CPAP and I think now is more motivated to use it regularly.  He understands more about maintenance and the importance of persistence.

Thank you very much for referring this patient.

Yours sincerely,

Sandra Horowitz, M.D.
Tel: 617-783-1441
Fax: 617-783-1458
Sleep HealthCenters

SH/712134/2264

cc:

I www.sleephealth.com I telephone: 1.877.SLEEPHC I fax: 781.271.0601 I

Locations: MA – Bedford, Beverly, Boston, Brighton, Framingham, Jamaica Plain, Marlborough, Medford, North Dartmouth, Stoughton, Weymouth, Worcester
NY – Manhattan; RI – Cumberland



# Sleep Health Centers®
*Better Sleep. Better Health.*

## CPAP Polysomnography Report

**Patient Name: Amodeo, Frank**
**Patient D.O.B.: 9/1/1960**
**Patient Age: 47**

**Patient Gender: Male**
**Height: 65.0 In**
**Weight: 224.0 Lb**

**Test Date: 8/8/2008**
**Test Location: Framingham**
**Referring MD: Alexander Yuckovic, MD**

**History:** The patient was diagnosed with sleep apnea by prior polysomnography. This study is performed to determine the appropriate CPAP pressure.   He has been on CPAP for 6 weeks, but previous studies are not available.

**Technical Summary:** Attended in-laboratory recording montage included: EEG, EOG, EMG, EKG, nasal thermistor flow, nasal pressure, pharyngeal snoring, respiratory effort (2 channels), anterior tibialis EMG, SaO2 and body position. Continuous Positive Airway Pressure (CPAP) was initiated at the beginning of the study. This study was performed in accordance with the AASM scoring manual.

| ALL NIGHT DATA | | | | | | | |
|---|---|---|---|---|---|---|---|
| Total Recording Time | 419 min | WASO | 12 min | Min SaO2 | 92.0% | | |
| Total Sleep Time | 360 min | Stage N1 | 5.3% | Baseline SaO2 | 95.0% | | |
| Sleep Efficiency | 85.8% | Stage N2 | 56.9% | | | | |
| Sleep Latency | 47 min | Stage N3 | 4.2% | | | | |
| | | Stage R | 33.6% | | | PLM Index | 0.0 |
| | | Stage R Latency | 64 min | | | PLM arousal index | 0.0 |

CPAP was titrated from 5 to 13 cm of water pressure. A pressure of 11-13 cm of water was most effective and was observed during supine-REM sleep. in this study he had 41 apneas and hypopneas. At 5 cm h20 pressure he had frequent events that improved by 11 cm H20 pressure.

EKG Findings: Single-lead demonstrated no clinically significant abnormalities.
EEG Findings: Three channel EEG demonstrated no seizure activity.

Further Interpretive Notes: The patient reported that sleep was worse than usual, awoke feeling awake but not alert and would be willing to wear CPAP at home. He complained of many dreams during the night and light sleep.

**Diagnosis:**

- Obstructive Sleep Apnea 327.23

**Discussion:**

- Treatment for moderate obstructive sleep apnea is often warranted even in the absence of clinical symptoms. Recommended options include positive airway pressure, custom-made oral appliances, or upper airway surgery. Regardless of treatment approach for the obstructive sleep apnea, maximization of nasal airway patency, weight loss if appropriate, and avoidance of sedatives and alcohol in proximity to bedtime are strongly encouraged.

- This study shows the effectiveness of CPAP in treating sleep-disordered breathing. Consider a trial of CPAP at 13 cm of water pressure during sleep with clinical follow-up to assess treatment response. It would be useful to have his pre CPAP data and to check his own CPAP for current pressure. History suggests he has a CPAP unit but has gained weight and may need an increased pressure.

Note was made of vivid dreams during the test and REM was early at 64 minutes. The may be a sign of sleep deprivation but is also noted with mood disorder and narcolepsy.



## Sleep HealthCenters®
*Better Sleep. Better Health.*

Clinical correlation is recommended for all patients undergoing polysomnography. Caution is recommended with driving or during other activities requiring alertness for safety.

Thank you for referring this patient for a sleep study and interpretation. If you have any questions or comments, please feel free to give us a call.

Sandra Horowitz, M.D., FRCP(C)
Board Certified in Sleep Medicine
Medical Director, Sleep HealthCenters at Framingham

08/11/2008 12:49 FAX 617 855 3731          McLEAN INT. MED. ASSOC.                    ☑001

McLEAN HOSPITAL
PROGRESS NOTES                                                                      Page ___1___

| No. | Name | Frank Amodeo |
|---|---|---|
| | | 47 Pavilion |

8/11/08

PMH/ ↑BP dx 5/08
   asthma, longstanding (20's) - never hosp.
      uses albut inhaler prn.
   sleep apnea - uses CPAP x 1 mo.
   abd surg as newborn ? type.
Allerg/ no.
ROS/ LOC - no. sz Ⓝ h/a c̄ allerg season.
   Eyes - myopic - during glasses. Ears c̄
   sinus probs c̄ allergies. Teeth -
   Thy Ⓝ CV fast, irreg heartbeat - recent
   ETT(2) - "clean bill of health". Pulm Ⓝ.
   GI app no good o→o GERD. Hep Ⓝ
   bowels Ⓝ Gu Ⓝ Wt ↑ 18 lbs on Depakote.
   STD Ⓝ Back ~ Muskel Ⓝ Ⓝheel pain
S/H/ ō cig no EtOH Ⓝ IVDA Ⓝ Tooth 16 Sudafed/
   x 11 yrs - stopped '00. Caffeine 2-3 gal
   ice tea/d (Equal). Exercise walk 2-3 mi/d
   recently, nothing before. "Turnaround" work
   Separated. 1 dau. ō pets.
FH/ 3 sibs - 1 AM; "developmental probs"
   M CVA ↑BP. wife A&W
   F Ca esoph remiss x 11 yrs
   1 dau A&W
Meds/ Depakote, Lyrica x 2-3 d
      fish oil x 3 d, Metoprolol. FACO.
                        200 ✓

1550 rev 08/02

McLEAN HOSPITAL
PROGRESS NOTES                                                        Page  2

| No. | Name | | |
|---|---|---|---|
| | | Frank Amodeo | |

8/11/08 IET

160/88.  225 1/2 lbs  5'6"  p72 reg
(later 155/90 (1) 9   BMI = 36 (obese)
Pleasant obese wm.

NC/AT EOMI Discs flat mouth ~ neck ~
chest clear Heart reg ⊕mBR Abd
protuberant NT surg scar KUB. Back ~
organs palp. GU normal. Ext. ⊕IC/E
pedal pulses 2+=. ⊕ handed. CN 2 → 12 ~
DTRs nl Rombs ~ gait nl. Strength LE nl.
Speech clear articulate appropriate.

Imp/

① Obesity / ↑BP — BP not under adequate
control. Sugg Δ to labetolol + follow.
needs aggressive wt loss.

② Abnl EKG → RBBB, indet. age. Pt says had
cardiac imaging recently — please get
record. Before embarking on vigorous
exercise program, need clarification of
cardiac status. Add ASA 81 mg /d.

③ Heel pain — leg weakness. No evidence of
the latter. ? mild plantar fasciitis.
May benefit by heel stretches.
? podiatry consult → sugg Dr Kester
at Pro Sports Ortho (787 487 9444).

50 rev 08/02

08/07/08   06:44   North Shore Salem Medical Center   (978)741-1215

Page 1

# NORTH SHORE MEDICAL CENTER LABORATORIES

Page 1

Salem Hospital Laboratory
81 Highland Ave
Salem, MA 01970
(978)741-1215 Ext. 4134

Union Hospital Laboratory
500 Lynnfield St
Lynn, MA 01904
(781)581-9200 Ext 3456

***** LABORATORY REPORT *****

Patient: AMODEO, FRANK
Unit # : 10226283
Acct # : 001046797880
DOB   : 09/01/1960
Phone #: 617-855-2000

Loc: MCLNPAV
Sex: M
Age: 47Y

Copy To Phys: VUCKOVIC, ALEXANDER

Printed: 08/07/2008 at 06:31

| TEST | ABN | RESULT | NORMALS | UNITS |
|------|-----|--------|---------|-------|

08/06/2008 at 12:30

Ordering Physician: VUCKOVIC, ALEXANDER

URINE DRUG SCREEN

| | | | | |
|---|---|---|---|---|
| AMPHETAMINES (U) | | NEG | [NEG] | NS |
| BARBITURATE (U) | | NEG | [NEG] | NS |
| BENZODIAZEPINES (U) | | NEG | [NEG] | NS |
| CANNABINOIDS (U) | | NEG | [NEG] | NS |
| COCAINE METAB (U) | | NEG | [NEG] | NS |
| OPIATES (U) | | NEG | [NEG] | NS |
| DAU COMMENT | | Please Note: | | NS |

Unconfirmed positive screening results should
not be used for non-medical purposes.
Confirmation may be performed at physician's
request.

| | | | | |
|---|---|---|---|---|
| ETHANOL (U) | | NEG | [NEG] | |
| MACROSCOPIC UA | | | | |
| COLOR UA | | NORMAL | [NORM] | NS |
| CHARACTER UA | | CLEAR | [CLEAR] | NS |
| SPECIFIC GRAVITY UA | | 1.019 | [1.003-1.030] | NS |
| PH UA | | 6.0 | [5.5-6.5] | NS |
| PROTEIN UA | | NEG | [NEG] | NS |
| GLUCOSE UA | | NEG | [NEG] | NS |
| KETONES UA | | NEG | [NEG] | NS |
| BILIRUBIN UA | | NEG | [NEG] | NS |
| BLOOD UA | | NEG | [NEG] | NS |
| UROBILINOGEN UA | | 0.2 | [0.2-1.0] | MG/DL |
| LEUKOCYTES UA | | NEG | [NEG] | NS |
| NITRITE UA | | NEG | [NEG] | NS |

{NS} = Processed and/or performed at NSMC, 81 Highland Ave, Salem, MA

! 08/08/08  06:43  North Shore Salem Medical Center  (978)741-1215          Page 1

## NORTH SHORE MEDICAL CENTER LABORATORIES          Page 1

Salem Hospital Laboratory
81 Highland Ave
Salem, MA 01970
(978)741-1215 Ext 4134

Union Hospital Laboratory
500 Lynnfield St
Lynn, MA 01904
(781)581-9200 Ext 3456

***** LABORATORY REPORT *****

Patient: AMODEO,FRANK
Unit # : 10226283
Acct # : 001046816771
DOB    : 09/01/1960
Phone #: 617-855-3574

Loc: MCLNPAV
Sex: M
Age: 47Y

Copy To Phys: VUCKOVIC,ALEXANDER

Printed: 08/08/2008 at 06:30

| TEST | ABN | RESULT | NORMALS | UNITS | |
|------|-----|--------|---------|-------|---|

08/07/2008 at 08:00                      Ordering Physician: VUCKOVIC,ALEXANDER

### COMPLETE BLOOD COUNT

| TEST | ABN | RESULT | NORMALS | UNITS | |
|------|-----|--------|---------|-------|---|
| WBC | | 10.20 | [4.0-11.0] | K/uL | NS |
| RBC | | 4.66 | [4.60-6.20] | M/uL | NS |
| HGB | | 14.1 | [14.0-18.0] | G/DL | NS |
| HCT | | 40.8 | [40.0-54.0] | % | NS |
| MCV | | 87.5 | [81.0-99.0] | FL | NS |
| MCH | | 30.3 | [27.0-31.0] | PG | NS |
| MCHC | | 34.7 | [32.0-36.0] | G/DL | NS |
| PLATELET | | 204 | [150-450] | K/uL | NS |
| RDW-CV | | 14.2 | [11.0-16.0] | % | NS |
| DIFFERENTIAL | | | | | |
| NEUTROPHIL | L | 47.6 | [54.0-62.0] | % | NS |
| LYMPHOCYTE | H | 41.3 | [25.0-33.0] | % | NS |
| MONOCYTE | H | 8.5 | [3.0-7.0] | % | NS |
| EOSINOPHIL | | 2.0 | [0.0-3.0] | % | NS |
| BASOPHIL | | 0.6 | [0.0-1.0] | % | NS |
| ABS NEUT COUNT | | 4.80 | [1.8-7.0] | K/UL | NS |
| COMP METAB PANEL | | | | | |
| SODIUM | | 141 | [135-146] | MEQ/L | NS |
| POTASSIUM | | 4.3 | [3.6-5.0] | MEQ/L | NS |
| CHLORIDE | | 100 | [100-110] | MEQ/L | NS |
| CARBON DIOXIDE | | 28 | [20-29] | MEQ/L | NS |
| ANION GAP | | 13 | [8-16] | meq/L | NS |
| GLUCOSE | | 99 | [65-99] | MG/DL | NS |
| BUN | | 18 | [5-21] | MG/DL | NS |
| CREATININE | | | [0.6-1.2] | MG/DL | NS |

1.2 New IDMS standardization method
as of 7/14/08.

| GFR_x1.2 IF AFR | | >60 | [60-128] | ml/min/1.7 | NS |
|------|-----|--------|---------|-------|---|
| TOTAL PROTEIN | | 6.5 | [6.1-8.3] | G/DL | NS |
| ALBUMIN | | 3.7 | [3.3-4.8] | G/DL | NS |
| CALCIUM | | 9.0 | [8.9-10.3] | MG/DL | NS |
| BILIRUBIN,TOTAL | | 0.5 | [0.4-1.2] | MG/DL | NS |
| ALK PHOS | | 68 | [0-100] | U/L | NS |
| ALT | H | 41 | [0-35] | IU/L | NS |
| AST | | 25 | [0-46] | U/L | NS |
| LIPID PANEL | | | | | |
| CHOLESTEROL | | 191 | [0-200] | MG/DL | NS |

08/12/08  06:41  North Shore Salem Medical Center  (978)741-1215

Page 3

## NORTH SHORE MEDICAL CENTER LABORATORIES

Page 2

Salem Hospital Laboratory
81 Highland Ave
Salem, MA 01970
(978)741-1215 Ext 4134

Union Hospital Laboratory
500 Lynnfield St
Lynn, MA 01904
(781)581-9200 Ext 3456

***** LABORATORY REPORT *****

Patient: AMODEO, FRANK
Unit # : 10226283
Acct # : 001046816771
DOB   : 09/01/1960
Phone #: 617-855-3574

Loc: MCLNPAV
Sex: M
Age: 47Y

Copy To Phys: VUCKOVIC, ALEXANDER

Printed: 08/12/2008 at 06:30

| TEST | ABN | RESULT | NORMALS | UNITS | |
|------|-----|--------|---------|-------|--|

08/07/2008 at 08:00

Ordering Physician: VUCKOVIC, ALEXANDER

| LIPID PANEL | | (CONTINUED) | | | |
|-------------|---|-------------|---------|-------|----|
| TRIGLYCERIDE | | 176 | [0-250] | MG/DL | NS |
| HDL | | 43 | [>39] | MG/DL | NS |
| CHOL/HDL | | 4.4 | [<5] | | NS |
| LDL | | 113 | [40-130] | MG/DL | NS |
| NON HDL CHOL | | 148.0 | [50-100] | MG/DL | NS |
| DEPAKENE | | 87 | [7.0-18.0] | UG/ML | |
| CORTISOL AM | | 15.8 | | UG/DL | |
| PROLACTIN | | 19 | | NG/ML | |

REFERENCE RANGE: (NG/ML)
   MALE:          3-13
   FEMALE:
     PRE-MENOPAUSAL:  3-27
     POST-MENOPAUSAL: 3-20

| TSH | | 2.42 | [0.34-5.00] | MIU/ML | |
| B12 | | 716 | [180-914] | PG/ML | |

REFERENCE RANGE: (pg/ml)
   NORMAL:         180-914
   INDETERMINATE: 145-179
   DEFICIENT:    <145

| FOLIC ACID | | 8.8 | | | |

REFERENCE RANGE: (ng/ml)
   NORMAL:         >3.0
   INDETERMINATE: 2.5-3.0
   DEFICIENT:    <2.5

| HEMOGLOBIN A1C | H | 7.1 | [4.5-6.5] | % | |
| HOMOCYSTEINE (S/P) | H | 10.2 | [<10] | UMOL/L | |
| FREE TESTOSTERONE | | | | | |
| TESTOSTERONE | L | 138 | [240-950] | ng/dL | MC |
| FREE TESTOSTERONE | L | 7.5 | [9-30] | ng/dL | MC |
| ETHYLMALONIC ACID | | | | | |
| METHYLMALONIC | | 0.14 | [0-0.40] | umol/L | |

   Reference range: <= 0.40

| PR | | NON-REACTIVE | [NR] | | |
| CARDIO CRP | | | | | |

08/12/08  06:41  North Shore Salem Medical Center  (978)741-1215

Page 5

## NORTH SHORE MEDICAL CENTER LABORATORIES

Page 3

Salem Hospital Laboratory
81 Highland Ave
Salem, MA 01970
(978)741-1215 Ext 4134

Union Hospital Laboratory
500 Lynnfield St
Lynn, MA 01904
(781)581-9200 Ext 3456

##### ***** LABORATORY REPORT *****

Patient: AMODEO,FRANK
Unit # : 10226283
Acct # : 001046816771
DOB    : 09/01/1960
Phone #: 617-855-3574

Loc: MCLNPAV
Sex: M
Age: 47Y

Copy To Phys: VUCKOVIC,ALEXANDER

Printed: 08/12/2008 at 06:30

| TEST | ABN | RESULT | NORMALS | UNITS |
|------|-----|--------|---------|-------|

08/07/2008 at 08:00                    Ordering Physician: VUCKOVIC,ALEXANDER

CARDIO CRP
   CARDIO CRP                H      (CONTINUED)
                                    [0.00-0.30]        MG/DL
                             0.572 Relative Risk (Cardiac)
                             Low:    <0.10 mg/dl
                             Average:  0.10- 0.30 mg/dl
                             High:   >0.30 mg/dl
                             PERFORMED AT:
                             NORTH SHORE MEDICAL CENTER
                             500 LYNNFIELD STREET
                             LYNN, MA 01904

{MC} = Processed and/or performed at Mayo Clinic, Rochester, MN.
{NS} = Processed and/or performed at NSMC, 81 Highland Ave, Salem, MA
{UH} = Processed and/or performed at Union Hosp., 500 Lynnfield St, Lynn, MA

08/13/08  14:15  North Shore Salem Medical Center  (978)741-1215          Page  1

## NORTH SHORE MEDICAL CENTER LABORATORIES                Page  1

Salem Hospital Laboratory
81 Highland Ave
Salem, MA 01970
(978)741-1215 Ext 4134

Union Hospital Laboratory
500 Lynnfield St
Lynn, MA 01904
(781)581-9200 Ext 3456

***** LABORATORY REPORT *****

Patient: AMODEO,FRANK
Unit # : 10226283
Acct # : 001046899736
DOB    : 09/01/1960
Phone #: 617-855-3574

Loc: MCLNPAV    Copy To Phys: MCLEAN,NON-STAFF
Sex: M
Age: 47Y

Printed: 08/13/2008 at 14:05

| TEST | ABN | RESULT | NORMALS | UNITS | |
|------|-----|--------|---------|-------|---|

08/12/2008 at 08:00                    Ordering Physician: MCLEAN,NON-STAFF

LIVER PANEL
| | | | | | |
|------|-----|--------|---------|-------|---|
| TOTAL PROTEIN | | 6.8 | [6.1-8.3] | G/DL | NS |
| ALBUMIN | | 3.6 | [3.3-4.8] | G/DL | NS |
| BILIRUBIN,TOTAL | | 0.4 | [0.4-1.2] | MG/DL | NS |
| DIRECT BILI | | 0.0 | [0.0-0.2] | MG/DL | NS |
| ALK PHOS | | 53 | [0-100] | U/L | NS |
| ALT | H | 45 | [0-35] | IU/L | NS |
| AST | | 25 | [0-46] | U/L | NS |
| DEPAKENE | | 73 | [50-100] | UG/ML | |
| FREE T4 | | | | | |
| FT4 | | 0.6 | [0.6-1.6] | NG/DL | |
| PROLACTIN | | | | NG/ML | |
| | | 24 | REFERENCE RANGE: (NG/ML) | | |
| | | | MALE: | 3-13 | |
| | | | FEMALE: | | |
| | | | PRE-MENOPAUSAL: | 3-27 | |
| | | | POST-MENOPAUSAL: | 3-20 | |
| PSA | | 1.3 | [0.0-4.0] | NG/ML | |
| TOTAL T3 | | 108 | [87-178] | NG/DL | |
| ANTI-HAV | | NEG | | | |
| ANTI HBC | | NEG | [NEG] | | |
| HBSAB | | NEG | [NEG] | | |
| HBSAG | | NEG | [NEG] | | |
| HEP C ANTIBODY | | NEG | [NEG] | | |
| SEX HORM. BIND. GLOB | | | [NEG] | | |
| SHBG | | 6.9 | | nmol/L | |
| | | Reference range: 10 to 60 | | | |

{NE} = Test performed by Mayo Medical Laboratories New England,Wilmington,MA
{NS} = Processed and/or performed at NSMC, 81 Highland Ave, Salem, MA

08/15/08   16:08   North Shore Salem Medical Center   (978)741-1215

Page 1

## NORTH SHORE MEDICAL CENTER LABORATORIES

Page 1

Salem Hospital Laboratory
81 Highland Ave
Salem, MA 01970
(978)741-1215 Ext 4134

Union Hospital Laboratory
500 Lynnfield St
Lynn, MA 01904
(781)581-9200 Ext 3456

***** LABORATORY REPORT *****

Patient: AMODEO,FRANK
Unit # : 10226283
Acct # : 001046975031
DOB    : 09/01/1960
Phone #: 617-855-3574

Loc: MCLNPAV
Sex: M
Age: 47Y

Copy To Phys: MCLEAN,NON-STAFF

Printed: 08/15/2008 at 16:00

| TEST | ABN | RESULT | NORMALS | UNITS |
|------|-----|--------|---------|-------|

08/15/2008 at 08:00

Ordering Physician: MCLEAN,NON-STAFF

| DEPAKENE | | 83 | [50-100] | UG/ML |

{NS} = Processed and/or performed at NSMC, 81 Highland Ave, Salem, MA

08/19/08  06:42  North Shore Salem Medical Center  (978)741-1215        Page  1

## NORTH SHORE MEDICAL CENTER LABORATORIES

Page 1

Salem Hospital Laboratory
81 Highland Ave
Salem, MA 01970
(978)741-1215 Ext 4134

Union Hospital Laboratory
500 Lynnfield St
Lynn, MA 01904
(781)581-9200 Ext 3456

***** LABORATORY REPORT *****

Patient : AMODEO,FRANK
Unit # : 10226283
Acct # : 001047008592          Loc: MCLNPAV       Copy To Phys: MCLEAN,NON-STAFF
DOB   : 09/01/1960             Sex: M
Phone #: 617-855-3574          Age: 47Y

                                                  Printed: 08/19/2008 at 06:30

| TEST | ABN | RESULT | NORMALS | UNITS |
|------|-----|--------|---------|-------|

08/17/2008 at 21:30                    Ordering Physician: MCLEAN,NON-STAFF

URINE DRUG SCREEN
| | | | | |
|--|--|--|--|--|
| AMPHETAMINES (U) | | NEG | [NEG] | NS |
| BARBITURATE (U) | | NEG | [NEG] | NS |
| BENZODIAZEPINES (U) | | NEG | [NEG] | NS |
| CANNABINOIDS (U) | | NEG | [NEG] | NS |
| COCAINE METAB (U) | | NEG | [NEG] | NS |
| OPIATES (U) | | NEG | [NEG] | NS |
| DAU COMMENT | | Please Note: | | NS |

Unconfirmed positive screening results should
not be used for non-medical purposes.
Confirmation may be performed at physician's
request.

ETHANOL (U)                     NEG          [NEG]

{NS} = Processed and/or performed at NSMC, 81 Highland Ave, Salem, MA

08/19/08  16:11  North Shore Salem Medical Center  (978)741-1215

Page  1

## NORTH SHORE MEDICAL CENTER LABORATORIES

Page 1

Salem Hospital Laboratory
81 Highland Ave
Salem, MA 01970
(978)741-1215 Ext 4134

Union Hospital Laboratory
500 Lynnfield St
Lynn, MA 01904
(781)581-9200 Ext 3456

***** LABORATORY REPORT *****

Patient: AMODEO,FRANK
Unit # : 10226283
Acct # : 001047032857
DOB   : 09/01/1960
Phone #: 617-855-3574

Loc: MCLNPAV
Sex: M
Age: 47Y

Copy To Phys: VUCKOVIC,ALEXANDER

Printed: 08/19/2008 at 16:00

| TEST | ABN | RESULT | NORMALS | UNITS |
|------|-----|--------|---------|-------|

08/19/2008 at 08:00

Ordering Physician: VUCKOVIC,ALEXANDER

DEPAKENE                73              [50-100]      UG/ML

{NS} = Processed and/or performed at NSMC, 81 Highland Ave, Salem, MA

Subj:    RE: Frank A
Date:    8/14/2008 2:58:36 P.M. Eastern Daylight Time
From:    JLevinson@Levinsonharris.com
To:      Alpsy@aol.com

et, voila!
J

Frank Amodeo


John Levinson, MD, PhD
Levinson Harris Medical Group
535 Boylston Street   7th Floor
Boston MA  02114
Phone 617-247-3444    Fax 617-247-9444

Clinical summary for Frank Amodeo

Report: 08/14/2008
*********************************************************************************

Unit No: 463-97-03        Age: 47        Birthdate: 09/01/1960
Address: 2875 S.orange Ave Ste500 1810
         Orlando,fl 32806
home #: 407-855-0055
work #: 407-373-4351
Genl MD: T. Higgins
Ref MD: Alex Vuckovic
Last office visit: 08/14/2008
Next office visit:  / /   (approximate)
*********************************************************************************

ECG: 08/14/2008: SR 77/-40 — LADEV, POSSIBLE OIMI, NSSTTWAS
Main Dx: ABNL ECG, HTN

*********************************************************************************


*** Family & Social Hx ***

Fhx: Stroke, Hypertension, Diabetes, Cancer
Spouse: Claire Holland
Occupation: President AGMI Strategy Co
SHx: Lives with spouse in Orlando. Trained in law/econ
Alcohol: Social alcohol
Substance: No substance abuse
Caffeine: 3 or more/day
Diet: Ad lib
Exercise: Active with regular walking exercise
Tobacco: Never


*** Current Medications ***

Metoprolol      100 mg – 1 QD
Depakote        500 mg – 6 QD
Cpap


Thursday, August 14, 2008 AOL: Alpsy

Aspirin     81 mg - 1 QD

### *** Allergy List ***

There are no allergies in the database for this patient

### *** Problem List ***

1. ABNL ECG W ?IMI INA
2. HYPERTENSION
3. OBESITY
4. GLUCOSE INTOLERANCE
5. BIPOLAR DISORDER
6. SLEEP APNEA - OBSTRUCTIVE

### *** Procedure List ***

1. 08/13/2008    hs crp=0.572 (hi risk)  tsh 2.42

### *** Fluoroscopy List ***

There are no fluoroscopies in the database for this patient

### *** Weights & Lipids ***

| Date | Wt | Chol | LDL | HDL | TG | Ratio | Medications |
|------|-----|------|-----|-----|-----|-------|-------------|
| 05/29/2008 F | 0 | 248 | 167 | 49 | 162 | 5.0 | |
| 08/14/2008 F | 233 | 191 | 113 | 43 | 176 | 4.4 | |

### *** Visit Report ***

Visit Date: 08/14/2008 @ OFC

Weight:   233 pounds, with BMI of 37.6
Vitals:   125/80 @ 76 reg L=R
General:   Healthy appearing centrally obese man
HEENT:    EOMI PERRL no arcus Dentition OK
Skin:    Without stigmata of cardiac disease
JVP:    5cm
Carotids: Normal in upstroke & without bruits
Thyroid:   Normal, nonnodular
Chest:    No dullness, clear to P&A
Cor:     ?PMI, RRR w soft S4
Abdomen:   NBS, Nontender, w/o masses, bruits, hsm
Ext:     No c/c/e, no stasis changes or ulcers, nl gait
Pulses:   Full & symmetric UE's & LE's
Neuro:    Ox3, CN intact, general motor OK

Narrative:
  Outpatient Cardiovascular Consultation

>>Chief Complaint.

Abnormal EKG, possible metabolic syndrome

>>Present Illness.
This is the first office visit for this 47 year-old man referred by Dr. Vukovich for the problems above among others. The patient is now at the Pavilion in order to have a thorough reassessment of his psychiatric status. He tells me that he has bipolar disorder with a significant manic component but that there is question as to how much of the illness and especially the mania are related to his work.

The coronary risk factors include hypertension which he says was only diagnosed perhaps three months ago, obesity, and gender. He is felt to have perhaps pre-diabetes as well but no one has diagnosed frank diabetes. He has never abused tobacco. There is no family history of atherosclerotic disease. With regard to known coronary cardiac risk factors, he has never used Redux for Phen-Fen, never had rheumatic fever.

His weight has been going up steadily. Three months ago, in response to LDL of 167 he tells me that his internist told him in no uncertain terms that he either needed to tighten up on the diet and lose weight or get medications by the fall. The patient has cut portions, almost completely discontinued snacks, and says he has lost 5 pounds. Follow-up labs which I have shown under today's date are significantly improved from the ones three months ago.

He says that he has progressive exertional dyspnea and he describes mild huffing and puffing which he believes is related to allergy and asthma as well as perhaps overweight. He does not have tightness or pain.

He has not had palpitations, syncope, presyncope, and so forth — but he does tell me that his heart rate has been noted to be fast and that has been attributed to the fact that he has about 25 cups each day of caffeinated tea.

He was diagnosed as having sleep apnea and started using CPAP just last month. He says he is compliant on a regular basis.

He says that he has not had cardiovascular noninvasive testing as we talked about echocardiography and stress testing given his abnormal EKG.

>>Allergies, Medications, Past Medical and Surgical History, Family Medical History.
See lists above. He is married but separated. He trained in the law and in economics and is now president of AQMI Strategy Corp. which purchases and turns around businesses then either liquidating or selling them. He says mostly they liquidate. His life is enormously stressful. He is now in a position where he is thinking very seriously about changing what he does do something much more relaxing.

>>Review of Systems.
Positives: Beyond the above he only notes the psychiatric and asthma-related issues. He has also recently had some trouble with his left foot as he has been exercising more at the urging of his physician in Florida.
Otherwise negative — details to be found in the paper record

>>Physical Examination.
Above

>>Laboratory.
Lipids from recently are shown above and are much better than studies from three months ago.

CRP is on the high risk side. TSH is normal.
Fasting sugar from back in May was 131 in Florida. Sugar more recently at 99 is
top normal.
Renal function is normal.
Glycohemoglobin at 7.1 is elevated.

>>Assessment & Recommendations.
In summary, this is a 47-year-old man with issues as noted below. NOTE that he
is unsure of his medications and believes that the metoprolol has been changed
to some other similar medication. I believe he is on long-acting metoprolol.

ABNL ECG -
His EKG does indeed look like old inferior infarction. However, many people
with this EKG will turn out never to have had infarction -- it can be a false
positive. With his various risk factors it is certainly worth knowing
unequivocally. I believe that his huffing and puffing dyspnea is on the basis of
deconditioning and overweight with perhaps an element of asthma -- but this
dyspnea is obviously another reason to proceed toward noninvasive testing.
>> echocardiogram
>> nuclear treadmill stress test off metoprolol the day of the study
>> we will get these next week and he and I will confer by telephone with the
results.

OSA -
Sleep apnea diagnosed in being treated with CPAP.

HTN -
Controlled nicely

LIPIDS -
His current lipids are fine for primary prevention unless he does indeed have
diabetes. With his glycohemoglobin being 7.1 it may well be that we are moving
in that direction. However, he has been losing weight and his lipids are
clearly already better so I do not think it would be essential at this point to
treat. If his stress test comes back positive for coronary disease we would be
stuck treating him to the secondary prevention guideline. Same is true if his
tendency toward diabetes does not resolve. Finally, he has an elevated CRP
which would be another concern in this regard.
>> would recommend rechecking CRP with lipids in three months

PREVENTION -
Weight loss is going to be his major target. His blood pressure, sleep apnea,
lipids, and glucose intolerance are all related to obesity. His dyspnea is
probably also related to obesity. He is working hard and succeeding so for now I
think there is nothing to do but continue. Of course we also spoke about his
truly heroic caffeine consumption.


Thank you very much, Alex, for asking me to participate in this patient's care.
Please let me know if I have missed anything important or if my speech
recognition system has encrypted portions of this letter to you.

Sincerely,


John R. Levinson, M.D. Ph.D.


Prepared by computer speech recognition - please excuse transcription errors
*******************************************************************************

I am using the free version of SPAMfighter for private users.
It has removed 2 spam emails to date.
Paying users do not have this message in their emails.
Try SPAMfighter for free now!

Appendix F

General Explanation of Bipolar Disease

# INSIDE THE BIPOLAR BRAIN

Scientists can't point to one lobe that makes a person bipolar, but they have identified several areas that are involved in ways they are just beginning to understand

**AMYGDALA**

WHAT IT DOES: One of the brain's emotional centers; helps in the recognition of facial expressions and tones of voice. Neural transmissions increase in response to emotional stimuli. Normally, repeated exposure to the same experiences or images leads to habituation, or reduced response

WHAT HAS GONE WRONG: Habituates slowly to some stimuli, remaining reactive beyond the usual response time

**HIPPOCAMPUS**

WHAT IT DOES: One of the brain's memory centers. One layer of the hippocampus, the subiculum, helps recognize contexts that represent danger or reward

WHAT HAS GONE WRONG: Loss of branches that connect neurons may lead to a constant state of anxiety because the person can no longer identify safe situations

**VENTRAL STRIATUM**

WHAT IT DOES: Helps the brain process rewards

WHAT HAS GONE WRONG: Studies show overactivity and a 30% loss in gray matter in this region, causing people to lose judgment about how certain behaviors, such as overspending or being sexually indiscriminate, will affect their lives

**BRAIN STEM**

WHAT IT DOES: The raphe nucleus in the brain stem is home to serotonin cell bodies which create and disperse the neurotransmitter to different parts of the brain

WHAT HAS GONE WRONG: Bipolar patients have a 40% loss of the serotonin 1a receptor in the raphe, which may contribute to atrophy of neurons and depression

**PREFRONTAL CORTEX**

WHAT IT DOES: Parts of the prefrontal cortex regulate emotion and are instrumental in processing rewards and motivation

WHAT HAS GONE WRONG: Studies show a 20% to 40% reduction in gray matter—the result of a loss of the branches that connect neurons

Amygdala

Spinal cord

SOURCE: Wayne Drevets, M.D., National Institute of Mental Health

Text by Sora Song
TIME Diagram by Joe



# THE MOOD SPECTRUM

The mood spectrum runs a wide gamut. Here are four major forms of the disorder—unipolar, bipolar I and II, and cyclothymia—and different parts of the mood are affected. Other conditions, such as dysthymia or depression, are all Someone with bipolar will stay fixed in one emotional state.

| | SEVERE DEPRESSION | MILD/MODERATE DEPRESSION | NORMAL | HYPOMANIA | MANIA OR MIXED MANIA |
|---|---|---|---|---|---|
| | SYMPTOMS: At least two weeks of hopelessness, apathy, decreased appetite, insomnia | SYMPTOMS: Similar to severe depression but not as long lasting or debilitating | Moods may change from day to day but not in a way that interferes with life | SYMPTOMS: Four days of unusually elevated mood, less need for sleep, distractability, inflated self-esteem | SYMPTOMS: At least a week of even greater mania; mixed states show signs of both mania and depression |

involving lifestyle and diet management are showing real promise. On every front, hopes we may some day defeat bipolar are rising.

NATIONAL INSTITUTE OF MENTAL HEALTH: *www.nimh.nih.gov/publicat/bipolarmenu.cfm*

New technologies increase the options for both women and men who seek to control conception

Some sources report that the FDA may approve the sale of the "morning after" birth-control pill without a prescription by the end of 2004

After decades of little or no innovation in birth control, recent years have brought a tidal wave of novel techniques and technologies. The new era of began with the arrival of two very different birth control measures. In the fall of 2000, the FDA approved the sale of the abortion pill mifepristone (RU 486);



have confirmed that most autistic brains don't react to facial cues the way normal brains do, new evidence shows that in some, perhaps milder cases, below, an autistic brain can "light up" or show recognition, when faces of strangers are replaced by faces of loved ones.

Many parents of autistic kids believe childhood vaccines cause the disease. A 2001 study by the Institute of Medicine found no link between vaccines and autism. A 2002 Danish survey of 500,000 children agreed.

Resources

AUTISM RESOURCES:
*www.autismresources.com*



As germs develop increasing resistance to antibiotics, choose your antibacterial measures with care

In the war against bacteria, some antibacterial soaps may actually be helping breed new, mutant superbugs

As the widespread use of antibiotics helps breed drug-resistant germs, will things get even worse if everybody starts using the antibacterial soaps that have hit the market in recent years? No one knows for sure, but there is cause for concern. Unlike antibiotics, which either are found in nature or mimic the action of natural substances, antibacterial soaps contain triclosan and other synthetic chemicals that manufacturers once

claimed could wipe out all bacteria. But new research shows that some germs can mutate, at least in the lab, to counter triclosan's effects. The problem: numerous household products now contain triclosan. Many researchers are advising against bringing triclosan into the home. Alcohol-based sanitizers such as Purell are less likely to pose a problem, because the alcohol quickly evaporates and leaves no bug-fighting residue.

Can we tame the wild mood swings of its cycle of mania and depression?

The number of those afflicted seems to be holding steady

In a single generation, the average age of onset has fallen from the early 30s to the late teens

Bipolar disorder—once known as manic depression, always known as a ferocious mental illness—was until recently thought of as the rare province of luckless adults. But now it seems to be showing up in children at an increasing rate. Why is the age of onset in free fall? Some experts believe that kids are being tipped into bipolar disorder by family and school stress, by recreational-drug use and perhaps even by a collection of genes that increase in strength in each generation. Others argue we're just better at diagnosing the illness.

Yet scientists are making real progress against bipolar disorder. Researchers are finding genes that

appear to be related to the disease and may offer targets for drug development. New drugs are better at leveling the ailment's manic peaks and lifting its disabling lows. New behavioral therapies are giving victims back their lives.

Bipolar disorder, notes one expert, "is hugely familial." Kids with one bipolar parent have a 10% to 30% chance of developing the condition; a bipolar sibling means a 20% risk; if both parents are bipolar, the danger rises as high as 75%. Some researchers believe gene penetrance may play a role in bipolar onset, since defective sequences of genes may grow longer each time they are inherited, making it likelier that descendants will come down with the illness. This phenomenon plays a role in Huntington's disease and could be involved in bipolar as well. Investigators at eight research centers around the country, working under a grant from the National Institute of Mental Health, are studying the genomes of 500 families with a bipolar history to see what variations they share.

While gene research goes on, new drugs are aiding victims. In fact, even though bipolar's cycle is much more rapid in children than adults, kids on a properly balanced regimen of drugs and therapy can probably go on to lead normal lives. Lithium, which regulates a number of neurotransmitters, remains very beneficial for



STRAIGHT TALK

some 70% of bipolar victims. Anticonvulsants, such as Depakote, and atypical antipsychotics, such as Thorazine, have been found to soothe the bipolar cycle. Therapies